NO CV30

NO CV71

FILED

United States District Court Middle District of Tennessee

_____ X

Ann Zhai,

        Plaintiff,

2019 AUG 13  PM 4:38

~~CENTRAL DIST. OF CALIF.~~
~~LOS ANGELES~~

BY: _____

vs.

Bridgestone/Firestone Americas Inc.,
Retail Operations of Bridgestone/Firestone
Americas Inc., and Employees 1-20,
Engine Lubricant Manufacturers, Marketers, Distributers,
and Sellers with Business Entity Names A-Z,
Gasoline Fuels Manufacturers, Marketers, Distributers,
and Sellers with Business Entity Names A-Z,
The Lubricant and Fuel Additive Inventors, Marketers,
Manufacturers, Distributers, and Sellers With Business
Entity Names A-Z,

        Defendants.

**CV19-7057-CAS (SSx)**

_____ X

## **NOTICE OF SUIT AND VERIFIED COMPLAINT**

By: _____

re-signed  8/5/2019
original signed with notary
stamp 10/25/2018
( see notary receipt
& USPS mailing on
10/25/2018 )

Ann Zhai
3167 Little John Way
Atlanta, GA 30340-2025
201-787-8788 (Mobile)
ann.zhai@gmail.com

1

## I. The Nature of Suit

1.    This is a consumer matter and toxic tort action to recover permanent personal injuries and property damage from all parties derived from the failed engine/ exhaust system and exposure of toxic materials.   This action also give notice and preserve the future legal rights for any foreseeable and unforeseeable medical conditions and diseases derived from this toxic tort action.   Since automobile engine/ exhaust system is a mobile source releasing toxic fumes and toxic chemicals and carbon monoxide, United States Congress has passed legislature of Clean Air Act pursuant to 42 USC §7401 to protect public welfare and consumer safety and to grant Environmental Protection Agency (EPA) authority to set tail pipe emission standard under the normal combustion condition in the ambient air.   Any public or private business in the nature of engine/exhaust system care, must operate its business in compliance with 42 USC §7401 and applicable State laws to meet current emission standard in which the mobile emission source is registered.

2.    Bridgestone/Firestone Americas Inc. have retail operations in the brand names of "Firestone Complete Automobile Care" in United States nationwide and "WheelWorks Complete Automobile Care" in State of California.

3.    7/7/2016, a news release by California State Government stated that Bridgestone/Firestone Americas Inc. and its retail operations have voluntarily entered a global settlement decree with Department of Consumer Affairs to end two-year fraud investigation.   This decree was particularly targeted on mobile source emission and registration, the so called SMOG check stations. This Global Settlement Decree and

Administrative Law Order became effective 7/14/2016[1].  But this suit demonstrates that Bridgestone/Firestone Americas Inc. and retail operations continued to place themselves above all laws and the fraud was continued.  The violation of Federal and State laws in the scope of engine/exhaust system care and the fraud and willful disregard the public welfares and consumer rights for safety protection have subjected plaintiff in close contact with excessive toxic fumes and toxic chemicals and deadly carbon monoxide from failed engine/exhaust system under the duty of due care from 11/2016 to 11/2017.  Both retail operation and corporate office of Bridgestone/Firestone Americas Inc. never informed plaintiff about the toxic nature of engine lubricant and gasoline fuels released from the failed mobile source system.  Furthermore, both retail operation and corporate office of Bridgestone/Firestone Americas Inc. never informed plaintiff to seek immediate medical care after they failed the mobile emission source system and created man-made disaster from 11/2016-11/2017.   On the contrary, Bridgestone/Firestone Americas Inc. abandoned property and terminated rental car lease and left plaintiff to die in the hospital Emergency Room 11/2017.

## II. Subject Matter Jurisdiction

4.     Federal Court has original jurisdiction over subject matter of violation of United States Laws pursuant to 28 USC §1331.  Federal Court has original jurisdiction over diversity of citizenship and damages amount exceeding $75,000 pursuant to 28 USC §1332.  Federal Court has supplemental jurisdiction over violation of applicable State and Common Laws derived from the same subject matter in the scope of mobile

---

[1] News release and global settlement decree entered between Bridgestone/Firestone Americas Inc. and Department of Consumer Affairs State of California were made available online.

emission source system failure and exposure of toxic materials under the duty of due care pursuant to 28 USC §1367.

### III. Personal Jurisdiction

5.     This court has direct personal jurisdiction over Bridgestone/Firestone Americas Inc. due to the fact principle corporate offices and Federal Tax ID are in Nashville, Tennessee.

### IV. Venue

6.     This case sets off a chain of events which has several venues and each step would give an independent venue and this case would deem to be a multi-district and multi-party litigation.   The determination of appropriate venue for personal injuries and property damage, together according to Federal venue law, is a bit complex. Plaintiff, at the initial notice of complaint, is to let the court decide the ultimate appropriate venue for the above named defendants, in that personal jurisdiction and venue are intertwined given the complexity nature of this matter.

(1).   The first venue of chain events is in Concord, California where Bridgestone/Firestone Americas Inc. retail operations have a store location. WheelWorks technician performed engine oil and filter change but they forgot to secure the engine oil cap to the engine and the customer service advisor failed to inspect the work before release the vehicle to consumer for billing.

(2).   The second venue is in San Jon, New Mexico.   The engine/exhaust system was exploded on interstate highway I-40 after four-day driving from Davis, California to San Jon, New Mexico 11/4/2016.

(3).    The third venue is in Bloomingdale, Illinois.    The retail operation management of Bridgestone/Firestone Americas Inc. accepted full liability of negligence 1/2017 for failure to secure engine oil cap at oil and filer change therefore causing original mobile emission source system explosion after the corporate office engaged SouthWest independent automobile inspection.

(4).    The fourth venue is in Amarillo, Texas.   Bridgestone/Firestone Americas Inc. engaged Amarillo, Texas Honda dealership for refitting the damaged mobile emission system and paid for towing and refitting from San Jon, New Mexico to Amarillo, Texas 1/26/2017.

(5).    The fifth venue is in Bakersfield, California.   The first California Honda Dealership came to check Amarillo, Texas dealer's work on engine/exhaust system refitting 2/2017.  Plaintiff had visited this dealership numerous times for the same issue.

(6).    The sixth venue is in Dallas, Texas.  Plaintiff visited an independent large Honda dealership to check Amarillo, Texas Honda dealer's refitting 8/2017.

(7).    The seventh venue is in Amarillo, Texas.  Plaintiff returned the vehicle to Amarillo, Texas dealership and informed Bridgestone/Firestone corporate office and consumer claim department simultaneously in 8/2017.

(8).    The eighth venue is in Sacramento, California.   The corporate office at Nashville, Tennessee instructed Firestone Complete Automobile Care center at Sacramento, California to repossess the vehicle, after California Department of Motor Vehicles (CA DMV) discovered the fraud and fraudulent refitting at consumer license plate renewal registration and SMOG in 9/2017.

(9).    The ninth venue is in Sacramento, California.    The corporate office at Nashville, Tennessee ordered Firestone manager to abandon the vehicle at Sacramento Honda Dealership and to give plaintiff a false pretense that the fraudulent refitting which they knew all along would be cured at Sacramento Honda Dealership to ensure the registration renewal 10/2017.  Once the vehicle left the premises of Firestone Complete Automobile Center, corporate office of Bridgestone/Firestone Americas Inc. in Nashville, Tennessee ordered their consumer affairs department to terminate the rental car contract with Enterprise-Rent-A-Car and left plaintiff in the Emergency Room to die, to deal with property damage, and to deal with the fraud uncovered by California Department of Motor Vehicles (CA DMV) and Department of Consumer Affairs.

(10).    The tenth venue is in Sacramento, California.  An independent dealership uncovered digital forensic evidence for proof of fraud 10/2017.

(11).    The eleventh venue is in Fremont, California.    An independent Honda dealership examined the mobile emission system and the entire vehicle 11/2017 and corroborated with forensic findings of fraud and fraudulent refitting by California Department of Motor Vehicles (CA DMV) 9/2017.  California Department of Consumer Affairs informed plaintiff that they could not take official action for this particular fraud against Bridgestone/Firestone Americas Inc. and/or the Texas Honda Dealership for lacking jurisdiction but they nevertheless pin-pointed news release issued 7/7/2016.

(12).    The twelfth venue is in Bakersfield, California.  Two separate Emergency Medical Teams have confirmed the toxic exposure and notified regional poison control unit 11/2017.   Emergency oxygen treatment applied twice to save plaintiff from the

excessive toxic and poisonous exposure from 11/2016-11/2017 but with many medical issues left unable to save and care.

## V. Brief Statement of Property Damage and Personal Injuries
## From Toxic Exposure 11/2016-11/2017

7.      Since negligence and fraud are alleged in this year long toxic exposure as direct causation of failed mobile emission system and fraudulent refitting the failed mobile emission system under the duty of due care, this statement is pursuant to Federal Civil Rule 9(b) with particularity for pleading fraud or mistakes from plaintiff's personal experiences and recollection of personal knowledge and will subject to amendment as manifestation of toxic loads progressing:

1).     I am learned and trained in medical science. I am also registered to practice patent law with United States Patent Office since 2001.  In early part of 2016, I came to University of California at Davis to investigate historical food processing technologies and agricultural economics with purpose to test new consumer food product proof of concept.

2).     My 2005 Honda Civic LX was well maintained and in perfect working condition and passed visual inspection and California SMOG check and registered on **09/14/2016** in Davis, California.

3).     On **9/26/2016**, I took the vehicle to WheelWorks at Concord, CA in the street address of 1410 concord avenue, Concord, CA 94520 with telephone number 925-265-7753 for engine oil and filter change before embarking cross country trip back to East Coast.

4).     The retail operations of Bridgestone/Firestone Americas Inc. at Wheel Works changed oil and filter by using conventional mineral based oil in the grade of 5W/20W recommended by Honda manufacturer.  The customer service advisor who accepted the car was different than the advisor who released the car to me for billing and I did not know which technician performed the service.   After extended delay waiting for the service despite my appointment I was offered a discount for the payment.

5).     I was scheduled to leave Davis, California 10/1/2016 but another event in San Jose changed my departure schedule and the vehicle was parked in Davis student apartment complex garage for another month.

6).     On **11/1/2016**, I took off at UC Davis and headed back to the East.

7).     I enjoyed the smooth driving about 1300 miles from I-5 to I-40 and cruising through State of California, Arizona, and part of New Mexico.  I wasted no time other than stopping for food, fueling and rest.

8).     About 5PM on **11/04/2016**, local time in New Mexico, a short distance from San Jon, the Honda engine exploded suddenly without any warning on the dashboard.  I saw heavy smoke came out of hood and heard very loud boom-boom sound.

9).     The weather condition along the National Highway I-5 to I-40 was nice and unremarkable with sunny skies but chilly temperature.  Each State would have storage for local weather and meteorologist report.  I had all windows shut with air-conditioner on at moderate heat.  No smells in the cabin prior to the explosion.

10).    At first, I thought this was terrorist attack.   But fortunately US Military Personnel behind me helped me move the disabled vehicle off I-40 on shoulder.   I was immediately advised by the gentleman in uniform that **THERE WAS NO ENGINE OIL CAP** secured at the Engine.

11).    With burning fuels and heavy smoke, he retrieved a canister from his truck and sprayed the entire engine area to reduce fire hazard.

12).    I was then informed to go up to Valero gas station on the right side of I-40 to call towing service.  Before he left, he asked me to call WheelWorks.

13).    Workers at Terry highway services observed the vehicle damage.   The Honda was stored at Terry Services at street address 2369 State Hwy 469, San Jon, NM 88434 (telephone 575-576-9252) pending liability investigation.

14).    The consumer affairs department of Bridgestone/Firestone Americas Inc. opened a claim and claim number is 2222391 under my name 11/2016.

15).    Mr. Juan Mendoza and Mr. Stanley Guzik, were my contact persons at Bridgestone/Firestone Americas Inc. retail operations located then in Bloomingdale, IL for my claim matter.

16).    Neither Mr. Mendoza nor Mr. Guzik (Mr. Mendoza's boss) nor consumer affairs department of Bridgestone/Firestone informed me about human effect of toxic exposure from their man-made disaster after claim was opened **11/2016**.

17).        From **11/4/2016 to April of 2017**, I have several sessions of flu-like symptoms without any grade of fever.  The sessions described as coughing, sneezing, running noses and watery eyes, itching and burning sensation of eyes, nose, ear lobes, forehead, hands bi-lateral.  There were red and purple-ish colored skin rashes, short of breath, headache and sleep disturbance.  But never once with any grade of fever.  I drank a lot of orange juice and green tea and ate a lot of greek yogurt and home made cranberry sauce and a lot of green leaf veggies for relief.  I thought I had stress over the course of disruption and under the weather.

18).        My regular menses usually started the first week of every month made a sudden stop **1/10/2017**.  I never experienced menopausal problems and hormonal changes, as both my mother and older sister shared with me about their horrible menopausal affairs.  For me, It bursted out the first day of 1/10/2017 and stopped next day completely, much more liking the effect that someone turned off the faucet suddenly.

19).        In **March of 2017**, I noticed my left index finger nail appeared a single beau's line and I began to document that strange appearance. (Note:  I've observation on cancer patients who were undergoing cycles of chemo-and radiation therapies usually had multiple beau's lines on one's finger nails, this was learned experience at my oncology training in the late 1980s).  I documented my finger nail beau's line on **3/18/2017, 3/23/2017, and 4/1/2017.**

20).        I am a professional woman who have led a clean and productive lives with strong religious faith and balance of nutrition without any chemical addiction and chemical treatment; but why I suddenly grew a beau's line on my left index finger nail?!

21).        At the end of **summer 2017**, those red and pinkish skin rashes have receded and became clusters of dark spots intensely appeared on my both hands.  I documented those cluster of dark spots.  My other parts of body covered by clothing never appear any clusters of dark spots.

22).        Throughout the year of **2017**, I noticed my hairs turned layers of grey and became very brittle, dry scalp and dry hair but I was oily hair all my life.

23).        Throughout the year of **2017**, I noticed my headaches gradually getting worse but with my forehead evenly maintained the same degree of low temperature.

24).        Right after the engine explosion, I noticed my urine had sweet and rotten egg-like odors and smells.   But, both my smell sensation and taste sensation gradually became retarded from **11/4/2016 to 3/26/201**7, when I was told by other people in the restaurant that I could no longer identify

the smells of apple cider vinegar and wasabi sushi sauce.  Now, when I drink soup without added salt, I will have no complaint because my taste bud would not tell.

25).    In **7/2016** when I renewed driver license, eye examination was required as I passed eye examination at doctor's office with flying color however, throughout of **2017**, I have double vision and blur vision.

26).    Since **11/4/2016 and throughout 2017**, my lower extremities in forearms and lower legs bi-lateral marked as weakness, numbness, muscle tinkling and twitching with night being the worst time due to lacking of sleep.  The ER examination **11/2017** puzzles doctors and nurses as I physically appeared to be stocky but muscle and skeletal system appeared very weak.

27).    On the day of **12/18/2016**, my lower eye lids bi-lateral was having twitching and tremor, it came so strong and lasted so long, the students at North Carolina State University sitting across the table with me saw it and asked me whether I was okay and joked about "too much coffee?"

28).    Since **11/4/2016 and throughout 2017**, each day when I was stepping into shower, I noticed my right side of belly is getting larger and fuller without any sharp pain.

29).    Since **11/4/2016 and throughout 2017**, each day my head was getting cloudier and having cramps and spasm-like dull pains radiated from the deep back stem of my brain without any known excuses, as I am free of alcohol, tobacco, illicit recreational drug, or prescription drug abuse.   I have not been on any medication.

30).    Since **11/4/2016 and throughout 2017,**  each day I noticed that I have lost the ability of recalling the specific words and terse and specific events which used to be dear to me.  I have lost my full executive capability which I used to hold my self in high regard for whatever I do.

31).    Since **11/4/2016 and throughout 2017,** my both hands skin was very dry and always feel like touch of detergent and my usual sweaty hands were completely replaced by dry palms.

32).    Since **11/4/2016 and throughout 2017,** I have gradually experienced my posture was unsteady from changing motions and changing body positions such as getting up, getting out of bed, getting out of the car, holding a cup of coffee while getting out of the car, the usual normal small tasks became unsteady and tardy.

33).     Since **11/4/2016 and throughout 2017,** my personality has changed drastically and even myself cannot recognize and explain those behavior.

34).     Since **11/4/2016 and throughout 2017,** I saw my both hands gradually had cutaneous lipid per-oxidation and lipidosis and my bottom of belly had the same cutaneous lipid per-oxidation and lipidosis and I was puzzled by the fact that my diet was mainly fish, egg, fruit and vegetables and I was not a fat or red meat eater all my life.  I have always been soda free.

35).     Since **11/4/2016 and throughout 2017**, I saw my limbs bi-lateral had cutaneous lipidosis and when I raised one leg, I saw the clear line of skeletal-muscular separation.

36).     On **10/10/2017**, I was admitted to ER and my blood pressure was measured at 190-200 in absence of any cardiovascular diseases.  EKG and X-ray shown normal size of heart and lungs without irregular heart beat or murmur.  X-ray of spine shown demyelination and loss of minerals of bones.  CT and MRI[2] were shown a "lesion" measured as 1X1X1 cm3 and the location of which is at front lobe of brain right above the olfactory bulb.  But, the ER divested their professional opinion onto "Oncologist" consultation for a "Brain Tumor."  To make the matter worse, ER counseled "Oncologist" told me that nothing to be worried about malignancy due to "Calcification of the Tumor[3]."

37).     After I insisted to have toxic profile blood workup done at ER, the only one index available at current hospital ER is **Carboxyhemoglobin (COHb%) which was elevated to 2.7% after 45 days cessation of the toxic exposure**.  Once again, the ER released me without any Oxygen Treatment and literally left me to die.

38).     **11/2017**, Blood panel index already shown Heptological systemic damage as I have been free of type I and type II diabetes all my life but the fasting blood sugar level close to 100.

39).     Subsequently, two Bakersfield Hospital ER applied emergency oxygen treatment twice looking after my near death symptoms after puncture of my artery and venous blood and verified the extreme disparity of gas ratios.  I was advised at the end of oxygen treatment that my blood pressure range at 120/70 cannot be restored and needs life long

---

[2] Had Manganese and/or Cadmium toxic affinity to human Astro-glial cells and melanin rich neurons made known to the public, would hospital ER repeat the same mistake by giving the patient who suffers Manganese/Cadmium toxicity another Manganese intravenous solution for contrast test of Brain MRI on a fake "Brain Tumor?"  Had consumers are made known to the toxic effects of specific metals, would consumers still give consent for another IV Manganese solution to exacerbate conditions?

[3] If the ER divested professional opinion to Toxicologist, the alternative care at ER would be different.

medications.   Without emergency oxygen treatment twice, I would have been killed by the silent toxic exposure[4].

40).  Regional toxic control unit was notified this time but I was informed by the visiting physician that so many issues could not be saved without any remedy and many toxic chemicals have already caused systemic damage.

41).  **11/6/2017**, Mr. David Verde at corporate office of Bridgestone/Firestone let Consumer Affairs department to terminate the corporate rental car lease and left me to die in the ER while I was in the course of seeking medical professional answers about what have happened to me over the course of one year.

42).  Mr. David Verde took over the responsibility of Mr. Stanley Guzik and repossessed the vehicle at Firestone Complete Auto Care Center in Sacramento, California (shop #1228/Vishaal Singh) **9/25/2017** after the fraud and fraudulent refitting was discovered by California Department of Consumer Affairs and Motor Vehicle Registration.

43).  Bridgestone/Firestones Americas Inc. informed me that Rapton Honda Dealership in Sacramento, California would remedy the fraudulent refitting but once the vehicle was left the premises of Firestone shop in Sacramento, California, they terminated the rental car lease with Enterprise-Rent-A-Car and left me to handle impending death by myself, as well as property damage and the fraud.   In light of Mr. David Verde's personal knowledge with the fraud and fraudulent refitting, he and the consumer affairs department of corporate office never informed me or inquire me to seek medical care since **9/25/2017**.

44).  I have asked Mr. David Verde to provide a corporate written release letter from whom he affirmatively declined **11/2017**.

45).  **11/2017**, an independent Honda dealership corroborated California Department of Consumer Affairs findings of fraud and fraudulent refitting on the mobile emission source and another independent Honda dealership corroborated the digital fraudulent data entry.

46).  California Department of Consumer Affairs pointed to the news release for the global settlement decree to end two-year fraud investigation executed by Bridgestone/Firestone Americas Inc. 7/14/2017.

---

[4] My personal experience at general hospital ERs exposed another truth of narcotics over-prescription in addition to lacking any knowledge, expertise, and training of toxic fumes and toxic chemicals exposure. In my case, I refused the Narcotics ER doctors so eager to prescribe without clarification the root of causation.

## V. Causes of Action for Bridgestone/Firestone Americas Inc.
## and Retail Operations and Employees 1-20 for Negligence and Fraud

8.      Plaintiff alleges the following causes of action against Bridgestone/Firestone Americas Inc. and retail operations and employees 1-20 for personal injuries and property damage:

Claim 1.      Bridgestone/Firestone Americas Inc. violated 42 USC §7401 and California laws by turning consumer mobile emission source (engine/exhaust system) into releasing toxic fumes and toxic chemicals and carbon monoxide many times exceeding EPA ambient air standard to pollute environment and endanger public welfare from 11/2016-11/2017.

Claim 2.      Bridgestone/Firestone Americas Inc. violated 42 USC §7401 and California laws by turning consumer mobile emission source (engine/exhaust system) into releasing toxic fumes and toxic chemicals and carbon monoxide many times exceeding EPA ambient air standard which have caused consumer to accumulate toxic loads from 11/2016-11/2017.

Claim 3.      Bridgestone/Firestone Americas Inc. violated 42 USC §7401 and California laws by turning consumer mobile emission source (engine/exhaust system) into releasing toxic fumes and toxic chemicals and carbon monoxide many times exceeding EPA ambient air standard which have caused consumer to suffer permanent personal injuries.

Claim 4.      Bridgestone/Firestone Americas Inc. violated 42 USC §7401 and California laws by turning consumer mobile emission source (engine/exhaust system) into releasing toxic fumes and toxic chemicals and carbon monoxide many times exceeding EPA ambient air standard which have caused consumer to develop personal

injury, and/or terminal illness, and/or premature death due to accumulation of toxic loads from 11/2016-11/2017 and manifestation of such toxic loads.

Claim 5.     Bridgestone/Firestone Americas Inc. violated 42 USC §7401 and California laws by turning consumer mobile emission source (engine/exhaust system) into releasing toxic fumes and toxic chemicals and carbon monoxide many times exceeding EPA ambient air standard to endanger anyone who has come into contact with failed mobile emission source.

Claim 6.     Bridgestone/Firestone Americas Inc. was negligent in compliance with 42 USC §7401 and California laws by failure to hire, to train, and to retain competent employees in retail operations for mobile emission source care.

Claim 7.     Bridgestone/Firestone Americas Inc. was negligent in compliance with 42 USC §7401 and California laws by failure to hire, to train, and to retain competent corporate counsels to enforce all applicable Federal and State laws in consumer mobile emission source care.

Claim 8.     Bridgestone/Firestone Americas Inc. was negligent in compliance with 42 USC §7401 and California laws by failure to hire, to train, and to retain competent executives who were in managerial roles in charge of retail operations which included mobile emission source care.

Claim 9.     The negligence of Bridgestone/Firestone Americas Inc. in compliance with 42 USC §7401 and California laws in mobile emission source care has caused consumer property damage.

Claim 10.    The negligence of Bridgestone/Firestone Americas Inc. in compliance with 42 USC §7401 and California laws in mobile emission source care has caused consumer to suffer permanent personal injuries.

Claim 11.    The negligence of Bridgestone/Firestone Americas Inc. in compliance with 42 USC §7401 and California laws in mobile emission source care has caused consumer to develop permanent personal injury, and/or terminal illness, and/or premature death due to accumulation of toxic loads from 11/2016-11/2017 and manifestation of such toxic loads.

Claim 12.    Bridgestone/Firestone Americas Inc. committed fraud in compliance with 42 USC §7401 and California laws in consumer mobile emission source (engine/ exhaust system) refitting in light of global settlement decree executed 7/14/2016.

Claim 13.    The culpability of fraud of Bridgestone/Firestone Americas Inc. in compliance with 42 USC §7401 and California laws in consumer mobile emission source refitting (engine/exhaust system) constitutes criminality in light of global settlement decree entered 7/14/2016 and corporate admission of liability 1/2017.

Claims 14.    The culpability of fraud of Bridgestone/Firestone Americas Inc. in compliance with 42 USC §7401 and California laws in consumer mobile emission source refitting (engine/exhaust system) constitutes criminality in recklessness and wonton disregard consumer rights for safety protection in light of global settlement decree entered 7/14/2016 and corporate admission of liability 1/2017.

Claim 15.    The culpability of fraud of Bridgestone/Firestone Americas Inc. in compliance with 42 USC §7401 and California laws in consumer mobile emission source care and refitting constitutes criminal negligence in light of both retail operations

and corporate offices knew the accumulation of toxic loads from 11/2016-11/2017 but never inform and/or inquire consumer for medical care.

Claim 16.     Bridgestone/Firestone Americas Inc. knowingly set aside the global settlement decree 7/14/2016 and engaged patterns of fraud in consumer mobile emission source refitting and such patterns of fraud demonstrated at following events which have caused property damage and permanent personal injuries:

(1).   Withholding independent SouthWest automobile inspection report;

(2).   Disregarding the original mobile emission source was registered with State of California;

(3).   Sourcing and/or consent with dealership sourcing of a unknown used engine without valid California engine ID in violation of California law;

(4).   Using and/or consent with dealership using broken original exhaust manifold to attach with unknown used engine without valid California engine ID in violation of Federal and California laws;

(5).   Wiring fraud payment for the fraudulent refitting of mobile emission source system in interstate commerce without proof of compliance with 42 USC §7401 and California laws;

(6).   Causing and/or consent to causing false and fraudulent CarFax data entry that mobile emission source (engine/exhaust system) refitting in Amarillo Texas was a regular maintenance;

(7).   Giving consumer the false pretense that dealership warranty would take over their liability when in fact and truth they knew the

refitting would never pass muster in State of California when they wired the fraud payment for fraudulent refitting;

(8).    Giving consumer the false pretense after repossession of the vehicle that new California dealership would remedy their initial fraud and fraudulent refitting and yet the previous wire fraud through interstate commerce 1/27/2017 could not be remedied by new additional wire payment 11/2017.

(9).    Abandoning consumer and consumer property and leaving consumer to die in the Hospital Emergency Room without any conscience to remedying the patterns of fraud and deceit in the scope of mobile emission source system care.

Claim 17.    The patterns of fraud by Bridgestone/Firestone Americas Inc. in consumer mobile emission source (engine/exhaust system) refitting have caused consumer to develop permanent personal injury, and/or terminal illness, and/or premature death due to accumulation of toxic loads from 11/2016-11/2017 and manifestation of such toxic loads.

Claim 18.    The patterns of fraud by Bridgestone/Firestone Americas Inc. in consumer mobile emission source (engine/exhaust system) refitting have caused anyone to endanger oneself who has come into contact with fraudulently refitted deadly mobile emission source.

Claims 19.    The patterns of fraud by Bridgestone/Firestone Americas Inc. in consumer mobile emission source (engine/exhaust system) refitting have polluted environment from 11/2016-11/2017 due to the release of toxic fumes, toxic chemicals,

and deadly carbon monoxide exceeded many times of EPA ambient air emission standard.

Claim 20.     Bridgestone/Firestone Americas Inc. was a fraud in mobile emission source care and registration but was willing to pay a fine to end the two-year fraud investigation and has voluntarily entered global settlement decree 7/14/2016.

Claim 21.     Bridgestone/Firestone Americas Inc. was a fraud when they engaged Amarillo Texas dealership for refitting the failed mobile emission system after accepting liability but the wired fraud payment in interstate commerce borne no proof of compliance with 42 USC §7401 and California laws.

Claim 22.     Bridgestone/Firestone Americas Inc. was a fraud to let consumer mobile emission source (engine/exhaust system) to release excessive toxic fumes and toxic chemicals and deadly carbon monoxide and subjected consumer to accumulate toxic loads from 11/2016-11/2017 without conscience to honor global settlement decree entered 7/14/2016 and to protect consumer health and public welfare.

### VI. Causes of Action for Product Liability Claims
### For Engine Lubricant And Gasoline Fuels Incorporation of Toxic Metals and Toxic Chemicals Without Instigation A Product Warming Label

9.     Consumers and public in general limits the knowledge in maintenance of vehicles as: (a) we need to pump gasolines when the fuel tank gives empty signal; (b) we need to bring the vehicle to the shops for engine oil and filer changes every few months or every 3000-5000 miles according to the vehicle Manufacturers; (c) we need to SMOG our vehicles every two years mandated by state law.   What's in the engine lubricant and gasoline fuels?   What happens to us when the mobile emission source system failed under the duty of due care of mechanical shops?   No one tells us

anything.   This consumer and public innocence and hospital ER ignorance on toxic fumes and toxic chemicals exposure can no longer be overlooked.

10.     We read in the news that someone was killed accidentally in a closed garage with running engine because of accumulation of carbon monoxide so we learned to open the garage door first before we turn on the engine.  This tragedy is avoidable if Bridgestone/Firestone Americas Inc. did not commit fraud and negligence under the duty of due care for mobile emission system.  This tragedy is preventable in the future only if the court struck down an adequate product warning label.  The warning label should instigate the toxic nature of metals and chemicals  incorporated in lubricant and fuels as anti-knocking agent and detergent to ensure the combustion efficiency.  The warning label should instigate the negative consequences to human organism in the event of mobile emission source failure.   The warning label should be extended to anyone in the chain of commerce - from the manufacturers, marketers, distributers, sellers, and to the inventors.

11.     Citing from legal precedent in products liability cases involving scope of manufacturer's duty to warn of dangers associated with use of product, manufacturer is held to knowledge and skill of an expert and when a failure to give adequate warning is alleged to have made a product unreasonably dangerous, the standard of strict liability is essentially similar to the standard for establishing negligence; the seller or manufacturer has a duty to warn of foreseeable dangers (Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (1973)).  The inherent nature of toxicity and danger of both lubricant and gasoline fuels by incorporation of toxic metals and chemicals as additives or detergent to ensure smooth combustion efficiency and meeting the tail pipe

emission standard cannot be secretively and selectively held by the chosen fews between EPA (42 USC § 7545) and manufacturers.   The foreseeability of consumer mobile emission source failure and the superior knowledge of manufacturers at registration of fuels or additives and the unknown consequences of toxic exposure to general hospital emergency doctors and nurses and the helplessness of consumers in our current medical care system to seek treatment, all of the above compounded factors compel the court to take the issue of adequate product warning label as a matter of fact in product liability domain.

Claim 1.    Anyone in the chain of commerce for engine lubricant and gasoline fuels must install and/or instigate a product warning label in final product design to inform the end users about toxic metals which including but not limited to Manganese and Manganese derivatives as engine anti-knocking agent due to the toxic affinity of Manganese in human olfactory bulb, astro-glial cells, central nervous system (CNS), melanin-rich neurons and melanin-rich cutaneous cells.

Claim 2.    Anyone in the chain of commerce for engine lubricant and gasoline fuels must install and/or instigate a product warning label in final product design to inform the end users about toxic metals which including but not limited to Manganese and Manganese derivatives as engine anti-knocking agent due to synergistic toxicity of Manganese with other metals which including but not limited to lead, Iron, Cadmium, Copper, and Zinc may bring the onset of Neurological Diseases such as Parkinson's disease, Alzheimer's disease, and Multiple Sclerosis, Cancer (such as Melanoma), Macular Degeneration, Hearing Loss, Smell and Taste Sensation Loss.

Claim 3.      Anyone in the chain of commerce for engine lubricant and gasoline fuels must install and/or instigate a product warning label in final product design to inform the end users about toxic chemicals which including but not limited to Tricresyl Phosphate (TCP), Tri-O-Cresyl Phosphate (TOCP), and Saligenin Cyclic O-Tolyl Phosphate (SCOTP) which is the active metabolite of TOCP as detergent due to the toxicity may bring onset of human Central and Peripheral Nervous System impairment, reproductive system impairment, lower extremity disability, or even paralysis.

Claim 4.      Anyone in the chain of commerce for engine lubricant and gasoline fuels must install and/or instigate a product warning label in final product design to inform the end users about toxic heavy metal of Cadmium as Sulfur level reducing agent, due to toxicity of Cadmium on cellular lipid per-oxidation in multiple organs and toxic affinity of Cadmium to human olfactory bulb, astro-glial cells.

Claim 5.      Anyone in the chain of commerce for engine lubricant and gasoline fuels must install and/or instigate a product warning label in final product design to inform the end users about release of carbon monoxide as result of incomplete combustion of engine lubricant and gasoline fuels in the event of mobile emission source failure.  And long term toxic effect of Benzene and other PCHs as carcinogens.

## VII. Causes of Action for Product Liability Claims
### For Lubricant and Fuel Additive Inventors and Marketers For Licensing Toxic Metals and Chemicals Without Instigation A Product Warning Label

12.      Ethyl Corporation now New Market Corporation continued to play primary roles in patenting the Manganese and Manganese derivatives as anti-knocking agent in combustion engine oil and fuels after the "leaded gasolines" were phasing out. Manganese is an essential metal for human beings but Cadmium is a heavy metal and

should not be in human organism.   Both metals have demonstrated toxic affinity to human astro-glial cells in peer reviewed medical publications.   My year long toxic fumes and toxic chemicals exposure unfortunately corroborated with those facts.   Some peer reviewed publications named human astrocytes as storage of Manganese and Cadmium through inhalation exposure of Olfactory Bulb.   But my recent review of "EPA Comments on the Gasoline Additive MMT" issued 1/19/2017 prior filing does not pertain pK/pD data of Manganese/Manganese derivatives to human or animal organism.

13.    The devastating scientific facts of Manganese affinity to human astro-glial cells and melanin-rich neurons and melanin-rich cutaneous cells along with Cadmium affinity to human astro-glial cells compel the inventors and/or licensors to make full and complete disclosure to the end users who have come to use the product in absence of any expertise in this regard.

14.    The economics of long term health care in debilitating systemic damage cannot afford ignorance of consequences of toxic exposure without extending adequate product warning labels for combustion engine oil and gasoline additive inventors and/or licensors who have come to profit.

## VIII. Prayer for Damages

15.    Plaintiff demands trial by jury on all issues of facts and seeks unspecified compensatory and punitive damages for the loss of health, productivity, enjoyment of life, reduction of life span, pain and sufferings permitted by laws.   Plaintiff reserves legal rights for any foreseeable and unforeseeable future medical conditions and diseases derived from this case.

## AFFIRMATION FOR FILING OF VERIFIED COMPLAINT BY MAIL

I, ANN ZHAI, plaintiff, duty sworn, state, and affirm under the penalty of perjury of United States Law that information pertaining to this complaint is my personal experiences, my personal knowledge and recollection of my personal knowledge. News release 7/7/2017 on Global Settlement Decree executed by Bridgestone/Firestone Americas Inc. with California State Department of Consumer Affairs 7/14/2016 are made available online on State Government website. The undersigned signature is mine and I have notary public in State of Georgia so certify the name and signature appeared on page 1 and page 23 are mine. On <u>October 25th 2018</u>, I caused the following documents to be sealed in an United States overnight express mail envelop with mailing label _____ and deposited to United States Postal Service:

1) verified complaint,
2) petition for waiver of filing fees and affidavit of poverty and asking court permission for filing under the seal and seeking pro bono counsels at Federal Bar with Non-partisan inclination,
3) letter notifying United States Department of Justice from whom other executive branches such as EPA and CDC may be notified for executive action.


Dated: 10/22/2018
Atlanta, Georgia


By: _____   8/5/2019   re-sign

Ann Zhai
3167 Little John Way
Atlanta, GA 30340-2025
201-787-8788 (Mobile)
ann.zhai@gmail.com

10/22/2018

Chief Counsel for United States Attorney General Hon. Jeffrey Sessions
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

RE:   Ann Zhai v. Bridgestone/Firestone Americas, Inc. et. al.,
      Index to TBA at United States District Court Middle District of
      Tennessee

Dear Hon. Sessions:

This letter is to notify the Department of Justice about this suit pursuant to 28 USC §503. As the chief law enforcement officer of United States, you have the authority to notify other executive branches such as EPA and CDC in the pending procedure and outcome of this matter. I believe this case is the first one in the entire jurisdiction of United States District Court to challenge product warning label on combustion engine lubricant and gasoline fuels in the product liability domain. This case is not in the nature of "global warming" and/or based on that scientific theory.

I am an Asian-American Woman who is taking Non-Partisan approach to this matter in light of current highly charged political and partisan environment. I am afraid of any undue influence coming from all angles to interfere the judicial procedure and process. Thus, I respectfully ask United States District Court Middle District of Tennessee to help appoint competent and non-partisan pro bono counsels in the Federal Bar. I respectfully ask your office to ensure this matter is adjudicated by the legal officer of the court in the full faith and integrity of abiding by Constitution and law.

Respectfully,

By:   _____
      Ann Zhai
      3167 Little John Way
      Atlanta, GA 30340-2025
      201-787-8788 (Mobile)
      ann.zhai@gmail.com

10/22/2018

Clerk Office of United States District Court
at Middle District of Tennessee
801 Broadway, Room 800
Nashville, TN 37203
Telephone: 615-736-5498

RE:   Ann Zhai v. Bridgestone/Firestone Americas, Inc. et. al.,
      Index to TBA at United States District Court Middle District of
      Tennessee

Dear Sir/Madam:

Enclosed this United States Express mail envelop you would find the following documents;

1) verified complaint,
2) petition for waiver of filing fees and affidavit of poverty and asking court permission for filing under the seal and seeking pro bono counsels at Federal Bar with Non-partisan inclination,
3) letter notifying United States Department of Justice from whom other executive branches such as EPA and CDC may be notified for executive action.

This case is a complex matter and it requires supreme civil trial skills and expertise on all issues of fact, particularly in medical experts and science. I believe this is the first case to bring product liability claims in the products of combustion engine lubricant and gasoline fuels. Given the hot button national and perhaps international important issues and current highly charged political partisan environment, I ask the court help with appointment of competent and non-partisan counsels in the Federal Bar. Until then, I ask this complaint be filed under the seal.

Respectfully,

By:  _____

Ann Zhai
3167 Little John Way
Atlanta, GA 30340-2025
201-787-8788 (Mobile)
ann.zhai@gmail.com

25

The UPS Store - #1140
5456 Peachtree Industrial BLVD
Atlanta, GA 30341
(770) 458-1922

10/25/18  10:00 AM

We are the one stop for all your
shipping, postal and business needs

Visit us on the web at
www.theupsstorelocal.com/1140/

```
001 000003 (011)          TO $  4.00
    Notary              QTY 2
    Reg Unit Price   $   2.00
002 035001 (003)          T1 $  0.40
    8.5 X 11 Copies     QTY 4
    Reg Unit Price   $   0.10

              SubTotal  $   4.40
         Dekalb7% (T1)  $   0.04
                 Total  $   4.44

           VISA CREDIT  $   4.44
ACCOUNT NUMBER *    ***********5864
Appr Code: 025847  (I)  Sale

ENTRY METHOD: ChipRead
MODE: Issuer
AID: A0000000031010
TVR: 8080008000
TSI: 6800
AC: 0A2F396F14B74AC0
ARC: 00
```

Receipt ID 83330862562813888873 005 Items
CSH: REBECCA          Tran: 2061 Reg: 001

Whatever your business and personal
needs, we are here to serve you.

We're here to help.
Join our FREE email program to receive
great offers and resources.

www.theupsstore.com/signup

```
                    CHAMBLEE
                 3545 BROAD ST
                    ATLANTA
                      GA
                   30341-2259
                   1204590064
 10/25/2018     (800)275-8777    10:28 AM
=============================================
=============================================
 Product                   Sale      Final
 Description                Qty       Price

 PM 2-Day                    1       $6.70
 Flat Rate Env
     (Domestic)
     (NASHVILLE, TN  37203)
     (Flat Rate)
     (Expected Delivery Date)
     (Saturday 10/27/2018)
     (USPS Tracking #)
     (9505 5117 3521 8298 2304 33)
  Insurance                  1       $0.00
     (Up to $50.00 included)
 PM 2-Day                    1       $6.70
 Flat Rate Env
     (Domestic)
     (WASHINGTON, DC  20530)
     (Flat Rate)
     (Expected Delivery Date)
     (Saturday 10/27/2018)
     (USPS Tracking #)
     (9505 5117 3521 8298 2304 40)
  Insurance                  1       $0.00
     (Up to $50.00 included)

 Total                              $13.40

 Credit Card Remitd                 $13.40
     (Card Name:VISA)
     (Account #:XXXXXXXXXXXX5864)
     (Approval #:025983)
     (Transaction #:062)
     (AID:A0000000031010         Chip)
     (AL:VISA CREDIT)
     (PIN:Not Required)


 Includes up to $50 insurance

 Text your tracking number to 28777
 (2USPS) to get the latest status.
 Standard Message and Data rates may
 apply. You may also visit www.usps.com
 USPS Tracking or call 1-800-222-1811.
```

United States District Court Eastern District of California
at Sacramento, California

———————————————————————————— X

Ann Zhai,

        Plaintiff,

        -vs-

Woodland Memorial Hospital/Dignity Health Organization,
Emergency Department and Attending and Consulting
Physicians and Physician Assistants DOEs 1-20,
Bakersfield Mercy Hospital/Dignity Health Organization,
Emergency Department and Attending and Consulting
Physicians DOEs 1-20,
American Association of Poison Control Center Regional
Chapters at Sacramento and Bakersfield California, and
Consulting Physicians DOEs 1-20

        Defendants.

———————————————————————————— X

## <u>NOTICE OF SUIT AND VERIFIED COMPLAINT</u>

Notary: Winifred Walker
Date: November 15, 2018
Expires: August 11, 2019      By: Ann Zhai
                                   3167 Little John Way
                                   Atlanta, GA 30340-2025
                                   201-787-8788 (Mobile)
                                   ann.zhai@gmail.com

WINIFRED WALKER
COM. EXP.
NOTARY
PUBLIC
Aug. 11, 2019
DEKALB COUNTY, GEORGIA

1

## I. The Nature of Suit

1.      This legal matter is the first case presented to United States District Court about human toxicity as results of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels due to consumer mobile emission source (Engine/Exhaust) system failure under the third party duties of due care and disaster response by two California hospital emergency departments in conjunction with consultation of local chapters of American Association of Poison Control Centers[1].

2.      This suit demonstrates that both Emergency Department of Woodland Memorial Hospital and Mercy Hospital of Bakersfield were not legally and medically equipped to handle human toxicity of inhalation and cutaneous exposure from combustion engine lubricant and gasoline fuels.   The deficiency in both legal and medical duties of due care to make correct disaster response lies in these key aspects: (1) Hospital/Emergency Department have no **protocols** to identify and/or to reference and/or to cross reference human toxicity from toxic property of combustion engine lubricant and gasoline fuels; (2) Hospital/Emergency Department have no **tools** to identify and/or to reference and/or to cross reference human toxicity from toxic property of combustion engine lubricant and gasoline fuels; (3) Hospital/Emergency Department have no **common knowledge** and **specific knowledge** to human toxicity from toxic property of combustion engine lubricant and gasoline fuels; (4) Hospital/Emergency Department have no **designated personnels** to do due diligence and to make effective communication with American Association of Poison Control Centers to convey the

---

[1] Plaintiff had no personal knowledge of exact content of conversation conveyed to local chapters of Poison Control Center by ER of Woodland Memorial Hospital and Mercy Hospital of Bakersfield pursuant to CA Code §1799.105.

clinical criteria from their findings.    Consequently, vast National and/or Regional resources which including but not limited to emergency clinical toxicology care cannot be mobilized, deployed, and utilized to effectively treat human toxicity from inhalation and cutaneous exposure of combustion engine lubricant and gasoline fuels.

3.    Instead of abiding the normal legal and medical standard of duty of due care, both hospitals/emergency departments used "**Carte Blanche**" approach upon each physician assistant[2], attending physician, or consulting physician.

4.    The collective "**Carte Blanche**" approaches in disaster response of emergency medical care have denied plaintiff's rights to access emergency clinical toxicology care, denied plaintiff's chance to recover from damaging toxic property in combustion engine lubricant and gasoline fuels, and denied plaintiff's chance to reduce the probability of developing debilitating chronic or terminal diseases, since such toxic property pertaining toxic metals, toxic chemicals, and toxic gases having toxic affinity to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.

5.    The collective "**Carte Blanche**" approaches in disaster response of emergency medical care further exacerbated human toxicity by giving idiopathic "**Brain Tumor**" CT diagnosis without detailing patient history when plaintiff was suffering from inhalation and cutaneous exposure of combustion engine lubricant and gasoline fuels, since such toxic property pertaining toxic metals, toxic chemicals, and toxic gases having toxic affinity to human astro-glial cells, melanin rich neurons, melanin rich

---

[2] It was physician assistant sat at ER front line three times to dismiss human toxicity and on a whim to issuing "brain tumor and calcified brain tumor" diagnosis and to prescribe anti-epileptic drugs while plaintiff was suffering from inhalation and cutaneous exposure to combustion lubricant and gasoline fuels.

cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.

6.      The collective "**Carte Blanche**" approaches in disaster response of emergency medical care further exacerbated human toxicity by giving idiopathic **"Calcified Brain Tumor**" MRI diagnosis without detailing patient history after administration of Manganese IV injection when plaintiff was suffering from inhalation and cutaneous exposure of combustion engine lubricant and gasoline fuels, since such toxic property pertaining toxic metals, toxic chemicals, and toxic gases having toxic affinity to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria. Particularly both Manganese and Cadmium having specific toxic affinity through Olfactory Bulb to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.

7.      The collective "**Carte Blanche**" approaches in disaster response of emergency medical care further exacerbated human toxicity by giving **"Anti-epileptic Drugs"** when plaintiff was suffering from inhalation and cutaneous exposure of combustion engine lubricant and gasoline fuels.

8.      The collective "**Carte Blanche**" approaches in disaster response of emergency medical care further exacerbated human toxicity by giving **"Narcotic Pain Medication"** when plaintiff was suffering from inhalation and cutaneous exposure of combustion engine lubricant and gasoline fuels. Plaintiff refused to swallow the pills after asking the ER nurse what was the name of pain killers.

4

9.     The collective "**Carte Blanche**" approaches at Woodland Memorial Hospital ER further exacerbated human toxicity by never giving **"Oxygen Treatment"** and/or "**Metal Chelation Treatment**" when plaintiff was suffering from inhalation and cutaneous exposure of combustion engine lubricant and gasoline fuels and when they knew patient had such exposure from chief complaints.

10.    The collective "**Carte Blanche**" approaches at Mercy Hospital of Bakersfield Southwest ER had *divergence* of approaches in two separate shifts: the second shift attending physician further exacerbated human toxicity by never giving **"Oxygen Treatment"** and/or "**Metal Chelation Treatment**" in light of obvious clinical toxicology profiles but he decided to call social services and suspected illicit drug abuse or attempted suicide and his judgment was followed after the previous attending physician who had punctured artery and venous blood and verified extreme disparity of gas ratios and immediately ordered pure oxygen treatment.   But both attending physicians never consulted with American Association of Poison Control Centers on toxic property of combustion engine lubricant and gasoline fuels when they knew patient had such exposure from chief complaints.   The divergent "**Carte Blanche**" approaches let first physician prescribed Narcotics and dismissed human toxicity on CT scans and the second physician wanted to turn patient over to social services.

11.    The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments *causally* dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels and never looked into the fasting glucose level at 109 mg/dL (normal range 70-99) in absence of any history of Type I and Type II diabetes and in light of

blood pressure hovering at 185-200 with frequent chest pain and frequent urination and frequent deep brain stem radiation pain but they looked down upon the ***lipid peroxidation*** and ***lipidosis*** of plaintiff's belly as result of year long toxic exposure and missed Heptological and urological systemic damage[3] from toxic metals and toxic chemicals and toxic gases exposures and never made the diagnosis as common as ER medical term of "***Toxic Encephalopathy[4].***"

12.     The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments ***Causally*** dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels because plaintiff carried no form of medical insurance and had no primary care physician.

13.     The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments ***causally*** dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels because both ER attending physicians or consulting physicians had absolute no concept of clinical toxicology versus idiopathic diseases when they knew patient had such exposure to mobile emission source (Engine/Exhaust) system failure.

14.     The collective "**Carte Blanche**" approaches further exacerbated human toxicity because when attending physician or consulting physician had no concept of clinical toxicology versus idiopathic diseases, they simply could not make effective

---

[3] See also Tohoku J. Exp. Med., 2017, 241, invited review entitled as "Kidney Cadmium Toxicity, Diabetes and High Blood Pressure: The Perfect Storm."

[4]  See SafeHealth Work 2012;3:243-56 | http://dx.doi.org/10.5491/SHAW.2012.3.4.243  Review Article "Toxic Encephalopathy."

communication to American Association of Poison Control Centers local or national chapters to mobilize the resources for proper diagnosis and effective treatment.

15.    The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments ***Causally*** dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels and the gross negligence proximately caused inaction of American Association of Poison Control Center to transfer the patient to other facilities which might provide first aid which including but not limited to chelation of metals and detoxing the organic solvent and neutralizing the toxic gases by application of hyperbaric oxygen treatment.

16.    The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments ***causally*** dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels and the gross negligence proximately caused no data was registered in National Poison Data System as all Federal agencies[5] have come to rely upon for policy making and executive actions.

17.    The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments ***causally*** dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels and the gross negligence proximately caused deletion of crucial time for clinical toxicology assessment of inhalation and cutaneous exposures of combustion

---

[5] This is not just regular medical malpractice matter.  DOJ, EPA, CDC and Department of Human Services and Department of Energy all rely upon the National Poison Data System for policy making and executive actions.

7

engine lubricant and gasoline fuels as forensic evidence for third party consumer toxic tort legal action.

18.     The collective "**Carte Blanche**" approaches further exacerbated human toxicity because both hospitals/emergency departments ***causally*** dismissed human toxicity of inhalation and cutaneous exposures of combustion engine lubricant and gasoline fuels and the gross negligence proximately caused gloom prognosis of permanent personal injuries and manifestation of chronic or terminal diseases[6].

19.     Plaintiff has no personal knowledge as to how the consultation took place between ERs and Poison Control Centers.  Only through discovery do we learn whether American Association of Poison Control Centers at chapters of Sacramento and Bakersfield region are also gross negligent in departure of legal and medical standard of duty of due care.

## II. Subject Matter Jurisdiction

20.     This court has subject matter jurisdiction over medical malpractice and gross negligence in disaster response to human toxicity of combustion engine lubricant and gasoline fuels by Woodland Memorial Hospital and Mercy Hospital of Bakersfield based on diversity of citizenship pursuant to 28 USC §1332 and the damages amount exceeding $75,000.

## III. Personal Jurisdiction

21.     This court has direct personal jurisdiction over Woodland Memorial Hospital and Mercy Hospital of Bakersfield and local chapters of American Association of Poison Control Centers responsible for Sacramento and Bakersfield region.

---

[6] This is one of many review articles discovered at UC Davis Medical Center entitled as "The Mammary Gland Carcinogens: The Role of Metal Compounds and Organic Solvents."

## IV. Statute of Limitations for Medical Malpractice Suit
## in State of California

22.     The commencement of suit pursuant to California civil code §340.5 for action against health care provider is three years from injury or one year from discovery.

23.     This medical malpractice suit derived from consumer toxic tort action in legal context of consumer mobile emission source (Engine/Exhaust) system failure under third party duty of due care.  There are fraud and negligence claims alleged upon third party defendants who have subjected plaintiff to combustion engine lubricant and gasoline fuels exposure from 11/2016 to 11/2017.

24.     Both Woodland Memorial Hospital and Mercy Hospital of Bakersfield have breached both legal and medical duties of due care by dismissing the human toxicity from inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels at conclusion of emergency services 11/19/2017.   Their dismissals of human toxicity were not based on medical facts but based upon their ignorance and carte blanche approach to medical facts.   In 20/20 hindsight, plaintiff's emergency clinical toxicological profiles were so obvious and clean cut that a learned lay person without medical licensure could have directed the clinical presentation criteria to toxicology rather than idiopathic diseases.

25.     Woodland Memorial Hospital ER attending and consulting physicians as well as physician assistants had collectively covered-up their mistakes based upon the toxicological profiles tested and retained in the medical records but they chose to conceal the truth and never followup with plaintt after blood workup confirmed toxic exposure 10/26/2017.

26.     Mercy Hospital of Bakersfield told plaintiff CT scan was negative exam on Carbon Monoxide poison and gave no diagnosis as to causation of same Brain Lesion described at conclusion of ER services 11/19/2017.

27.     Plaintiff on her own initiatives, first by discovering a treatise around 1/28/2018 and such intelligent work was written for medical professionals entitled "TOXICOLOGICAL PROFILE FOR USED MINERAL-BASED CRANKCASE OIL" by Center for Disease Control and Prevention at Agency for Toxic Substances and Disease Registry Division of Toxicology/Toxicology Information Branch at 1600 Clifton Road NE, E-29, Atlanta, Georgia 30333.  Plaintiff has learned that no updates of the treatise since first publication in 1997.

28.     Further reading and investigation from this treatise from 02/2018 to 06/2018, it has led plaintiff to discover the body of medical information on toxic metals and toxic chemicals and toxic gases stored in Center for Disease Control and Prevention (CDC) and discovered body of peer reviewed articles on toxicity of mineral-based crankcase oil in reference to her toxic symptoms.   Some of articles were sponsored by US Environmental Protection Agency (EPA) with large volumes published and shared in international domains.

29.     Since the inhalation and cutaneous exposure was due to mobile emission source (Engine/Exhaust) system failure under third party duty of due care, efforts were made on human toxicity of inhalation and cutaneous exposure to both combustion engine lubricant and gasoline fuels[7].

---

[7] This review article entitled "Potential Health Effects of Gasoline and Its Constituents: A Review of Current Literature (1990-1997) on Toxicological Data" authored by Luciano Caprino and Giuseppina I.Togna Institute of Medical Pharmacology, University of Rome "La Sapienza," Rome, Italy is one of many discovered at UC Davis Medical Center in the summer of 2018.

30.   From 8/1/2018 to 9/30/2018, plaintiff came to UC Davis Medical Center seeking medical proof of causation for her manifestation of toxicity and have since compiled literally a small database in the subject matter.  By the end of investigation, a reasonable learned person without medical licensure can reasonably draw conclusion that medical malpractice and gross negligence have been committed by Woodland Memorial Hospital and Mercy Hospital of Bakersfield on human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels.

31.   UC Davis Medical Center disputed plaintiff inquiry in 09/2018 that facility does not have toxicology clinic[8] and pointed to hospital admission Directory Board that no such service existed.   Plaintiff on her own initiatives discovered Emory University which is also affiliated with CDC indeed does provide clinical toxicology assessment and medical care on toxic fumes and toxic chemicals and HAZMAT material exposure.

32.   10/1/2018, plaintiff left UC Davis Medical Center and came to Atlanta, Georgia seeking proper human toxicity care and proper diagnosis on her brain lesion as well as whole host of toxic medical issues which have destroyed her physical and mental health with debilitating and disabling consequences.

33.   The first third party suit which exposed plaintiff to toxic property from combustion engine lubricant and gasoline fuels from 11/2016-11/2017 was filed from Atlanta, GA 10/28/2018 at United Sates District Court Middle District of Tennessee, and this medical malpractice and gross negligence suit ensues 11/08/2018.

### V. Invocation of Res Ipsa Loquitur Doctrine as Departure of Legal and Medical Standard of Duty of Due Care

---

[8] On the contrary, American Association of Poison Control Center Website does list UC Davis Medical Center as Sacramento local chapter for poison control consultation.

34.    The fundamental question to the fact finder of the court is this: if we cannot rely on our emergency department of general hospital to recognize and treat human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels as results of mobile emission (engine/exhaust) system failure, who do we trust and count on to save our lives?

35.    Plaintiff was admitted to Emergency Department of Woodland Memorial Hospital and Mercy Hospital of Bakersfield without any history of idiopathic chronic diseases prior to the toxic exposure 11/2016-11/2017.  Plaintiff is a life long non-smoker in absence of any type of chemical addiction legal or illegal.   Plaintiff has strong religious faith with balanced nutrition.  Plaintiff carried no form of medical insurance and had no primary care physician.  Admission office of both ERs accepted personal IDs and credit card as form of payment and billed each service under plaintiff's IDs.  Doctor and patient relationship was established at the time of admission with exception that Woodland Memorial Hospital placed physician assistant at Emergency Department front line as "physician-in-charge" such as taking histories, performing examinations, ordering medical or laboratory tests, prescribing medications, making referrals, and discharging of ER patients.    Woodland Memorial Hospital of course never disclosed such arrangement in advance when first obtained patient consent form with signature. In sequence, (1) patients check in with form of ID and form of insurance or payment at admission;  (2)  patients wait in the lobby of ER department, (3) nurse does basic intake and physician assistant comes out to see patients.    Plaintiff met with physician-assistants four times (10/10, 10/11, 10/18, 10/26) and only on her 4th admission of ER

with persistent request for a complete blood workup as she felt like dying was a physician finally coming out to order the blood workup (10/26).

36.     Both Woodland Memorial Hospital and Mercy Hospital at Bakersfield owed both legal and medical duty of due care to plaintiff in three folds: (1) to provide emergency services based on the doctor-patient and hospital-patient relationships for any type of emergency medical conditions known or unknown existed on earth; in the event no first aid is available, patient at ER discretion can be transferred by Airlift Device to other facilities from which adequate first aid is available; (2) to collect forensic clinical toxicology evidence based upon obvious and unobvious complaints presented by patient; (3) to provide proof of medical causation of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels as licensed emergency medicine professionals for consumer toxic tort action.  Failure of legal and medical duties proximately caused and/or contributed to permanent personal injuries and manifestation of permanent personal injuries.

37.     California recognizes the judicial doctrine of ***Res Ipsa Loquitur*** and plaintiff invokes the doctrine on the issue of facts.

## VI. Statement of Consumer Toxic Exposure to Mobile Emission Source Failure and Gross Negligence of Emergency Toxicology Services

38.     Since plaintiff alleges gross negligence as proximate causation and contribution of permanent personal injuries in this complaint, the statement of facts is pursuant to Federal Civil Rule 9(b) with particularity for pleading mistakes from plaintiff's personal experiences and personal knowledge by using clear and convincing standard. And it will subject to amendment as discovery and manifestation of human toxicity uncovers and becomes known:

1).     I am learned and trained in medical science. I am also registered to practice patent law with United States Patent Office since 2001.  In early part of 2016, I came to University of California at Davis to investigate historical food processing technologies and agricultural economics with purpose to test new consumer food product proof of concept.

2).     My 2005 Honda Civic LX was well maintained and in perfect working condition and passed visual inspection and California SMOG check and registered on **09/14/2016** in Davis, California.

3).     On **9/26/2016**, I took the vehicle to WheelWorks at Concord, CA in the street address of 1410 concord avenue, Concord, CA 94520 with telephone number 925-265-7753 for engine oil and filter change before embarking cross country trip back to East Coast.

4).     The retail operations of Bridgestone/Firestone Americas Inc. at Wheel Works changed oil and filter by using conventional mineral based oil in the grade of 5W/20W recommended by Honda manufacturer.  The customer service advisor who accepted the car was different than the advisor who released the car to me for billing and I did not know which technician performed the service.   After extended delay waiting for the service despite my appointment I was offered a discount for the payment.

5).     I was scheduled to leave Davis, California 10/1/2016 but another event in San Jose changed my departure schedule and the vehicle was parked in Davis student apartment complex garage for another month.

6).     On **11/1/2016**, I took off at UC Davis and headed back to the East.

7).     I enjoyed the smooth driving about 1300 miles from I-5 to I-40 and cruising through State of California, Arizona, and part of New Mexico.  I wasted no time other than stopping for food, fueling and rest.

8).     About 5PM on **11/04/2016**, local time in New Mexico, a short distance from San Jon, the Honda engine exploded suddenly without any warning on the dashboard.  I saw heavy smoke came out of hood and heard very loud boom-boom sound.

9).     The weather condition along the National Highway I-5 to I-40 was nice and unremarkable with sunny skies but chilly temperature.  Each State would have storage for local weather and meteorologist report.  I had all windows shut with air-conditioner on at moderate heat.  No smells in the cabin prior to the explosion.

10).    At first, I thought this was terrorist attack.   But fortunately US Military Personnel behind me helped me move the disabled vehicle off I-40 on

shoulder.    I was immediately advised by the gentleman in uniform that **THERE WAS NO ENGINE OIL CAP** secured at the Engine.

11).    With burning fuels and heavy smoke, he retrieved a canister from his truck and sprayed the entire engine area to reduce fire hazard.

12).    I was then informed to go up to Valero gas station on the right side of I-40 to call towing service.  Before he left, he asked me to call WheelWorks.

13).    Workers at Terry highway services observed the vehicle damage.   The Honda was stored at Terry Services at street address 2369 State Hwy 469, San Jon, NM 88434 (telephone 575-576-9252) pending liability investigation.

14).    The consumer affairs department of Bridgestone/Firestone Americas Inc. opened a claim and claim number is 2222391 under my name 11/2016.

15).    Mr. Juan Mendoza and Mr. Stanley Guzik, were my contact persons at Bridgestone/Firestone Americas Inc. retail operations located then in Bloomingdale, IL for my claim matter.

16).    Neither Mr. Mendoza nor Mr. Guzik (Mr. Mendoza's boss) nor consumer affairs department of Bridgestone/Firestone informed me about human effect of toxic exposure from their man-made disaster after claim was opened **11/2016**.

17).    **1/26/2017**, Bridgestone/Firestone Americas Inc. accepted full liability of negligence by subjecting to mobile emission source system explosion in San Jon, New Mexico and paid Honda dealership at Amarillo, Texas to refitting the mobile emission source system.

18).    From **2/2017 to 8/2017**, plaintiff had visited Bakersfield Honda dealership four times to complain about refitting issues but Bakersfield Honda dealership was too incompetent to discovering the fraud.

19).    **9/14/2017,** California Department of Motor Vehicles and Consumer Affairs Department uncovered the fraud and fraudulent refitting and notified plaintiff that they cannot take official legal action due to lack of jurisdiction over Bridgestone/Firestone Americas Inc. and Texas Honda dealership.

20).    **9/25/2017**, Bridgestone/Firestone Americas Inc. repossessed the vehicle and kept the property at Sacramento Firestone Complete Auto Care Center.

21).    From **9/26/2017 to 10/10/2017**, plaintiff was given a rental car under Bridgestone/Firestone corporate rental agreement with Enterprise.  It was

during the two week cession of toxic exposure plaintiff was taken by ambulance to Woodland Memorial Hospital ER address at 1325 Cottonwood Street, Woodland, CA 95695, with phone number 530-662-3961 when the driver of semi-trailer lost control at the steering wheel and hit plaintiff's rental car at rear end.

22).  **10/10/2017**, after admission was completed, plaintiff was seen by Mr. Nathan Trueblood, PA with blood pressure was measured at 190-200 and chief complaint was deep brain stem radiation pains and sharp traveling chest pains and felt like dying.  No patient history was taken, Mr. Trueblood, PA order a CT Scan.  He then informed that plaintiff had a brain tumor measured at 1.3 cm3.   He ordered further follow-up with Oncologist.   With complaint of sharp chest pains, Mr. Trueblood, PA ordered two views of Chest X-Rays.   Neither Mr. Trueblood, PA nor the diagnostic physician informed me on the clinical findings **"Mildly elevated left diaphram.  Mild widening of the superior mediastinum most likely do to vascular structures.  Enlarged nodes or other soft tissue mass cannot be ruled out.  Consider CT scanning."**  Mr. Trueblood, PA never informed me on this clinical findings and recommendation of CT scan on chest.

23).  **10/10/2017**, I have never met nor heard from Supervising Physician Jordan L. Kramer, MD, although his name appeared on the ER medical records.   Indeed, neither Mr. Trueblood, PA nor Dr. Jordan L. Kramer consulted with local or national chapters of American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels.   Upon discharge, I lodged at Downtown Woodland hotel and felt like I was dying.

24).  **10/11/2017**, I re-admitted to Woodland Memorial Hospital ER.   Ms. Ali Grechko, PA saw me based on previous day's diagnosis "high blood pressure and brain tumor" and she was pregnant at the time and did very preliminary examination.  Upon my persistent complaint of symptoms, Ms. Ali Grechko, PA ordered a MRI for malignancy evaluation of the brain tumor shown on CT scan from 10/10/2017.  I was given ***Manganese IV injection*** before placed in the MRI machine.  Within a couple of hours, I felt my brain was going to be exploded and endured the whole exam.  I was discharged and told never to worry about malignancy of the brain tumor as they concluded clinical findings: **"1.2X1.0cm partially calcified left frontal parafalcine extra-axial dural based mass without surrounding peritumoral edema or significant mass effect.   Most consistent with meningioma.  No additional lesions."**

25).  **10/11/2017**, Cam Chau, MD never met with me nor took any personal  or medical history, and her impression was based upon Physician-Assistant

communication to her.  Before I was discharged, neither Ms. Ali Grechko, PA nor Cam Chau, MD consulted with local or national chapters of American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels.

26).     After discharged from Woodland ER, I lodged in Sacramento Hotels for a few days.  On **10/18/2017**, I was re-admitted to Woodland ER because I felt I was dying with a lot of pains and laboring my breath.  Mr. Trueblood, PA saw me again and ordered additional X-Rays on Spine with 2-3 views.  Lower lumbar spine shown demyelination and the bones demineralized.  I have never met nor heard from John N. Winn, MD the Radiologist who issued the clinical opinion on my spine.   Neither Dr. Winn nor Mr. Trueblood, PA took patient personal and medical history and never asked me any questions related to clinical findings on my spine.   I was discharged when my blood pressure at 182 mmHg over 105 mmHg with deep brain stem radiation pains and sharp traveling chest pains and finding of lower lumbar spine of demyelination and bones demineralized.  Indeed, on **10/18/2017**, neither Mr. Trueblood, PA nor John N. Winn, MD consulted with local or national chapters of American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels.

27).     **10/26/2017**, I was re-admitted to Woodland ER again because I felt like I was dying.   Ms. Ali Grechko, this time did not perform any examination and she turned my case to Mohammed Kayali, MD after extended period of waiting, he saw me and I insisted to have a blood workup and explicitly told him my chief complaints and the toxic exposure.   I was discharged under the condition that my blood pressure was 185 mmHg over 115 mmHg, my oxyhemoglobin measured as 58% (normal range 92.0-100.0%) and my fasting blood glucose level at 109 mg/dL (normal range 70-99) without diagnosis of poison or toxicity and without any treatment.

28).     **10/26/2017**, Mohammed Kayali, MD told me that he made call to poison control center but they said the COHb at 2.7% was too low to warrant any treatment.  I was discharged.

29).     The medical records **10/26/2017** documented by Dilbag Singh, MD as re-examination/re-evaluation physician.  Plaintiff never met with this physician and has no personal knowledge nor recollection of personal knowledge to this physician.  It appears the content of documentation by this person is a made-up.  Plaintiff only met with Mohammed Kayali, MD who wrote down the chief complaint ED as "**multiple complaints, frequent urination. 'My vessels in my head were pulsating.' 'I want a**

**CO test because I've been driving around in a car with leaking.'"** 10/26/2017 17:53.

30).    I have come back to Woodland twice **11/2017-12/2017** to obtain medical records.  No one from ER and/or Woodland Hospital attempted to contact me to make any diagnostic corrections from **12/2017 to present** in light of clean-cut obvious medical evidences they have dismissed for human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels.

31).    **11/2-11/3/2017**, plaintiff was admitted to Mercy Hospital of Bakersfield Southwest, after staying in downtown Bakersfield Hotels sleeping and woke up without any sensation of lower extremes bi-lateral.    I was seen by ER physician John Neely, MD who ordered CT and punctured artery and venous blood and verified extreme disparity of gas ratios and told me that COHb index was not reliable as indicator for toxicity and ordered "Pure Oxygen Treatment" and I was kept at ER overnight.   My fasting blood glucose level was 138 mg/dL (normal range 65-105 mg/dL) and my blood pressure was 174 mmHg over 100mmHg.   Dr. Neely told me CT scan was negative of Carbon Monoxide poison but give no diagnosis of Brain Lesion appeared in CT scan concluded as **"no acute intracranial abnormality.  Calcified mass adjacent to the anterior falx in the left frontal lobe measuring 1.2X0.8X1.1 cm (signed off by Alfred Sein, MD)**.    Prior to my discharge, no attending physician nor consulting physician consulted American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels despite the fact it pertained chief complaint in the ER admission and in the medical records.

32).    **11/8/2017-11/9/2017**, I was re-admitted to Mercy Hospital of Bakersfield Southwest again as I felt like dying.  I was seen by Edward L. Nichols, MD who decided to turn me over to social services.  I was discharged  without treatment as Dr. Nichols deemed COHb at 2.8% was too low for Oxygen Treatment, despite the blood workup 11/08/2017 shown Anion Gap 14 mmol/L (Normal range 3-11 mmol/L); Glucose Level 139 (normal range 65-105 mg/L); BUN/Crt Ratio 24 (normal range 10-20).   Dr. Nichols did nothing in light of his clinical impression:
1.  Carboxyhemoglobin exposure by history.
2.  Hypertension.
3.  Headache evaluation.
It was Dr. Nichols judgment that prior to my discharge he never called American Association of Poison Control Centers for any consultation in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels despite the fact it pertained chief complaint in the ER admission and in the medical records.

33).    **11/19/2017**, I was re-admitted to Mercy Hospital of Bakersfield Downtown due to close distance to hotel I was staying.  I felt like dying with severe deep brain stem radiation pains, nausea and vomit and dizziness with laboring breath.  My extremities bi-lateral had no sensation and complete numb.  After admission, I was placed in ER observation bed and with extended long period of delays, ER physician and nurses notified me that they were waiting for local Poison Control Consultation.  I do recall a male visitor stopping my bed while I was administered pure oxygen treatment.   At conclusion of ER treatment, no attending physician nor consulting physician consulted American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels despite the fact it pertained chief complaint in the ER admission and in the medical records.

34).    As to toxic property pertaining inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and manifestation of such toxic property in human organism from toxic exposure **11/2016 to 11/2017**, below description is my personal documentation.

35).    From **11/4/2016 to April of 2017**, I have several sessions of flu-like symptoms without any grade of fever.   The sessions described as coughing, sneezing, running noses and watery eyes, itching and burning sensation of eyes, nose, ear lobes, forehead, hands bi-lateral.  There were red and purple-ish colored skin rashes, short of breath, headache and sleep disturbance.  But never once with any grade of fever.  I drank a lot of orange juice and green tea and ate a lot of greek yogurt and home made cranberry sauce and a lot of green leaf veggies for relief.  I thought I had stress over the course of disruption and under the weather.

36).    My regular menses usually started the first week of every month made a sudden stop **1/10/2017**.   I never experienced menopausal problems and hormonal changes, as both my mother and older sister shared with me about their horrible menopausal affairs.  For me, It bursted out the first day of 1/10/2017 and stopped next day completely, much more liking the effect that someone turned off the faucet suddenly.

37).    In **March of 2017**, I noticed my left index finger nail appeared a single beau's line and I began to document that strange appearance. (Note:  I've observation on cancer patients who were undergoing cycles of chemo-and radiation therapies usually had multiple beau's lines on one's finger nails, this was learned experience at my oncology training in the late 1980s).  I documented my finger nail beau's line on **3/18/2017, 3/23/2017, and 4/1/2017.**

38).      I am a professional woman who have led a clean and productive lives with strong religious faith and balance of nutrition without any chemical addiction and chemical treatment; but why I suddenly grew a beau's line on my left index finger nail?!

39).      At the end of **summer 2017**, those red and pinkish skin rashes have receded and became clusters of dark spots intensely appeared on my both hands. I documented those cluster of dark spots. My other parts of body covered by clothing never appear any clusters of dark spots.

40).      Throughout the year of **2017**, I noticed my hairs turned layers of grey and became very brittle, dry scalp and dry hair but I was oily hair all my life.

41).      Throughout the year of **2017**, I noticed my headaches gradually getting worse but with my forehead evenly maintained the same degree of low temperature.

42).      Right after the engine explosion, I noticed my urine had sweet and rotten egg-like odors and smells. But, both my smell sensation and taste sensation gradually became retarded from **11/4/2016 to 3/26/201**7, when I was told by other people in the restaurant that I could no longer identify the smells of apple cider vinegar and wasabi sushi sauce. Now, when I drink soup without added salt, I will have no complaint because my taste bud would not tell.

43).      In **7/2016** when I renewed driver license, eye examination was required as I passed eye examination at doctor's office with flying color however, throughout of **2017**, I have double vision and blur vision.

44).      Since **11/4/2016 and throughout 2017**, my lower extremities in forearms and lower legs bi-lateral marked as weakness, numbness, muscle tinkling and twitching with night being the worst time due to lacking of sleep. The ER examination **11/2017** puzzles doctors and nurses as I physically appeared to be stocky but muscle and skeletal system appeared very weak.

45).      On the day of **12/18/2016**, my lower eye lids bi-lateral was having twitching and tremor, it came so strong and lasted so long, the students at North Carolina State University sitting across the table with me saw it and asked me whether I was okay and joked about "too much coffee?"

46).      Since **11/4/2016 and throughout 2017**, each day when I was stepping into shower, I noticed my right side of belly is getting larger and fuller without any sharp pain.

47). Since **11/4/2016 and throughout 2017**, each day my head was getting cloudier and having cramps and spasm-like dull pains radiated from the deep back stem of my brain without any known excuses, as I am free of alcohol, tobacco, illicit recreational drug, or prescription drug abuse. I have not been on any medication.

48). Since **11/4/2016 and throughout 2017,** each day I noticed that I have lost the ability of recalling the specific words and terse and specific events which used to be dear to me. I have lost my full executive capability which I used to hold my self in high regard for whatever I do.

49). Since **11/4/2016 and throughout 2017,** my both hands skin was very dry and always feel like touch of detergent and my usual sweaty hands were completely replaced by dry palms.

50). Since **11/4/2016 and throughout 2017,** I have gradually experienced my posture was unsteady from changing motions and changing body positions such as getting up, getting out of bed, getting out of the car, holding a cup of coffee while getting out of the car, the usual normal small tasks became unsteady and tardy.

51). Since **11/4/2016 and throughout 2017,** my personality has changed drastically and even myself cannot recognize and explain those behavior.

52). Since **11/4/2016 and throughout 2017,** I saw my both hands gradually had cutaneous lipid per-oxidation and lipidosis and my bottom of belly had the same cutaneous lipid per-oxidation and lipidosis and I was puzzled by the fact that my diet was mainly fish, egg, fruit and vegetables and I was not a fat or red meat eater all my life. I have always been soda free.

53). Since **11/4/2016 and throughout 2017**, I saw my limbs bi-lateral had cutaneous lipidosis and when I raised one leg, I saw the clear line of skeletal-muscular separation.

54). From **10/10/2017 to 11/19/2017** at the peak of delayed onset of toxic symptoms, all relevant and material clinical toxicology tests and reports should have obtained then but were dismissed by Emergency Department of Woodland Memorial Hospital and Mercy Hospital of Bakersfield attending physicians and consulting physicians due to gross negligence and departure from legal and medical standard duty of due care.

55). Both hospital ERs and American Association of Poison Control Center at Sacramento and Bakersfield should present their argument in light of Massive Information written for medical professionals stored in CDC and shared via National Medical Library readily available which made the gross negligence inexcusable.

## VII. Causes of Action for Gross Negligence and Negligence

39.     When a patient was admitted to ER denied any history of chronic diseases and smoking and substance abuse, the emergency physician and consulting physician shall abide by legal and medical duty of due care in all conducts.     When the presentation of clinical toxicological profiles is so obvious and clean cut but ER physicians and consulting physicians choose to divest their duty and judgment away from clinical toxicology to idiopathic diseases and dismiss Emergency treatment, the ER physicians and consulting physicians and the hospital who hired them are gross negligent simply because a lay person would have acknowledged the departure from the standard duty of due care.   In this case, the gross negligence lies in breach of legal and medical standard duty of due care because the causation of toxic exposure was proximately caused by third party defendants who are under the duty of due care.

40.     Should American Association of Poison Control Center local chapters use "***Carte Blanche***" approaches in dispensing professional consultation in their official role as "Consulting Toxicologist," they should be held gross negligent in departure of standard duty of due care pursuant to CA Code 1799.105, in light of CDC resources and in view of digital medical records and patient were readily available for treatment.

41.     Both Woodland Memorial Hospital and Mercy Hospital of Bakersfield as Medical Institutions are negligent in emergency clinical toxicology care in absence of protocol, tools, common knowledge and specific knowledge, and in absence of designated personnel to make effective communication with American Association of Poison Control Centers to manage patient who presented emergency clinical toxicological profiles with clinical data simple, clear, and convincing.

42.     The fundamental medical principle of "DO NO HARMS" is dismissed in both Medical Institutions in that If you cannot treat you transfer but you cannot simply dismiss and discharge your duty.  When you find out the truth, you remedy the harm but you cannot conceal the truth and dismiss the medical facts by washing your hands.

### VIII. Prayer for Damages

43.     Plaintiff demands trial by jury on all issues of facts and seeks unspecified compensatory and punitive damages for the loss of health, productivity, enjoyment of life, reduction of life span, pain and sufferings permitted by laws.  Plaintiff reserves legal rights for any foreseeable and unforeseeable future medical conditions and diseases derived from this case.  Plaintiff demands any other and further relief permitted by law.

## AFFIRMATION FOR FILING OF VERIFIED COMPLAINT BY MAIL

I, ANN ZHAI, plaintiff, duty sworn, state, and affirm under the penalty of perjury of United States Law that information pertaining to this complaint is my personal experiences, my personal knowledge and recollection of my personal knowledge.  This case derived from third party fraud and negligence which have subjected plaintiff to inhalation and cutaneous exposure to combustion engine lubricants and gasoline fuels from consumer mobile emission source from 11/2016-11/2017.   The undersigned signature is mine and I have notary public in State of Georgia so certify the name and signature appeared on page 1 and page 24 are mine.  On November 10th, 2018, I caused the following documents to be sealed in United States express priority mail envelop with mailing label _____for tracking purpose_____and deposited to United States Postal Service:

1) verified complaint,
2) petition for waiver of filing fees and affidavit of poverty and asking court permission for filing under the seal and seeking pro bono counsels at Federal Bar with Non-partisan inclination,
3) letter notifying USDOJ in conjunction with third party consumer toxic tort action filed at US District Court Middle District of Tennessee.  Attorney General as Chief Law Enforcement Officer of United States has authority to notify EPA and CDC for executive actions concerning consumer rights and safety protection in mobile emission source system care and policy concerning improvement of American Association of Poison Control Centers with regard to human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels.

Dated: 11/08/2018
Atlanta, Georgia

By: _____
Ann Zhai
3167 Little John Way
Atlanta, GA 30340-2025
201-787-8788 (Mobile)
ann.zhai@gmail.com

Notary: _____

November 10, 2018

August 11, 2019



24

United States District Court Central District of California
Western Division at Los Angeles, California

_____X

Ann Zhai,

       Plaintiff,

       -vs-

American Honda Motor Company Inc. in Torrance, California,
Brown Honda in Amarillo, Texas, Officers and Directors, and
Employees DOEs 1-20,
Barber Honda in Bakersfield, California, Officers and Directors, and
Employees DOEs 1-20,
Rapton Honda in Sacramento, California, Officers and Directors, and
Employees DOEs 1-20,
Bridgestone/Firestone Americas Inc., Officers and Directors of
Retail Operations, and Employees DOEs 1-20,
Lubricant and Fuels Producers, Marketers, Distributers,
and Sellers with Business Names A-Z,
Lubricant and Fuel Additive Inventors, Marketers, Producers,
Distributers, and Sellers With Business Names A-Z,

       Defendants.

_____X

## NOTICE OF SUIT AND VERIFIED COMPLAINT

By:      _____e/Ann Zhai_____
Ann Zhai
4325 Hickory Wood Lane
Doraville, GA 30360
201-787-8788 (Mobile)
ann.zhai@gmail.com

WINIFRED WALKER
COM. EXP
NOTARY
PUBLIC
Aug. 11, 2019
DEKALB COUNTY, GEORGIA

## I. The Nature of Suit

1.      In refitting of mobile emission source by American Honda Motors Inc. and Bridgestone/Firestone Americas Inc. in order to resolve primary liability of Bridgestone/Firestone whose WheelWorks has caused original mobile source explosion, subject matter and controlling laws were knowingly and intentionally altered from mobile source refitting to regular maintenance with intent to kill and/or injure the consumer.  Fraud and tampering were concealed by both parties from 01/26/2017 to 11/06/2017 even after the fraud and tampering were revealed by government 09/2017.   Relief is sought for (1) Fraud, (2) Toxic Tort, (3) Product Liability, (4) Property Damage.

## II. Subject Matter Jurisdiction

2.      The subject matter jurisdiction is pursuant to 28 USC §1331 for violation of Congressional intent pursuant to 42 USC §§ 7401 & 7522(a)(3) & 7545 for tampering physical mobile source and digital data source with intent to bypass, defeat, and render the mobile source inoperative and evading mobile source emission standard set by EPA with intent to kill and/or injury the consumer.   The subject matter jurisdiction is pursuant to 28 USC §1332 for violation of California mandate for tampering physical mobile source and digital data source with intent to bypass, defeat, and render the mobile source inoperative and evading mobile source emission standard set by California Air Resources Board with intent to kill and/or injure the consumer. Supplemental jurisdiction pursuant to 28 USC §1367 for claims derived from same subject matter which have caused personal injuries and property damage.   Plaintiff demands **jury trial** and reserves future legal rights for foreseeable and unforeseeable personal injuries and manifestation of injuries derived from this matter.

2

## III. Personal Jurisdiction

3.      This court has personal jurisdiction over American Honda Motor Inc. whose principle corporate office is in Torrance, California.      Bridgestone/Firestone contracted with Honda to resolve WheelWorks primary liability for original mobile source explosion from which both WheelWorks and original mobile source was registered in California.      Lubricant and fuel products are interstate commerce having producers, marketers, distributors, sellers, and inventors/assignees nationwide.  Each lubricant and fuel product under registration with EPA pursuant to 42 USC §7545 has proximately caused permanent personal injuries and manifestation of personal injuries through inhalation and cutaneous exposure when Honda and Bridgestone/Firestone knowingly violated Congressional intent and California mandate by installing second "***Chemical Weapon***" with intent to kill and/or injure the consumer.

## IV. Venue

4.      The chain of events gave numerous venues but none of which has original subject matter jurisdiction and venue over American Honda Motor Company Inc. and Bridgestone/Firestone Americas Inc..   To help the court determine the proper venue pursuant to 28 USC §1391, each key event is listed below:

> (1). The explosion of original mobile source took place on I-40 in San Jon, New Mexico 11/04/2016 after WheelWorks created the first "Chemical Bomb" under the hood.     Bridgestone/Firestone took full liability after they retained SouthWest Auto Inspection as independent referee who issued causation report.
>
> (2). Bridgestone/Firestone contracted with Honda and picked Brown Honda due to its closest proximity to explosion site.   The contract for refitting altered contract for killing and the fraud was ratified 01/26/2017 after Bridgestone/Firestone wired fraud payment to Honda who released vehicle to consumer.  At ratification of fraud, both physical mobile source and digital data source were intentionally tampered by Honda and Bridgestone/Firestone.

3

(3). From 2/13/2017 to 8/15/2017, Barber Honda has re-examined the refitting at least four times at Brown Honda's explicit instruction that refitting was covered by any Honda dealers within 50 States.   Barber Honda concealed the fraud and tampering from 2/13/2017 to 8/14/2017 by misrepresentation of laws and facts on mobile source refitting but for a notation of cracked outlet of manifold dated on 08/14/2017 examination sheet.

(4). 09/01/2017, plaintiff let Rusty Wallis Honda of Dallas, Texas to re-examine the mobile source refitting who then told plaintiff that refitting was not Honda genuine devices and everything was void.   Plaintiff then brought back to Brown Honda who denied everything they have done with Bridgestone/Firestone and general manager of Brown Honda refused to speak.   Plaintiff simultaneously directed the matter to Bridgestone/Firestone who never made any responses.

(5). 09/14/2017, California government revealed the fraud and tampering at SMOG renewal in mere seconds.

(6). 09/25/2017, Bridgestone/Firestone repossessed the property and kept it at Firestone of Sacramento, California (shop#1228, manager Vishaal Singh) and informed plaintiff that Mr. Stan Guzik has since retired from retail operations.

(7). 10/02/2017, Bridgestone/Firestone by misrepresentation of new director of retail operations made false pretense that Rapton Honda would un-do the fraud of Brown Honda and the property was taken to Rapton Honda by Firestone manager.   Rapton Honda concealed the fraud and tampering from 10/02/2017 to 11/06/2017 by misrepresentation of laws and facts on mobile source refitting but for a notation of cracked outlet of manifold on examination sheet dated 11/06/2017.

(8). 10/10/2017, plaintiff was taken to ER by ambulance to Woodland Memorial Hospital of Woodland, California nearly dying from year long inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels from accumulation and manifestation of toxic fumes, toxic metals, and toxic chemicals.   Both Honda and Bridgestone/Firestone have concealed the human toxicity as consequences of fraud and tampering.

(9). 11/06/2017, Bridgestone/Firestone Mr. David Verde of retail operations changed position again in view of damaging internal and public documents on fraud of SMOG and explicitly told plaintiff: "Ann, when you sue Honda you add US, that's how the system works" they abandoned the property at Rapton Honda and terminated rental car lease with Enterprise and left plaintiff to die alone in the Emergency Rooms of California hospitals.

## V. Parties

5.      DOEs 1-20 are used for individual's civil and criminal liability.

4

6.     Complaint is subject to amendment for any party who was aiding and abetting the refitting process with intent to evade, bypass, and render the mobile source inoperative and to kill and/or injure the consumer.

7.     American Honda Motor Company Inc. (hereinafter "American Honda") is a subsidiary of Japan Honda Motors Ltd with principle corporate office at 1919 Torrance Blvd, Torrance, CA 90501, phone number 800-909-1009.   Brown Honda is franchisee of American Honda with address 4200 Georgia Street South, Amarillo, TX 79110, phone number 806-359-1675.   Barber Honda is franchisee of American Honda with address 4500 Wible Road, Bakersfield, CA 93313, phone number 661-834-6632.   Rapton Honda is franchisee of American Honda with address 3630 Fulton Avenue, Sacramento, CA 95821, phone number 916-436-8364.

8.     Bridgestone/Firestone Americans, Inc. (hereinafter "Bridgestone/Firestone") principle corporate office is in Nashville, Tennessee and have retail operations under brand names of WheelWorks in California and Firestone nationwide. Bridgestone/Firestone is customer of American Honda in order to resolve the former's primary liability[1] of personal injuries and property damage WheelWorks has caused original mobile source explosion.

9.     Fuel industry producers, marketers, distributers, and sellers with business names A-Z are nationwide.   Inventors/Assignees of additives as anti-knocking agents and/or detergents are nationwide and have licensed and profited from fuel products to ensure combustion efficiency but toxic property have proximately caused permanent injuries and manifestation of personal injuries.

---

[1] Suit for Bridgestone/Firestone primary liability causing mobile source explosion 11/04/2016 was filed at United States District Court Middle District of Tennessee 10/2018.

## VI.  Duty Under Congressional Intent and California Mandate for Mobile Source Emission Compliance and Misrepresentation of Laws and Facts

10.    Congressional intent pursuant to 42 USC §§ 7401 & 7522(a)(3) & 7545 and California mandate control the subject matter.    The proof of compliance to controlling laws in subject matter is new SMOG certificate.

11.    American Honda and Bridgestone/Firestone are bound by legal duty and contractual duty to comply with controlling laws in subject matter by proof of new SMOG certificate issued to Bridgestone/Firestone by American Honda after refitting.    The contract for refitting was knowingly and intentionally altered to contract for killing when American Honda breached legal duty and contractual duty by misconducts of Brown Honda to conspire with Bridgestone/Firestone to evade the controlling laws in subject matter.    American Honda and Bridgestone/Firestone are bound by legal duty, contractual duty, and common law duty of due care to consumer to comply with controlling laws in subject matter by proof of new SMOG certificate issued to California government after refitting.    The contract for refitting was knowingly and intentionally altered to contract for killing by installing second "***Chemical Weapon***" embedded under the hood.  The fraud and tampering physical mobile source and digital data source were uncovered by California government 09/14/2017 in mere seconds.    After truth was revealed to consumer, American Honda by misconducts of Brown Honda, Barber Honda, and Rapton Honda conspired with Bridgestone/Firestone to conceal the fraud and tampering and human toxicity by misrepresentation of controlling laws and material facts.  They mutually agreed and successfully executed the following transactions:

(1) changed subject matter "from mobile source refitting to regular maintenance" therefore subverted controlling laws to bypass new SMOG certificate;

(2) tampered physical mobile source by swapping "unknown engine attached with the rest of [11/04/2016] exploded mobile source with damaged inlet and cracked outlet of manifold and ruined Oxygen sensors[2] and ruined catalytic converters and rendering the new mobile source inoperative according to Congressional intent and California mandate;

(3) made explicit misrepresentation of laws and facts that refitting was covered by any Honda dealers within 50 states with any issues of refitting;

(4) induced consumer to make false belief that subject matter of refitting was in compliance with controlling laws;

(5) knew the fraud and tampering would subject consumer in grave danger with probability to kill but they chose to do it with affirmative intent to kill the consumer in order to settle the primary liability of original mobile source explosion which has caused personal injuries and property damage;

(6) contract for fraud and tampering with intent to kill cannot be one-sided contract with the other party protesting; but, neither party has protested or exposed the other party for fraud and tampering 01/26/2017-11/06/2017;

(7) both parties knowingly and intentionally concealed the human toxicity as consequences of fraud and tampering from 01/26/2017 to 11/06/2017.

### IV. American Honda's Authority and Abuse of Authority

12.   **07/2016**, American Honda re-issued position statement superseding 2008 version Entitled "**SUBJECT: USE OF SALVAGE/RECYCLED PARTS ON HONDA VEHICLES."**   This position statement along with Honda service manual and training manual of mobile source refitting effectively created agency relationship between American Honda and ALL Honda dealers pursuant to Federal and/or California Law of Agency.   The authority of American Honda to ALL Honda dealers by sourcing genuine "original equipment manufacturer's" parts ("OEM") is direct, explicit, and unmistakable with no room for debate whether that authority is actual or apparent according to

---

[2] Evidence of ruined oxygen sensors and catalytic converter along with other elements of mobile source re-examined by other Honda dealer in California after 11/07/2017.

Federal and/or California Law of Agency in subject matter of consumer mobile source refitting, because Congress and California mandate have exclusive control over mobile source emission standard and proof of compliance, whether American Honda has "***DAY-TO-DAY CONTROL***" over Honda dealers' other segments of businesses are irrelevant in determination of Franchisor's liability in this legal matter.   The liability of American Honda in behalf of Brown Honda, Barber Honda, and Rapton Honda in subject matter of consumer mobile source refitting is adjudicated by Federal and/or California Law of Agency that principle is liable for agent's fraud and/or negligence in the scope of employment if agent abuses actual or apparent authority of principle which has caused third party injuries and damages.

13.   American Honda shall have knowledge of controlling laws in subject matter of consumer mobile source refitting and proof of compliance.  American Honda shall uniformly pass this knowledge onto ALL Honda dealers regardless of State, location, size, reputation, revenue, business and operation practices, etc..  Indeed, the master Franchisor-Franchisee agreement dictates compliance of United States laws and pertinent State laws as condition of employment of service department of personnels within the automaker-dealership relationship.  Indeed, American Honda has both legal and contractual authorities to terminate franchisor-franchisee agreement if any dealer is found liable of violation of controlling laws and harmed consumers.

14.   Brown Honda has corporate knowledge and directors of service department have personal knowledge of controlling laws in subject matter of mobile source refitting and proof of compliance.   Brown Honda knew and had American

8

Honda's authority to use genuine "OEM" parts with re-granted authority since  07/2016 to replace 2008 version.

15.    Barber Honda has corporate knowledge and directors of service department have personal knowledge of controlling laws in subject matter of mobile source refitting and proof of compliance.   Barber Honda knew and had American Honda's authority to use genuine "OEM" parts with re-granted authority since 07/2016 to replace 2008 version.

16.    Rapton Honda has corporate knowledge and directors of service department have personal knowledge of controlling laws in subject matter of mobile source refitting and proof of compliance.   Rapton Honda knew and had American Honda's authority to use "OEM" parts with re-granted authority since 07/2016 to replace 2008 version.

17.    Bridgestone/Firestone by retail operations of WheelWorks in California and Firestone nationwide have corporate knowledge and directors of retail operations have personal knowledge of controlling laws in subject matter of mobile source refitting and proof of compliance.  Bridgestone/Firestone took public notice of American Honda's authority to use genuine "OEM" parts with re-granted authority since 07/2016 to replace 2008 version.  Bridgestone/Firestone abused Honda's authority as both customer and insurer of this matter in lieu of corporate and personal knowledge of causation report of original mobile source explosion rendered the intent to kill knowing and criminal.

18.    The mutual agreement for subversion of controlling laws in subject matter of consumer mobile source refitting and ratification of fraud 01/26/2017 to tampering digital data source and physical mobile source has effectively granted the two industry

leaders ***a license to kill*** without legal recourse if the consumer was found dead at random places.  In light of actual knowledge of controlling laws and American Honda's authority to use genuine "OEM" parts with proof of compliance of new SMOG certificate, both American Honda and Bridgestone/Firestone are legally estopped to counter suits each other and are jointly and severally liable for all damages.

## V.  Intent to Defraud and Induce Reliance by Tampering Physical Mobile Source and Digital Data Source and Intent to Kill the Consumer

19.    In  light  of  American  Honda  and  Bridgestone/Firestone  knowledge  on controlling  laws  in  subject  matter  of  consumer  mobile  source  refitting  and  actual knowledge for proof of compliance by new SMOG certificate, in view of two ***relevant and material*** public documents, any willful tampering physical mobile source and digital data source to evade government exclusive control of emission standard and to beach public  trust  with  intent  to  kill  the  consumer  will  have  severe  and  exemplary  legal consequences:

(1) **American Honda** has re-issued position statement on genuine "OEM" parts and services to supersede the 2008 version in 07/2016[3].

(2) **Bridgestone/Firestone** paid the fine and ratified administrative law decree with California Department of Consumer Affairs and Bureau of Automobile Repair 07/14/2016[4] to end two-year fraud investigation on SMOG check stations in retail operations.

20.    The  actual  and/or  apparent  authority  to  use  genuine  "OEM"  parts  in regular  consumer  automobile  repair  is ***equally  and  unequivocally*** granted  to  ALL Honda dealers which included Brown Honda and Rusty Wallis Honda in Texas, Barber

---

[3] American Honda Motor Company's position statement was made available online 2008 and 07/2016.

[4] This administrative law decree between Bridgestone/Firestone and California Department of Consumer Affairs enacted 07/14/2016 was made available on California State Government website.

Honda and Rapton Honda in California.   The authority to use genuine "OEM" parts in consumer mobile source refitting is separate and distinct from regular repair by one determinative legal factor for the liability - which is Congressional intent and California mandate have exclusive control over Honda and Bridgestone/Firestone legal compliance - be it automaker, auto dealer, or auto servicer.  The issue of authority - be it actual or apparent, must come from American Honda, and abuse of that authority must come from dealers - be it knowingly or negligently.    The "day-to-day control" of Franchisor over other services is not determinative factor for vicarious liability under Federal and/or California Law of Agency, American Honda must include actual authority of legal compliance with proof of SMOG certificate in subject matter of consumer mobile source refitting written into master agreement and service manuals and service training procedures as law requires since 1990 when Congress granted EPA to set mobile source emission standard; or else suffer exemplary legal consequences.

21.    Brown Honda, by two Parrish brothers who were titled as director of service department successively within that year have knowingly abused actual authority of American Honda by subversion of controlling laws in subject matter of refitting and by commission of fraud with Bridgestone/Firestone to tampering digital data source and physical mobile source in order to evade government exclusive control on emission standard.  Brown Honda, by two Parrish brothers along with employees DOEs 1-20 have sourced a "unknown" motor attached with [11/04/2016] exploded original mobile source with damaged inlet manifold and cracked outlet manifold and ruined Oxygen sensors and catalytic converter therefore rendering new mobile source inoperative according to Congressional intent and California mandate.   Since digital

data source was tampered by mutual agreement of altering the subject matter, inability to issue new SMOG certificate was effectively covered up by fraud and deceit.  Brown Honda, by misconducts of Parrish brothers along with DOEs 1-20 knowingly abused actual authority of American Honda by explicitly told plaintiff that mobile source refitting was covered by any Honda dealers within 50 states for any issues of refitting which plaintiff made justifiable reliance on such misrepresentation of laws and facts and has come to Brown Honda and Rusty Wallis Honda in Texas, Barber Honda and Rapton Honda in California for re-examination of refitting from 01/26/2017-11/06/2017.

22.    Barber Honda with equal and unequivocal actual authority of American Honda at least since 07/2016, had ample time to tell the whole truth nothing but the truth after re-examination at least four times from 02/13/2017 to 8/15/2017.   Barber Honda chose to reveal the cracked outlet manifold on 08/14/2017 after at least four times of communication with Brown Honda without revealing the entire fraud and tampering like California government did in mere seconds:

(1) no new SMOG certificate was issued to Government after refitting;

(2) new device was tampered according to the controlling laws and inoperative;

(3) digital data source was tampered by changing position from mobile source refitting to regular maintenance;

(4) new mobile source was not genuine Honda "OEM" parts.

23.    Bridgestone/Firestone repossessed the tampered mobile source after California government revealed the fraud to consumer 09/14/2017.  From 09/25/2017 to 10/02/2017, Bridgestone/Firestone had ample time to confess that refitting was fraud and "***Chemical Weapon***" was installed by the decision of Mr. Stan Guzik et. al. the former director of retail operations with corporate compliance counsels who signed off

12

the decree 07/14/2016.  Bridgestone/Firestone by misconducts of new director of retail operations Mr. David Verde made false pretense that Rapton Honda would remedy the fraud of Brown Honda so that tampered mobile source was taken by Firestone manager to Rapton Honda 10/02/2017.

24.    Rapton Honda with equal and unequivocal actual authority of American Honda at least since 07/2016, had ample time to tell the whole truth nothing but the truth after numerous re-examination and communication with Brown Honda and Bridgestone/Firestone from 10/02/2017 to 11/06/2017.  Rapton Honda chose to disclose the cracked outlet manifold on 11/06/2017 without revealing the entire fraud and tampering like California government did in mere seconds:

(1) no new SMOG certificate was issued to Government after refitting;

(2) new device was tampered according to the controlling laws and inoperative;

(3) digital data source was tampered by changing position from mobile source refitting to regular maintenance;

(4) new mobile source was not genuine Honda "OEM" parts.

25.    Bridgestone/Firestone by misconducts of new director of retail operations Mr. David Verde then changed position 11/06/2017 in light of damaging internal documents (Mr. Stan Guzik along with DOEs 1-20) signed off the deal and he is retired) and damaging public document with California government 07/14/2016.  Bridgestone/ Firestone by misconducts of new director of retail operations Mr. David Verde chose to abandon the property at Rapton Honda and explicitly told plaintiff: "***Ann, when you sue Honda, you add US, that's how the system works***" and terminated rental car lease with enterprise and left consumer to die in California emergency rooms.

## VI. Justifiable Reliance as Detriment of Permanent and Irreversible Personal Injuries and Property Damage

26.     The re-introduction of American Honda position statement effectively re-granted **Honda authority** to ALL Honda dealers to use genuine "Original Equipment Manufacturer's ("OEM") parts in order to protect public safety[5].  See also provisions in subject matter of consumer mobile source refitting by California Air Resources Board on their website.  The re-introduction of American Honda position statement effectively put **PUBLIC** on notice about Honda authority over ALL Honda dealers on potential liability. Indeed, American Honda has both legal authority and contractual authority to terminate franchise agreement with any dealer if the latter is found to be violation of controlling laws.  The "**PUBLIC**" includes consumers, customers, insurance companies, Federal and State regulatory agencies.   Public is entitled to presumption that HONDA shall comply with Congressional intent and California mandate to meet emission standard by proof of compliance of new SMOG certificate.  But,  justifiable reliance on authority of American Honda to ALL Honda dealers has brought detriment of consumer death bed because of second **"Chemical Weapon"** was knowingly and intentionally embedded and concealed from 01/26/2017 to 11/06/2017.   Neither HONDA nor Bridgestone/ Firestone protested the fraud and tampering to consumer in refitting and re-examination of refitting from 01/26/2017 to 11/06/2017.  The mutual agreement to alter the subject matter and controlling laws and to conceal the fraud and tampering have consistently demonstrated by both Honda and Bridgestone/Firestone throughout re-examinations from 01/26/2017 to 11/06/2017.

---

[5] Dallas Attorney Todd Tracy's crash test of OEM parts of Honda Fit and conclusion of which exonerated American Honda's liability 12/2017 is the case in point for the position statement.

14

## VII. Causes of Acton Against Defendants

27.     American Honda violated Congressional intent and California mandate in consumer mobile source refitting by subversion of controlling laws and subjected plaintiff to inhalation and cutaneous exposure to toxic property from combustion engine lubricant and gasoline fuels and reformulated gasoline fuels from which toxic metals, toxic chemicals, and toxic fumes having toxic affinity to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.   Particularly both Manganese and Cadmium are having specific toxic affinity through Olfactory Bulb to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.   The exposures result in irreversible personal injuries and manifestation of personal injuries.   Long term human toxicity has yet to be determined and calculated for in light of complex mechanism of onset of diseases from so many toxins.

28.     American Honda's liability is under Federal and/or California Law of Agency that principal is liable for agent's fraud and/or negligence to third party in the scope of employment when agent abuses actual/apparent authority given by principal which has caused third party personal injuries and property damage.  American Honda's liability is for fraud and toxic tort, product liability and property damage.

29.     The liability of Brown Honda, Barber Honda, and Rapton Honda is direct liability for fraud and toxic tort, product liability and property damage under legal duty, contractual duty, and common law duty of due care in consumer mobile source refitting which have caused permanent personal injuries and property damage.

30.    Bridgestone/Firestone violated Congressional intent and California mandate in consumer mobile source refitting by subversion of controlling laws and subject plaintiff to inhalation and cutaneous exposure to toxic property from combustion engine lubricant and gasoline fuels and reformulated gasoline fuels from which toxic metals, toxic chemicals, and toxic fumes having toxic affinity to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.  Particularly both Manganese and Cadmium are having specific toxic affinity through Olfactory Bulb to human astro-glial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.   The exposure results in irreversible personal injuries and manifestation of personal injuries.  Long term human toxicity has yet to be determined and calculated for in light of complex mechanism of onset of diseases from so many toxins.

31.    The liability of Bridgestone/Firestone in behalf of WheelWorks primary liability is under tort negligence of Respondeat-Superior as WheelWorks is under Bridgestone/Firestone corporate management.  The liability of Bridgestone/Firestone for mobile source refitting is direct liability for fraud and toxic tort, product liability and property damage.

32.    The liability of fuel industry is product liability (or strict liability) for human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels without instigating specific product warning label.   The toxic property from lubricant and fuels products comprises toxic metals, toxic chemicals, and toxic gases having toxic affinity to human astro-glial cells,

melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.  Particularly both Manganese and Cadmium are having specific toxic affinity through Olfactory Bulb to human astroglial cells, melanin rich neurons, melanin rich cutaneous cells, CNS and peripheral neurological system, P450 enzymes, and every cellular mitochondria.  Fuel industry has superior knowledge in toxic property of combustion engine lubricant and gasolines and reformulated gasolines when they register the fuels for sale with EPA pursuant to 42 USC § 7545.  That superior knowledge in human toxicity was secretively and selectively held within fuel industry and EPA.  There is no product warning label to make full and honest disclosure for specific human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels.

33.    Citing legal precedent in products liability cases involving scope of manufacturer's duty to warn of dangers associated with use of product, manufacturer is held to knowledge and skill of an expert and when a failure to give adequate warning is alleged to have made a product unreasonably dangerous, the standard of strict liability is essentially similar to the standard for establishing negligence; the seller or manufacturer has a duty to warn of foreseeable dangers (Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (1973)).  The chemical makeup of anti-knocking agent and/or detergent to ensure combustion efficiency might differ in property composition, but toxic property pertaining to lubricant and fuels has proximately caused irreversible and permanent personal injuries and manifestation of personal injuries.  After leaded gasoline phased out, the regulatory scrutiny on new anti-knocking agents and other chemical ingredients is lacking particularly after ***Ethyl Corp. v. E.P.A., 51 F.3d 1053***

*(1995).* Co-incidentally, there is no update on "TOXICOLOGICAL PROFILE FOR USED MINERAL-BASED CRANKCASE OIL" by Center for Disease Control and Prevention at Agency for Toxic Substances and Disease Registry since first publication in 1997.

### VIII. Statement of Facts Pursuant to Federal Rule 9(b) for Pleading Fraud/Mistakes in Particularity by Using Clear and Convincing Standard

34.    Since plaintiff alleges fraud, toxic tort, product liability, and property damage as proximate causation and contribution of permanent injuries and manifestation of personal injuries, the statement of facts is pursuant to Federal Civil Rule 9(b) with particularity for pleading fraud or mistakes from plaintiff's personal experiences and knowledge by using clear and convincing standard. And it will subject to amendment as discovery and manifestation of human toxicity uncovers and becomes known:

1).    I am learned and trained in medical science. I am also registered to practice patent law with United States Patent Office since 2001.  In early part of 2016, I came to University of California at Davis to investigate historical food processing technologies and agricultural economics with purpose to test new consumer food product proof of concept.

2).    My 2005 Honda Civic LX was well maintained and in perfect working condition and passed visual inspection and California SMOG check and registered on **09/14/2016** in Davis, California.

3).    On **9/26/2016**, I took the vehicle to WheelWorks at Concord, CA in the street address of 1410 concord avenue, Concord, CA 94520 with telephone number 925-265-7753 for engine oil and filter change before embarking cross country trip back to East Coast.

4).    The retail operations of Bridgestone/Firestone Americas Inc. at Wheel Works changed oil and filter by using conventional mineral based oil in the grade of 5W/20W recommended by Honda.  The customer service advisor who accepted the car was different than the advisor who released the car to me for billing and I did not know which technician performed the service.   After extended delay waiting for the service despite my appointment I was offered a discount for the payment.

5).      I was scheduled to leave Davis, California 10/1/2016 but another event in San Jose changed my departure schedule and the vehicle was parked in Davis student apartment complex garage for another month.

6).      On **11/1/2016**, I took off at UC Davis and headed back to the East.

7).      I enjoyed the smooth driving about 1300 miles from I-5 to I-40 and cruising through State of California, Arizona, and part of New Mexico.  I wasted no time other than stopping for food, fueling and rest.

8).      About 5PM on **11/04/2016**, local time in New Mexico, a short distance from San Jon, the Honda engine exploded suddenly without any warning on the dashboard.  I saw heavy smoke came out of hood and heard very loud boom-boom sound.

9).      The weather condition along the National Highway I-5 to I-40 was nice and unremarkable with sunny skies but chilly temperature.  Each State would have storage for local weather and meteorologist report.  I had all windows shut with air-conditioner on at moderate heat.  No smells in the cabin prior to the explosion.

10).     At first, I thought this was terrorist attack.   But fortunately US Military Personnel behind me helped me move the disabled vehicle off I-40 on shoulder.   I was immediately advised by the gentleman in uniform that **THERE WAS NO ENGINE OIL CAP** secured at the Engine.

11).     With burning fuels and heavy smoke, he retrieved a canister from his truck and sprayed the entire engine area to reduce fire hazard.

12).     I was then informed to go up to Valero gas station on the right side of I-40 to call towing service.  Before he left, he asked me to call WheelWorks.

13).     Workers at Terry highway services observed the vehicle damage.   The Honda was stored at Terry Services at street address 2369 State Hwy 469, San Jon, NM 88434 (telephone 575-576-9252) pending liability investigation.

14).     The consumer affairs department of Bridgestone/Firestone Americas Inc. opened a claim and claim number is 2222391 under my name 11/2016.

15).     Mr. Juan Mendoza and Mr. Stanley Guzik, were my contact persons at Bridgestone/Firestone Americas Inc. retail operations located then in Bloomingdale, IL for my claim matter.

16).     Neither Mr. Mendoza nor Mr. Guzik (Mr. Mendoza's boss) nor consumer affairs department of Bridgestone/Firestone informed me about human

effect of toxic exposure from their man-made disaster after claim was opened **11/2016**.

17).     **01/04/2017**, I was notified by telephone Bridgestone/Firestone accepted full liability of my mobile emission source explosion and asked my consent to refit the mobile emission source at Brown Honda of Amarillo, Texas.

18).     **1/26/2017**, Brown Honda release the vehicle to me and explicitly told me that Bridgestone/Firestone has wired requisite payment for the entire refitting and told me that I can go to any Honda Dealer within 50 states of United States for verification and service if any issue arises under warranty.

19).     From **2/13/2017 to 8/15/2017**, I have visited Bakersfield Barber Honda dealership four times to complain about refitting issues but Barber Honda by its officers and directors and employees never told me the fraud in parts, in labors, in warranty, in safety, in violation of Federal and California mandate on refitting based upon their physical examination. And they never told me that the refitting of mobile emission source has been modified in online data entry of digital network as route maintenance. Hence no new SMOG certificate was  issued to California government and docketed for the refitting.

20).     **9/14/2017,** California Department of Motor Vehicles and Consumer Affairs Department in a few seconds declined SMOG because it would not pass the visual inspection for Federal and California mandate.   They issued warning and asked to re-do the whole system immediately.   When they learned that Bridgestone/Firestone engaged Honda dealer, they alerted me about administrative law decree enacted 07/14/2016.

21).     **9/25/2017**, Bridgestone/Firestone repossessed the property and kept it at Firestone Complete Auto Care Center (shop #1228, manager Vishaal Singh) in Sacramento, California.

22).     From **9/26/2017 to 10/10/2017**, I was given a rental car under Bridgestone/Firestone corporate rental agreement with Enterprise.  It was during the two week cession of toxic exposure I was taken by ambulance to Woodland Memorial Hospital ER address at 1325 Cottonwood Street, Woodland, CA 95695, with phone number 530-662-3961 when the driver of semi-trailer lost control at the steering wheel and hit the rental car at rear end while I felt dying.

23).     **10/10/2017**, after admission was completed, I was seen by Mr. Nathan Trueblood, PA with blood pressure was measured at 190-200 and chief complaint was deep brain stem radiation pains and sharp traveling chest pains and felt like dying.  No patient history was taken, Mr.

Trueblood, PA order a CT Scan.   He then informed that I had a brain tumor measured at 1.3 cm3.   He ordered further follow-up with Oncologist.   With complaint of sharp chest pains, Mr. Trueblood, PA ordered two views of Chest X-Rays.   Neither Mr. Trueblood, PA nor the diagnostic physician informed me on the clinical findings **"Mildly elevated left diaphram.  Mild widening of the superior mediastinum most likely do to vascular structures.  Enlarged nodes or other soft tissue mass cannot be ruled out.  Consider CT scanning."**  Mr. Trueblood, PA never informed me on this clinical findings and recommendation of CT scan on chest.

24).   **10/10/2017**, I have never met nor heard from Supervising Physician Jordan L. Kramer, MD, although his name appeared on the ER medical records.   Indeed, neither Mr. Trueblood, PA nor Dr. Jordan L. Kramer consulted with local or national chapters of American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels.  Upon discharge, I lodged at Downtown Woodland hotel and felt like I was dying.

25).   **10/11/2017**, I re-admitted to Woodland Memorial Hospital ER.   Ms. Ali Grechko, PA saw me based on previous day's diagnosis "high blood pressure and brain tumor" and she was pregnant at the time and did very preliminary examination.  Upon my persistent complaint of symptoms, Ms. Ali Grechko, PA ordered a MRI for malignancy evaluation of the brain tumor shown on CT scan from 10/10/2017.   I was given ***Manganese IV injection*** before placed in the MRI machine.  Within a couple of hours, I felt my brain was going to be exploded and endured the whole exam.  I was discharged and told never to worry about malignancy of the brain tumor as they concluded clinical findings: **"1.2X1.0cm partially calcified left frontal parafalcine extra-axial dural based mass without surrounding peritumoral edema or significant mass effect.    Most consistent with meningioma.  No additional lesions."**

26).   **10/11/2017**, Cam Chau, MD never met with me nor took any personal   or medical history, and her impression was based upon Physician-Assistant communication to her.   Before I was discharged, neither Ms. Ali Grechko, PA nor Cam Chau, MD consulted with local or national chapters of American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels.

27).   After discharged from Woodland ER, I lodged in Sacramento Hotels for a few days.  On **10/18/2017**, I was re-admitted to Woodland ER because I felt I was dying with a lot of pains and laboring my breath.  Mr. Trueblood, PA saw me again and ordered additional X-Rays on Spine with 2-3 views.

Lower lumbar spine shown demyelination and the bones demineralized.  I have never met nor heard from John N. Winn, MD the Radiologist who issued the clinical opinion on my spine.   Neither Dr. Winn nor Mr. Trueblood, PA took patient personal and medical history and never asked me any questions related to clinical findings on my spine.   I was discharged when my blood pressure at 182 mmHg over 105 mmHg with deep brain stem radiation pains and sharp traveling chest pains and finding of lower lumbar spine of demyelination and bones demineralized. Indeed, on **10/18/2017**, neither Mr. Trueblood, PA nor John N. Winn, MD consulted with local or national chapters of American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels.

28).     **10/26/2017**, I was re-admitted to Woodland ER again because I felt like I was dying.   Ms. Ali Grechko, this time did not perform any examination and she turned my case to Mohammed Kayali, MD after extended period of waiting, he saw me and I insisted to have a blood workup and explicitly told him my chief complaints and the toxic exposure.   I was discharged under the condition that my blood pressure was 185 mmHg over 115 mmHg, my oxyhemoglobin measured as 58% (normal range 92.0-100.0%) and my fasting blood glucose level at 109 mg/dL (normal range 70-99) without diagnosis of poison or toxicity and without any treatment.

29).     **10/26/2017**, Mohammed Kayali, MD told me that he made call to poison control center but they said the COHb at 2.7% was too low to warrant any treatment.  I was discharged.

30).     The medical records **10/26/2017** documented by Dilbag Singh, MD as re-examination/re-evaluation physician. I never met with this physician and has no personal knowledge nor recollection of personal knowledge to this physician.  It appears the content of documentation by this person is a made-up.  Plaintiff only met with Mohammed Kayali, MD who wrote down the chief complaint ED as "**multiple complaints, frequent urination.  'My vessels in my head were pulsating.'  'I want a CO test because I've been driving around in a car with leaking.'"  10/26/2017 17:53.**

31).     I have come back to Woodland twice **11/2017-12/2017** to obtain medical records.  No one from ER and/or Woodland Hospital attempted to contact me to make any diagnostic corrections from **12/2017 to present** in light of clean-cut obvious medical evidences they have dismissed for human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels.

32).     **11/2-11/3/2017**, I was admitted to Mercy Hospital of Bakersfield Southwest, after staying in downtown Bakersfield Hotels sleeping and woke up without any sensation of lower extremes bi-lateral.  I was seen by ER physician John Neely, MD who ordered CT and punctured artery and venous blood and verified extreme disparity of gas ratios and told me that COHb index was not reliable as indicator for toxicity and ordered "Pure Oxygen Treatment" and I was kept at ER overnight.  My fasting blood glucose level was 138 mg/dL (normal range 65-105 mg/dL) and my blood pressure was 174 mmHg over 100mmHg.  Dr. Neely told me CT scan was negative of Carbon Monoxide poison but give no diagnosis of Brain Lesion appeared in CT scan concluded as **"no acute intracranial abnormality.  Calcified mass adjacent to the anterior falx in the left frontal lobe measuring 1.2X0.8X1.1 cm (signed off by Alfred Sein, MD)**. Before discharge, no attending physician nor consulting physician consulted American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels despite the fact it pertained chief complaint in the ER admission and in the medical records.

33).     **11/8/2017-11/9/2017**, I was re-admitted to Mercy Hospital of Bakersfield Southwest again as I felt like dying.  I was seen by Edward L. Nichols, MD who decided to turn me over to social services.  I was discharged  without treatment as Dr. Nichols deemed COHb at 2.8% was too low for Oxygen Treatment, despite the blood workup 11/08/2017 shown Anion Gap 14 mmol/L (Normal range 3-11 mmol/L); Glucose Level 139 (normal range 65-105 mg/L); BUN/Crt Ratio 24 (normal range 10-20).  Dr. Nichols did nothing in light of his clinical impression:

1. Carboxyhemoglobin exposure by history.
2. Hypertension.
3. Headache evaluation.

It was Dr. Nichols judgment that prior to my discharge he never called American Association of Poison Control Centers for any consultation in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels despite the fact it pertained chief complaint in the ER admission and in the medical records.

34).     **11/19/2017**, I was re-admitted to Mercy Hospital of Bakersfield Downtown due to close distance to hotel I was staying.  I felt like dying with severe deep brain stem radiation pains, nausea and vomit and dizziness with laboring breath.  My extremities bi-lateral had no sensation and complete numb.  After admission, I was placed in ER observation bed and with extended long period of delays, ER physician and nurses notified

23

me that they were waiting for local Poison Control Consultation.  I do recall a male visitor stopping my bed while I was administered pure oxygen treatment.   At conclusion of ER treatment, no attending physician nor consulting physician consulted American Association of Poison Control Centers in the subject matter of human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels despite the fact it pertained chief complaint in the ER admission and in the medical records.

35).        On my own initiatives, first I discovered a treatise around **1/28/2018** and such intelligent work was written for medical professionals entitled "TOXICOLOGICAL PROFILE FOR USED MINERAL-BASED CRANKCASE OIL" by Center for Disease Control and Prevention at Agency for Toxic Substances and Disease Registry Division of Toxicology/Toxicology Information Branch at 1600 Clifton Road NE, E-29, Atlanta, Georgia 30333.   I have learned that no updates of the treatise since first publication in 1997.

36).        Further reading and investigation from this treatise from **02/2018 to 06/2018**, I discover the body of medical information on toxic metals and toxic chemicals and toxic gases stored in Center for Disease Control and Prevention (CDC) and discovered body of peer reviewed articles on toxicity of mineral-based crankcase oil in reference to my toxic symptoms. Some of articles were sponsored by US Environmental Protection Agency (EPA) with large volumes published and shared in international domains.

37).        Since inhalation and cutaneous exposure was due to mobile emission source (Engine/Exhaust) system failure under third party duty of due care, efforts were made on human toxicity of inhalation and cutaneous exposure to both combustion engine lubricant and gasoline fuels[6] and reformulated gasoline fuels.

38).        From **8/1/2018 to 9/30/2018**, I came to UC Davis Medical Center seeking medical proof of causation and manifestation of toxicity and have since compiled literally a small database in the subject matter. By the end of investigation, a reasonable learned person without medical licensure can reasonably draw conclusion that medical malpractice and gross negligence have been committed by Woodland Memorial Hospital and Mercy Hospital of Bakersfield on human toxicity of inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels.  UC Davis Medical Center disputed

---

[6] This review article entitled "Potential Health Effects of Gasoline and Its Constituents: A Review of Current Literature (1990-1997) on Toxicological Data" authored by Luciano Caprino and Giuseppina I.Togna Institute of Medical Pharmacology, University of Rome "La Sapienza," Rome, Italy is one of many discovered at UC Davis Medical Center in the summer of 2018.

my inquiry in **09/2018** that facility does not have toxicology clinic[7] and pointed to hospital admission Directory Board that no such service existed.

39).     On my own initiatives, I have discovered Emory University which is also affiliated with CDC has clinics for exposure of toxic fumes and HAZMAT.

40).     **10/1/2018**, I left UC Davis Medical Center and came to Atlanta, Georgia seeking proper human toxicity care and proper diagnosis on my brain lesion as well as whole host of toxic medical issues which have destroyed my physical and mental health with debilitating and disabling consequences.

41).     The first suit which exposed plaintiff to toxic property from combustion engine lubricant and gasoline fuels was filed from Atlanta, GA **10/28/2018** at United Sates District Court Middle District of Tennessee, and the medical malpractice and gross negligence suit ensues **11/10/2018** at United States District Court Eastern District of California.  And this suit will be filed on or before **01/14/2019** at United States District Court Central District of California at Western Division in Los Angeles.

42).     As to toxic property pertaining inhalation and cutaneous exposure to combustion engine lubricant and gasoline fuels and reformulated gasoline fuels and manifestation of such toxic property in human organism from toxic exposure **11/2016 to 11/2017**, below description is my personal documentation.

43).     From **11/4/2016 to April of 2017**, I have several sessions of flu-like symptoms without any grade of fever.   The sessions described as coughing, sneezing, running noses and watery eyes, itching and burning sensation of eyes, nose, ear lobes, forehead, hands bi-lateral.  There were red and purple-ish colored skin rashes, short of breath, headache and sleep disturbance.  But never once with any grade of fever.  I drank a lot of orange juice and green tea and ate a lot of greek yogurt and home made cranberry sauce and a lot of green leaf veggies for relief.  I thought I had stress over the course of disruption and under the weather.

44).     My regular menses usually started the first week of every month made a sudden stop **1/10/2017**.   I never experienced menopausal problems and hormonal changes, as both my mother and older sister shared with me about their horrible menopausal affairs.  For me, It bursted out the first day of 1/10/2017 and stopped next day completely, much more liking the effect that someone turned off the faucet suddenly.

---

[7] On the contrary, American Association of Poison Control Center Website does list UC Davis Medical Center as Sacramento local chapter for poison control consultation.

45).     In **March of 2017**, I noticed my left index finger nail appeared a single beau's line and I began to document that strange appearance. (Note: I've observation on cancer patients who were undergoing cycles of chemo-and radiation therapies usually had multiple beau's lines on one's finger nails, this was learned experience at my oncology training in the late 1980s). I documented my finger nail beau's line on **3/18/2017, 3/23/2017, and 4/1/2017.**

46).     I am a professional woman who have led a clean and productive lives with strong religious faith and balance of nutrition without any chemical addiction and chemical treatment; but why I suddenly grew a beau's line on my left index finger nail?!

47).     At the end of **summer 2017**, those red and pinkish skin rashes have receded and became clusters of dark spots intensely appeared on my both hands. I documented those cluster of dark spots. My other parts of body covered by clothing never appear any clusters of dark spots.

48).     Throughout the year of **2017**, I noticed my hairs turned layers of grey and became very brittle, dry scalp and dry hair but I was oily hair all my life.

49).     Throughout the year of **2017**, I noticed my headaches gradually getting worse but with my forehead evenly maintained the same degree of low temperature.

50).     Right after the engine explosion, I noticed my urine had sweet and rotten egg-like odors and smells. But, both my smell sensation and taste sensation gradually became retarded from **11/4/2016 to 3/26/201**7, when I was told by other people in the restaurant that I could no longer identify the smells of apple cider vinegar and wasabi sushi sauce. Now, when I drink soup without added salt, I will have no complaint because my taste bud would not tell.

51).     In **7/2016** when I renewed driver license, eye examination was required as I passed eye examination at doctor's office with flying color however, throughout of **2017**, I have double vision and blur vision.

52).     Since **11/4/2016 and throughout 2017**, my lower extremities in forearms and lower legs bi-lateral marked as weakness, numbness, muscle tinkling and twitching with night being the worst time due to lacking of sleep. The ER examination **11/2017** puzzles doctors and nurses as I physically appeared to be stocky but muscle and skeletal system appeared very weak.

53).      On the day of **12/18/2016**, my lower eye lids bi-lateral was having twitching and tremor, it came so strong and lasted so long, the students at North Carolina State University sitting across the table with me saw it and asked me whether I was okay and joked about "too much coffee?"

54).      Since **11/4/2016 and throughout 2017**, each day when I was stepping into shower, I noticed my right side of belly is getting larger and fuller without any sharp pain.

55).      Since **11/4/2016 and throughout 2017**, each day my head was getting cloudier and having cramps and spasm-like dull pains radiated from the deep back stem of my brain without any known excuses, as I am free of alcohol, tobacco, illicit recreational drug, or prescription drug abuse.  I have not been on any medication.

56).      Since **11/4/2016 and throughout 2017,**  each day I noticed that I have lost the ability of recalling the specific words and terse and specific events which used to be dear to me.  I have lost my full executive capability which I used to hold my self in high regard for whatever I do.

57).      Since **11/4/2016 and throughout 2017,** my both hands skin was very dry and always feel like touch of detergent and my usual sweaty hands were completely replaced by dry palms.

58).      Since **11/4/2016 and throughout 2017,** I have gradually experienced my posture was unsteady from changing motions and changing body positions such as getting up, getting out of bed, getting out of the car, holding a cup of coffee while getting out of the car, the usual normal small tasks became unsteady and tardy.

58).      Since **11/4/2016 and throughout 2017,** my personality has changed drastically and even myself cannot recognize and explain those behavior.

60).      Since **11/4/2016 and throughout 2017,** I saw my both hands gradually had cutaneous lipid per-oxidation and lipidosis and my bottom of belly had the same cutaneous lipid per-oxidation and lipidosis and I was puzzled by the fact that my diet was mainly fish, egg, fruit and vegetables and I was not a fat or red meat eater all my life.  I have always been soda free.

61).      Since **11/4/2016 and throughout 2017**, I saw my limbs bi-lateral had cutaneous lipidosis and when I raised one leg, I saw the clear line of skeletal-muscular separation.

62).      From **10/10/2017 to 11/19/2017** at the peak of delayed onset of toxic symptoms, all relevant and material clinical toxicology tests and reports should have obtained then but were dismissed by Emergency Department

of Woodland Memorial Hospital and Mercy Hospital of Bakersfield attending physicians and consulting physicians due to gross negligence and departure from legal and medical standard duty of due care.

63).    My toxicology emergency data was not registered in National Toxicology Database because of gross negligence by ER health care providers as all Federal agencies come to rely on "the one and only database" for policy making and executive action.

65).    Not a single minute has gone by without deep brain stem pains and the fore head white matter scar tissues hugely impact on life and sleep and all other regular human life activities.   Every a few minutes, there is a skin spot has burning sensation.  Too many issues to list in this complaint now.

66).    None of my toxicology emergency condition is reversible and systemic damage has already been done.  My prognosis is gloom based upon vast medical precedents of inhalation and cutaneous exposure such as 9/11 national emergency.

66).    Due to superior industry knowledge Honda and Bridgestone/Firestone and fuel industry have had, SMOG certificate is legally insufficient for public safety protection without specific product warning label to raise the public awareness of human toxicity if the industry knowingly or negligently causes failure of safety protection for the public.

## IX. Prayer for Damages

35.    Plaintiff demands trial by jury on all issues of disputed facts.   Plaintiff seeks at least $100 million compensatory damages for near death experiences and permanent brain and organ and cell damages and pain and sufferings and at least $500 million punitive damages to send a strong message that willful subversion of laws with intent to kill cannot be tolerated in civil society.  Due to the nature of toxic property and manners of exposure, plaintiff reserves legal rights for any foreseeable and unforeseeable manifestation of personal injuries derived from this matter.   Such other and further relief this court may deem just and proper.

## AFFIRMATION FOR e-FILING

I, ANN ZHAI, plaintiff, duty sworn, state, and affirm under the penalty of perjury of United States Law that information pertaining to this complaint is my personal experiences, my personal knowledge and recollection of my personal knowledge. This case derived from defendants' fraud and toxic tort, product liability and property damage which have subjected plaintiff to inhalation and cutaneous exposure to combustion engine lubricants, gasoline fuels, and reformulated gasoline fuels from consumer mobile emission source from 01/26/2017-11/06/2017. For Bridgestone/Firestone liability, the exposure is from 11/2016 to 11/2017. On January 12th, 2019, I let Notary Public in State of Georgia to certify my name and signature and I file the complaint via ELECTRONIC MEANS on District Court Website with a set of paper copy mailed by USPS priority mail.

1) verified complaint,
2) petition for waiver of filing fees and affidavit of poverty and asking court permission for filing under the seal and seeking pro bono counsels at Federal Bar with Non-partisan inclination,
3) letter notifying USDOJ is deferred until after the confirmation of new United Stats Attorney General.

Dated:01/12/2019
Atlanta, Georgia

By:      __e/Ann Zhai_____
         Ann Zhai
         4325 Hickory Wood Lane
         Doraville, GA 30360
         201-787-8788 (Mobile)
         ann.zhai@gmail.com

29

<u>AFFIDAVIT IN SUPPORT WAIVER FOR FILING FEES AND COURT COST AT
RESPECTIVE UNITED STATES DISTRICT COURTS AND FOR APPOINTMENT OF
QUALIFIED LEGAL COUNSELS REGISTERED AT FEDERAL BAR</u>

<u>I. FOR WAIVER OF FILING FEES AND COURT COST</u>

I, Ann Zhai, plaintiff, duly sworn, state, and affirm under the penalty of perjury of United States Law, I furnish this affidavit in support of my position for waiver of filing fees and court cost at respective US District Courts for the following reasons:

1.      I am a single professional woman, never married, living alone, never had, and never have domestic living partner, common law spouse, or non-spouse otherwise in any State.

2.      I do not have children, biological, or adopted otherwise in any State.

3.      I came to United States of America to further advance my medical and scientific career and training after my discovery and provided scientific proof in thesis of molecular basis of non-responsiveness of Tamoxifen chemotherapy treatment for certain breast cancer patients.  I took advise from pathology professor a Yale Medical School graduate in 1940s that I would have great future in America and became United States citizen 02/2002.

4.      Although I am a citizen of United States of America, I have never exercised my right to vote nor do I have participated any political events in any capacity to support any candidate in governmental services at Federal, State or local levels.  I have not made financial contribution to anyone nor do I have means to do so.

5.      I am apolitical and remain independent in views of all matters due to life changing events which have happened to me personally since 2/1995 and from which I became plaintiff of law suits derived from that date and events.

6.      This can be verified with Department of Justice at United States Attorney's office at Southern District of New York and Second Circuit of US Court of Appeals and New York State Court of Appeals through an order to show cause I filed 01/2014.  And the reference of cases are as followings:

(1) Zhai v. Chemical Bank and Mount Sinai School of Medicine, Mount Sinai Hospital and Mount Sinai Medical Center (NYS Supreme Court);

(2) Zhai v. Batson et al..(SDNY).

7.      The corruption and deviation from the Rule of Law by officers of the court who have employed fraud and deceit to make subject matter disappear from correct subject matter jurisdiction and use the corrupt and deviated rulings as legal precedent for other cases to come prompted me to file the oder to show cause and sent that to Department of Justice at US Attorney's office Southern District of New York 01/2014.

8.      From 2/1995 to today, like anyone else reading from news media, I have learned one of the judges who decided on my case three times have committed suicide 4/12/2017.  I have not been notified any final disposition by United States Attorney's office and by courts.

9.      Due to the above cases derived from 2/1995, my faith in Constitution and principle in Rule of Law has been tested on fire in 24 years of my adult life and I was forced to depart from a conventional life path - such as marriage, career, family, children, and make contribution in medical and scientific community and/or industry.

10.      I strained my family sibling relationships due to my faith in principle and the Rule of Law and I have been too stubborn in truth and truth seeking process.  I was elated by 5/1/2017 called a law day by the Administration and the Chief Justice.

11.    I am eternally grateful for my parents who are both deceased but who have raised me and supported me in my faith and principle in truth and the Rule of Law.

12.    My personal and professional life suffered in unimaginable ways when I took the causation with powerful opponents who have ruled literally everything.   In the entire year of 2009, I sought legal counsels in New York State but no one was willing. Who would take on a cause with an institution comprising 50 plus board of trustees well connected to Wall Street, legal system, and Government Administration?

13.    Without the day before Christmas of 2009, I discovered one ruling from Supreme Court written by Hon. Clarence Thomas who said that "the subject matter jurisdiction can never be waived by anyone," I would have never maintained my faith, principle, determination, and personal sacrifice, to continue the fight for truth until today.

14.    I have lived a student life without income in absence of my choice.   I do not fancy for measurement in material possession, fame, glorified title, or currency of any kind as we rather all die one day and I have been living like student and nun since 2/1995 after embarking onto the truth seeking path.   I did learn however, political connection and financial resources do talk in the legal system where the rule of law has become an endangered species and commodity traded for favor, status, and promotion.

15.    My daily visit to the inspiration after a prayer since 2/1995 is this:

All truth passes through three steps ---- By Arthur Schopenhauer (Asael)

(1) It is ridiculed;

(2) It is violently opposed;

(3) It is accepted as being self-evident.

16.     From in re Zhai v. Chemical Bank and Mount Sinai School of Medicine, Mount Sinai Hospital and Mount Sinai Medical Center, the parties and officers of the court made sure the parties and the subject matter disappear in the legal system and use the corruption and deviation from the Rule of Law as legal precedent for others, just because they can.

17.     I came to University of California at Davis in early part of 2016 after I discovered the New York State Court of Appeals has removed its final ruling quietly and silently from public legal sources.    I was elated and began to plan on salvage my remaining life by devoting a just cause which can benefit everyone - the food processing and chronic diseases, food processing and agriculture economics.    As I was pounding the incompletion of research data for heart diseases and diabetes, I was hit by this matter in absence of my preparation.    Now my health is gone.    A health with intelligence and determination was all I have while facing adversity on fringe of society.

18.     This time around, it took me 8 months rather than 14 years to discover "the subject matter jurisdiction can never be waived by anyone," recalling from writing of Hon. Clarence Thomas from the fateful day of 12/2009. And I submitted the paper to respective United States District Courts in re Ethyl corporation's liability in gasoline fuel additives after exhaustion of all efforts searching for legal counsels at personal injury bar and patent bar nation wide.

19.     No one can return 24 years of my life lost for what I suppose to do and was capable to do and no damages can compensate the lost of time in that scale.    I wish someone next to me can record or report my sufferings in the past 24 years and in recent traumatic brain and organ injuries but no marriage or relationship can survive.

20.    I write this in good faith as I do not know whether citing 42 U.S.C. §1915 is appropriate as I am neither a Federal prisoner nor a locked-up.  I take great pain and even shame to write this as I am managing to de-swell my brain and liver after oxygen treatment without any known remedy other than "comfort care" in current medical information for gasoline fuel additives injuries.  I pray for the God that I am able to wake up every day.

21.    I am smoke, alcohol, and drug free my entire life.   After the traumatic injuries, I get 2 to 3 hours of shallow sleep each day.  When all aids failed and one day, I tried Dragon Fruit which is known for higher content of Magnesium and other good nutrient, and I consumed 3 in the afternoon and three in the evening, and on that day, I got 5 hours of deep sleep.  But, who can afford $6.99 per pound with each dragon fruit weighs more than a pound?  At least six of them each day every day until I finished the paper?  For the past 12 months, I maintained chaos in order to submit the papers just-in-time.  I learnt that the voltage-gated channels have been irreversibly destroyed.

22.    After oxygen treatment, I began noticing my frequency of soiling my pants without me knowing it.  From the knowledge of human anatomy of anal sphincter interior and exterior muscles and nerves function I knew something was wrong and has to do with Nitric Oxide.  I do know that no ER physician has given me nor did I consume large quantities of Organic Nitrate prescription drugs.  Since I was told that Oxygen treatment would flush out carbon monoxide, how come there is Nitric Oxide functioning at wrong place?  I still remember the first New England Journal of Medicine published the erectile disfunction in 1992 which shared the same neurotransmission with anal sphincter interior muscles.  From there, I turned to public information and I was not satisfied with

any of the answer.  Not until I turned to the patent portfolios of Ethyl corporation, was  I shockingly surprised and stunned.  Due to Nitrergic Neurotransmission is a class of independent neurotransmission parallel to the second messenger system, I began to relate other new physical problems and from there all my speculation was confirmed.

## II. FOR APPOINTMENT OF QUALIFIED COUNSELS REGISTERED AT FEDERAL BAR

23.    This matter may contain civil and criminal nature if the causation and intent to use fraud and inequitable conduct to secure patent rights and use it illegally for market manipulation to benefit one corporation to dominant worldwide fuel additives market but to subject people in great harm and to subject the balance sheet of Federal Government in fighting control of spending on wars on drugs, on reimbursement of medicare and medicaid, on social security disability payment, on lost of productivity of employees, on errors and omission of people on duties, etc. etc..

24.    No rational and logical Federal government would grant patent rights in the way it has been granted.  No rational and logical Federal government would grant the fuel additives certificate waiver in the way in has been granted under the patent rights in the name of public safety and public interest.

25.    No rational and genuine democratic government would subject its own people in an environment for the root of causes overlooked or neglected for decades. When I read "Central nervous system toxicity of manganese. II: Cocaine or reserpine inhibit manganese concentration in the rat brain" published in 1999 by Ingersoll RT1, Montgomery EB Jr, Aposhian HV. on Neurotoxicology. 1999 Apr-Jun;20(2-3):467-76) I was shocked to my core.  I pictured the publications with my own ER experiences by which Narcotics and controlled substance were handed over to nurses to patients.

26.    I copy-pasted the abstract of publication here:

**Abstract**

"Manganese concentrates in the ventral mesencephalon of male Sprague-Dawley rats after intrathecal administration of $MnCl2$. We tested the hypothesis that Mn concentration in the central nervous system (CNS), particularly in the ventral mesencephalon, is decreased by inhibiting dopamine reuptake using cocaine or by decreasing dopamine concentrations using reserpine. The intrathecal administration of Mn (250 micrograms Mn/rat as $MnCl2$) caused the Mn concentration in the ventral mesencephalon to increase from 0.57 to 31.8 micrograms Mn/g. Cocaine administration (8.6 mg/kg i.p.) thirty minutes prior to $MnCl2$ decreased ventral mesencephalon Mn to 3.3 micrograms Mn/g. By giving reserpine (5 mg/kg i.p.) 24 hours prior to $MnCl2$ the ventral mesencephalon Mn concentration was decreased from 29.9 micrograms Mn/g to 3.7 micrograms Mn/g. Intrathecal $MnCl2$ decreased the dopamine concentration in the caudate putamen by 40% six hours after administration. Cocaine or reserpine decreased the Mn concentration in the ventral mesencephalon, occipital pole, frontal lobe and caudate putamen but did not change the Mn concentration in the cerebellum. The results indicate that the mechanism(s) by which Mn is concentrated in many brain regions can be inhibited by cocaine, a dopamine reuptake inhibitor, or by reserpine, a dopamine depleter, and suggest that the Mn concentration in the CNS is related to dopamine reuptake and/or concentration."

27.    I respectfully urge respective United States District Courts to take a careful look in the subject matter of this legal matter at Ethyl corporation's patent portfolios and fuel additives waiver and societal public health matter, as I have said in my paper

7

earlier, the costs for public health is too heavy to worry about my personal destiny.   In my ER stay, physicians prescribed narcotics and gave it to nurses for patient consumption at ER without explaining it, should have I not been diligent enough and asked right questions before swallowing pills, I would be inadvertently hooked.   If we use venom to cure another venom and venom effects, we are not far from extinction.

28.   The public interest and safety demand swift action by our Federal government to execute resources effectively and intelligently.   US courts are put in the forefront to right the ship and upheld the Rule of Law in the subject matter jurisdiction. After 24 years of truth seeking process, I knew from the fact that without contacting Department of Justice at US Attorney's office in 1/2014 after reading one Supreme Court ruling "the subject matter jurisdiction can never be waived by anyone in 12/2009, the operation of public corruption still remains as status quo and business normalcy. For the good cause and the important cause shown, I respectfully ask respective United States District Courts to appoint competent legal counsels registered at Federal Bar in the interest of Justice and the Rule of Law.

DATED: 08/06/2019
ATLANTA, GA 30360

RESPECTFULLY SUBMITTED,

BY: _____

ANN ZHAI
4325 HICKORY WOOD LANE
DORAVILLE, GA 30360
201-787-8788 (MOBILE)

8

8/8/2019

Clerk of Court
United States District Court

In re:

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT CENTAL DISTRICT OF CALIFORNIA AT
WESTERN DIVISION OF LOS ANGELES
UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE
-------------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. WOODLAND MEMORIAL HOSPITAL ET AL;
IN RE ANN ZHAI V. AMERICAN HONDA MOTOR COMPANY ET AL;
IN RE ANN ZHAI V. BRIDGESTONE/FIRESTONE AMERICAS INC. ET AL
-------------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. NEWMARKET COMPANY (KNOWN AS ETHYL & AFTON)

Sirs/Madam:

        This letter is to confirm the court has the most current mailing address from
whichever address is on your docket:

Ann Zhai
4325 Hickory Wood Lane
Doraville, GA 30360

        Thank you very much in advance for your updating to present form.


Yours sincerely,

Ann Zhai
201-787-8788 (mobile)

8/8/2019

Clerk Office
United States District Court

In re:

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT CENTAL DISTRICT OF CALIFORNIA AT
WESTERN DIVISION OF LOS ANGELES
UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE
-------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. WOODLAND MEMORIAL HOSPITAL ET AL;
IN RE ANN ZHAI V. AMERICAN HONDA MOTOR COMPANY ET AL;
IN RE ANN ZHAI V. BRIDGESTONE/FIRESTONE AMERICAS INC. ET AL
-------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. NEWMARKET COMPANY (KNOWN AS ETHYL & AFTON)

### **Request for Electronic Access for Court Docket Information (Pacer System)**

Sirs/Madam:

I request to be able to electronically access the court docket information system to
reduce paper usage and postage cost:

My email address which can accommodate large size PDF or text format is gmail
address as such followings:

ann.zhai@gmail.com

My mobile phone number is as followings:

201-787-8788 (cell)

My most current mailing address is as followings:

4325 Hickory Wood Lane
Doraville, GA 30360

Thanks in advance for your assistance in this matter!

Yours sincerely,

Ann Zhai
201-787-8788 (mobile)

8/8/2019

Clerk Office
United States District Court

In re:
UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT CENTAL DISTRICT OF CALIFORNIA AT
WESTERN DIVISION OF LOS ANGELES
UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE
-------------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. WOODLAND MEMORIAL HOSPITAL ET AL;
IN RE ANN ZHAI V. AMERICAN HONDA MOTOR COMPANY ET AL;
IN RE ANN ZHAI V. BRIDGESTONE/FIRESTONE AMERICAS INC. ET AL
-------------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. NEWMARKET COMPANY (KNOWN AS ETHYL & AFTON)

Sirs/Madam:

You would find the list of documents in USPS Priority Mail envelope:

1. Supplemental public information in re Ethyl corporation's liability, 3 pages 6 Exhibits;
2. In re Ethyl corporation's liability, 38 pages, no exhibits;
3. Initial verified complaint with each respective United States District Court, I want to apologize that a copy to myself in a sealed envelop I might have left in Office Depot, or UPS notary public service store, or USPS in Chamblee office, because I have searched everywhere and I could not find that envelop, to cure that I re-signed with recent date but provided mailing receipt and notary public for two signature charges and letters sent to Attorney General Jeff Session of Department of Justice and to Clerk office of Middle District of Tennessee of US District Court all on 10/25/2018;
4. Affidavit in support of waiver of filing fees and court costs and for appointment of qualified legal counsels registered at Federal Bar with my 24 years of life experience since no custom made form would tailor this crucial background information;
5. Application for waiver of filing fees provided by respective US District Court;
6. Update the most current mailing address from your records;
7. Request for electronic access to Pacer System for court information;
8. This cover letter.

It is sent via Priority US mail with tacking receipt on or about 8/8/2019.

Thank your so much in advance for your assistance in this matter!

Yours,

Ann Zhai
201-787-8788 (mobile)

In re Ethyl Corporation's Liability to this legal matter Zhai v. American Honda et. al..

## SUPPLEMENTAL RELEVANT AND MATERIAL PUBLIC INFORMATION

1.      Ethyl Corporation SEC filings in 1974 (fiscal year ending 12/31/1974) under the header Domestic Chemicals disclosure, it said Chemicals sold domestically accounted for 33% of Ethyl's 1973 sales.   Sales were $337.5 million, up 36% over 1973......In January, a Federal court ruled in favor of the Company's petition to set aside regulations to phase down lead in gasolines (See message to Shareholders).   Sales of "Ethyl" MMT (methylcyclopentadienyl manganese tricarbonyl) as antiknock for unleaded gasoline began in **April 1974**.   Substantial interest in MMT continues.   But, Ethyl's patent application entitled "Fuel Composition for Reducing Exhaust Gas Catalyst Plugging" was filed **12/15/1975** and issued 4/4/1978 as US/4,082,517 (the "517" patent). See search results in US Patent collection databases for: AN/ethyl AND ACLM/"methylcyclopentadienyl manganese tricarbonyl" produce 23 patents).   The domestic MMT on sale date 04/1974 constitutes "On Sale Bar" pursuant to 35 U.S.C. §102(b)(1) according to pre AIA statute (EXH 1).

2.      Ethyl corporation SEC filings in 1977 under the header of Chemicals began with domestic sales of petroleum chemicals (EXH 2).   Third paragraph began with "Legislation affecting the use of MMT was passed and signed into law on August 7, 1977.   It prohibits use of MMT in unleaded gasoline effective September 15, 1978, unless the EPA Administrator waives the prohibition upon finding that MMT does not impair emission control devices when used in specified concentrations in gasoline. 1977 proved to be a critical year for Ethyl operations in several forefronts:

(1) Patent Rule 56 was enacted by Congress effective 1/28/1977;
(2) Prohibition of MMT in unleaded gasoline was signed into law 8/7/1977;

(3) Ethyl's 517 patent was pending from 12/15/1975 to 4/4/1978;

(4) Ethyl sought first waiver 9/12/1978 by <u>splitting apart</u> the disclosed and claimed composition in subject matter of 517 patent in order to escape regulatory and public scrutiny;

(5) Prohibition of MMT in unleaded gasoline became effective 9/15/1978.

3.    Ethyl corporation SEC filings in 1979 mentioned The Food and Drug Administration.    Under the header of "Ethyl's research and development activities provide a wealth of new products and processes-building blocks for growth," paragraph 3 began with "Ethyl is working to develop new plastics technologies for the 1980s. Substantial funds have been spent in laboratory facilities at Ethyl's Baton Rouge Technical Center (per SEC filings, the Baton Rouge Tech Center is also the antiknock chemical center).    Through improved orientation techniques and compositions, the Company is developing more chemically-resistant, lighter-weight plastic bottles of sparkling clarity for many uses, including food.    The Food and Drug Administration (FDA) continues to evaluate data submitted by Ethyl that shows no reasonable expectation of migration from PVC bottles made with very low levels of residual monomer in the range of a few parts per billion (EXH 3).    This disclosure demonstrates the corporate knowledge with regard to utilities of chemicals which are subject to FDA regulation and further raises the issue of fact in the subject matter of 517 patent application with USPTO and fuel additives certificate waiver at US EPA.

4.    MMT is a corporate created marketing image which is also Trademarked as HiTec 3000 according to public information.    Forbes 10/15/1990 publication, it sang as "MMT, mm-mm good."    It labeled as real kicker in sales and earnings (EXH 4).

5.    According to NewsBank, Mr. Newton Perry, senior vice president of Ethyl Corporation, published a paper 6/23/1999 (EXH 5), it said "The MTBE ban in California

is based on health grounds; the MMT importation ban was not.  In the MTBE case, the state of California contends there is scientific evidence that the additive is dangerous to human health.   In MMT's case, Health Canada's 1994 Risk Assessment for the Combustion Products of MMT in Gasoline found that "airborne manganese resulting from the combustion of MMT in gasoline powered vehicles is not entering the Canadian environment in quantities or under conditions that may constitute a health risk" (EXH 6). The strategy of splitting apart of 517 patent subject matter was not found.  Mr. Newton Perry was in charge of antiknock business and played pivotal role in the waiver of 1990's and many other strategies according to his retirement announcement 2004 by the CEO (closely held board was challenged by public fund investment in 1995).

6.      The Clean Air Act Amendments of 1990, Congress required that products containing ozone depleting chemicals must carry warning label statement for the substance which harms public health and environment by destroying ozone in the upper atmosphere.  Does Nitric Oxide of reactive nitrogen species have material relationship with ozone?   University of California at Berkeley publication in 1967 and 1972 shed lights.  Another German publication said [Formation of ozone and nitric oxide caused by welding] by Schwarzbach E. Zentralbl Arbeitsmed. 1971 Sep;21(9):290-2. German.

DATED: 08/06/2019
ATLANTA, GA 30360

RESPECTFULLY SUBMITTED,

BY:  _____
ANN ZHAI
4325 Hickory Wood Lane
Doraville, GA 30360
201-787-8788 (Mobile)

3

# DOMESTIC CHEMICALS

Chemicals sold domestically accounted for 33% of Ethyl's 1974 sales. Sales were $337.5 million, up 36% over 1973.

**Petroleum Chemicals Division:** Sales revenues from lead antiknocks were about 9% higher largely due to inflation and price increases. Sales volume was down about 8%, reflecting the effects on gasoline sales of the international oil embargo, lower premium gasoline use and broader marketing of unleaded gasoline during the second half.

In January, a Federal court ruled in favor of the Company's petition to set aside regulations to phase down lead in gasoline. (See Message to Shareholders.)

Sale of "Ethyl" MMT (methylcyclopentadienyl manganese tricarbonyl) as an antiknock for unleaded gasoline began in April 1974. Substantial interest in MMT continues.

**Industrial Chemicals Division:** Sales were achieved, up 74% over 1973. Heavy demand was placed on nearly all production facilities. Some sales were limited by either plant capacities or feedstock shortages, including ethylene, chlorine and aromatic hydrocarbons. The most severe shortage was for chlorine. Chlorine supplies are expected to be adequate in 1975.

Production of specialty chemicals in 1974 was at capacity in newly expanded facilities. Additional expansions for specialty chemicals at the Houston and Orangeburg, S.C. plants are under con-

Sales of petroleum additives for fuels and lubricants continued to improve. Antioxidants were in high demand and new markets were developed for industrial lubricants. A new gasoline detergent established a solid market position.

**Industrial Chemicals Division:** Record sales were achieved, up 74% over 1973. Heavy demand was placed on nearly all production facilities. Some sales were limited by either plant capacities or feedstock shortages, including ethylene, chlorine and aromatic hydrocarbons. The most severe shortage was for chlorine. Chlorine supplies are expected to be adequate in 1975.

struction, with completion of some phases scheduled in 1975.

Detergent alcohol capacity was increased modestly in 1974 while a major expansion of long-chain alpha olefin production was completed early in the year. Both Houston facilities operated at high rates. Major expansions of these operations are expected to begin in 1975. Production volume and sales of chlorinated solvents and vinyl chloride were limited for nearly all the year by shortage of chlorine.

**Instrument Division:** While this division continued to operate at a moderate loss, sales improved largely as a result of the emphasis on clean air regulations and the need for precision measurement of emission sources. Air Monitoring, Inc. and Ethyl Intertech Corporation are the two outlets. Sales

Ex. 1

EXh 2

# CHEMICALS

Domestic sales of petroleum chemicals in 1977 were up 15% over 1976 due to higher prices reflecting increased costs and higher shipments of lubricant additives. Domestic lead antiknock shipments declined slightly because of continued growth in sales of unleaded gasoline. While the phasedown of lead in gasoline is on an established timetable, the Environmental Protection Agency (EPA) has granted waivers to certain refineries from the previously set 0.8 gram-per-gallon limit for 1978.

Ethyl's manganese antiknock for unleaded gasoline—MMT—had sharply increased sales revenues in the domestic market in 1977. However, MMT sales fell below expected levels due to startup problems at the expanded Orangeburg, S.C. facility during the first quarter and limited availability of a key raw material during the second half of the year.

Legislation affecting the use of MMT was passed and signed into law on August 7, 1977. It prohibits use of MMT in unleaded gasoline effective September 15, 1978, unless the EPA Administrator waives the prohibition upon finding that MMT does not impair emission control devices when used in specified concentrations in gasoline. An industry test is underway to provide data to obtain a decision for such a waiver.

Ethyl of Canada's lead antiknock shipments were 11% lower than in 1976 resulting from an increased market share for unleaded gasoline and excess refining capacity. Canadian business continued to operate under government-imposed wage, price and profit controls during 1977, which will continue through 1978.

Lead antiknock sales were up slightly in 1977 in other foreign markets due largely to increased prices resulting from the strengthened British pound. Earnings from international lead antiknock sales remained about the same as in 1976 since rising costs roughly paralleled price increases. Ethyl maintained its international position in lead antiknocks during 1977 despite strong competitive pressure from foreign and domestic producers.

Building for growth, Ethyl completed bulk antiknock storage terminals at Bataan, Philippines, and at Singapore in mid-1977. The Singapore terminal will supply refiners there and in Malaysia, Thailand and other areas of Southeast Asia. A bulk terminal in Indonesia is set for commissioning in 1978. These new facilities are expected to reduce distribution costs and strengthen Ethyl's position in international markets.

Sales of other fuel additives in the U.S. rose modestly in 1977 due to higher prices and increased volume of some products. These products include gasoline detergents and antioxidants and additives to improve the performance of diesel fuels.

The Edwin Cooper Division's 1977 sales were up 15% from 1976 due to increased volume and higher prices. Shipments of lubricant additives set a new record with improvements in all major markets except Eastern Europe and South America.

Other international petroleum chemicals sales, primarily fuel additives, rose more than 10% in 1977 over the previous year. Contributing most strongly to the overall increase were sales of antioxidants for fuels and lubricants. Continued worldwide improvement is expected in 1978.

Domestic industrial chemicals sales increased 13% over 1976 levels primarily due to higher shipments in all business areas, while prices increased slightly. Substantial gains were achieved in agricultural chemical intermediates, pharmaceutical intermediates, chlorinated hydrocarbons and olefin derivatives.

1977 was marked by a large number of process startups and by many major pilot plant programs, some of which were for plants now under construction. Profits were adversely affected by higher than anticipated costs for some of these startups.

In agricultural chemical intermediates, a new plant for a herbicide raw material began operations at Magnolia, Ark. A major new orthoalkylation facility was started up at Houston in June, while expansion of existing ortho-alkylation facilities was completed at Orangeburg, S.C. Construction of a plant for phosphorus-based insecticide intermediates at Magnolia is scheduled for completion in the third quarter of 1978.

In the pharmaceutical intermediates and fine chemicals area, substantial expansion of facilities was achieved at Sarnia, Ontario, Canada. Construction of a new unit for a pharmaceutical intermediate was also completed at Orangeburg at year-end.

A new plant to produce a surfactant and bactericide intermediate—alkyldimethylamine—was put into operation at Magnolia. Construction began on a new multimillion dollar plant at Houston to produce zeolite A, a new component for detergents formulated to contain significantly less phosphorus.

In the bromine chemicals area, a flame retardant intermediate facility went into construction at Magnolia, with startup scheduled for the first half of 1978.

International sales of industrial chemicals increased in 1977 reflecting higher prices, Ethyl's improved competitive position and generally better worldwide markets. Substantially higher shipments of alcohols and ortho-alkylated chemical intermediates also were contributors to increased sales. Intensified sales efforts should yield continued growth in 1978 in excess of anticipated world economic growth.

A major expansion of the aluminum alkyls plant at Sarnia was begun, with completion set for 1978.

## PLASTICS

Sales of plastics products increased 6% in 1977 as a result of higher prices. Price increases were not sufficient to offset all cost increases.

The Imco* Container Products Division posted 4% higher sales in 1977 primarily because of higher prices. Imco is one of the nation's largest producers of polyethylene, polyvinyl chloride and other clear, rigid plastic containers. Markets were expanded in personal care and food packaging as consumers demanded more lightweight, energy-efficient plastics packaging.

Demand softened during the second half of 1977. Year-end orders were high indicating stronger sales and profit performance in 1978. Plans for a new Imco plant for custom plastic bottles, representing an investment of about $4 million, were announced in 1977. The Lewistown, Pa., facility is scheduled to start up in mid-1978.

The VisQueen* Film Products Division's sales and shipments were up 3% over 1976 as prices were level

# Ethyl's research and development activities provide a wealth of new products and processes—building blocks for growth.

Ethyl spent some $45 million on research and development activities in 1979. Of that, about $29 million qualified under the technical accounting definition of "research and development." As one measure of that effort, the Company received 164 U.S. and foreign patents for a total of 2,740 active patents on Ethyl products and processes.

In new product research, specialty intermediates derived from Ethyl's orthoalkylation technology are finding applications in specialty polyurethane plastics components for automotive and other uses. These include modifiers for reaction injection molded parts used in shock-absorbent car bumpers.

Ethyl is working to develop new plastics technologies for the 1980s. Substantial funds have been spent in laboratory facilities at Ethyl's Baton

few parts per billion. These results have been confirmed with test procedures developed by FDA. Exploring use of plastic bottles for a potential new market in liquor, Ethyl has developed sophisticated test capabilities for required taste and odor qualification standards.

Better flame retardance will be demanded of all materials in the next decade, and work with plastics is in progress toward that goal.

The Company participates in intermediates for the fast-growing synthetic pyrethroid insecticide business in world agricultural markets. Two related chemicals have significantly expanded commercial prospects. An orthoalkylated derivative with fungicide and herbicide uses entered commercial production in 1979, and a specialty intermediate for a new pesticide is being

for hard-to-make chemicals was broadened to include biochemical synthesis from non-petroleum raw materials, supplementing the Company's traditional synthetic chemistry base. This is a promising area for future growth i chemical products which utilize renewable resources.

During 1980, Ethyl plans limited market development production of a hydrocarbon-based synthetic lubricant derived from alpha olefins and used in blending low-viscosity/volatility crankcase oils with excellent fuel economy. Broader applications are found in industrial oils, hydraulic fluids and heat-transfer fluids.

Other new product developments include combustion improvers for the electric utility industry, additives for use with "gasohol" and new lube oil antioxidants.



R&D growth continues with construction of a new laboratory building at the Company's Technical Center in Baton Rouge, La.

Rouge Technical Center. Through improved orientation techniques and compositions, the Company is developing more chemically-resistant, lighter-weight plastic bottles of sparkling clarity for many uses, including food.

The Food and Drug Administration (FDA) continues to evaluate data submitted by Ethyl that shows no reasonable expectation of migration from PVC bottles made with very low levels of residual monomer to the range of a

produced for market development.

Several bromine-based intermediates for plastics are in development, and full-scale production is expected soon. In addition to calcium bromide, which was produced commercially in 1979, a related oil drilling completion compound is planned for the multi-product Magnolia facility.

Ethyl continued working during the year with major pharmaceutical firms worldwide to develop new processes for drug compounds. Another program

Ethyl cooperates with automobile manufacturers throughout the world to develop systems able to utilize energy-saving lead antiknocks. Outside the U.S. and Japan, exhaust-emissions standards compatible with the use of lead antiknocks have been established and may serve as models in an energy-scarce future.



year), analyst Robert Bartels of Chicago's William Blair & Co. thinks Loctite will earn $3.67 a share. He looks for a 10% gain, to $4.05 in 1991. At a recent NYSE price of 46¼, down 25% from its 12-month high, he thinks the stock's cheap at just 11 times next year's anticipated earnings.

Loctite's international strength has also caught the eye of a big foreign investor, Germany's Henkel KGaA. In 1985 Loctite's founding Krieble family sold 25% of the equity to Henkel, which currently owns nearly 27% of the 18.2 million shares. Henkel has the right of first refusal on the Kriebles' remaining 14% stake.

## MMT, mm-mm good

Speaking of specialty chemicals, William Blair's Bartels also thinks there is great leverage in $2.4 billion (revenues) Ethyl Corp. Recent NYSE price: 25⅜. Headquartered in Richmond, Ethyl manufactures industrial chemicals and petroleum additives. It also owns $4.4 billion (assets) First Colony Life Insurance, which generates roughly 30% of profits.

On the health of the insurance business, Bartels notes that it has never had a down quarter since 1982. As for chemicals, foreign markets account for about half of profits. Again, a weak dollar is helping.

But the real kicker in Ethyl, says Bartels, is something called MMT, a proprietary gasoline octane improver. MMT reduces total emissions. It has been endorsed by GM. Refiners like it because it is a cheap way to raise the octane rating of gas. In addition, it would promote lower oil consumption. According to Bartels, if MMT were used in all unleaded gas sold in the U.S. this year, it would save roughly 30 million barrels of oil, about as much as is set aside annually for the strategic petroleum reserve. Ethyl currently is applying for the EPA's approval of MMT. The agency is to decide by Nov. 5. Its chances, says Bartels, look good. But if the EPA says no? Canada already uses it; France, Mexico and others are considering it.

Bartels thinks Ethyl's earnings will rise only 7% in 1990, to $1.95 a share. But if MMT is approved, he's looking for $2.40 next year. Even without MMT, however, he still expects it to earn a healthy $2.20 a share. So the stock currently sells for a reasonable 11 or 12 times his 1991 estimate. MMT or no, Bartels says it's a buy. (There are 119 million-odd shares; the Gottwald family controls over 18%.)



# Portraits Of Success

**H**art Schaffner & Marx clothing—worn by the man who portrays success. "The FORBES 400—The Richest People In America"—a highly regarded portrait of success.

It's no wonder **Hart Schaffner & Marx** has chosen this Special Issue to unveil a distinctive four-page portfolio featuring some of their accomplished and noteworthy customers. Every issue of FORBES impacts over 2.7 million influential and affluent business executives— a group that comprises its own portrait of success.

The FORBES 400 issue is the most sought after and best-selling edition of FORBES, making it the perfect environment for **Hart Schaffner & Marx's** message of success and excellence.

Look for the **Hart Schaffner & Marx** "Portraits Of Success" portfolio in The FORBES 400 October 22, 1990 issue.



Forbes Magazine · 60 Fifth Ave · N.Y., N.Y. 10011

Exh 4

Exh 5

# Ban on MMT not scientific

June 23, 1999 | Sault Star, The (Ontario, Canada)
Author: NEWTON PERRY, SAULT STAR | Page: A4 | Section: Opinion
222 Words | Readability: Lexile: 1270, grade level(s): 11-12

The recent decision of Methanex Corp. to sue the United States government because of California's attempt to ban the gasoline additive MTBE has evoked considerable media coverage. Most of that coverage, like Andrew Duffy's article in The Sault Star on June 17, B.C. firm to launch $1.4B NAFTA lawsuit against U.S., places Ethyl Corporation and our product, MMT, in the same light.

There is a similarity. They are both gasoline additives, but that is where the similarity ends.

The MTBE ban in California is based on health grounds; the MMT importation ban was not.

In the MTBE case, the state of California contends there is scientific evidence that the additive is dangerous to human health.

In MMT's case, Health Canada's 1994 Risk Assessment for the Combustion Products of MMT in Gasoline found that "airborne manganese resulting from the combustion of MMT in gasoline powered vehicles is not entering the Canadian environment in quantities or under conditions that may constitute a health risk."

The simple fact of that matter is that there would not have been a NAFTA issue if the legislation that attempted to ban the importation and inter-provincial trade of MMT had been based on scientific evidence.

It was not and the government admitted that in settling the matter before it went to a hearing.

Case 2:19-cv-07057-FMO-SS   Document 1   Filed 08/13/19   Page 100 of 144   Page ID #:100

Newton Perry,

Senior Vice-President,

Ethyl Corporation,

Ottawa, Ont.

© Copyright © 1999 Sault Star, The

METALS: IMPACTS ON HEALTH AND THE ENVIRONMENT

NEWS

*Exh 6*

# Manganese: A High-Octane Dispute

**A debate over the health effects of airborne manganese is heating up as more and more countries begin adding the metal to gasoline**

Thirteen years ago, Donna Mergler and her team had good reason to wonder about the health of workers in a manganese alloy plant in a small town called Beauharnois, near Montreal. Ore hauled by barge up the St. Lawrence River was refined at the plant in a giant furnace, poured out in a glowing red stream of iron-manganese alloy, and crushed into pellets for making steel. The factory was in compliance with air quality standards in Quebec. But even the researchers would emerge from the plant "sneezing black particles for the next 24 hours," says Mergler, a neurophysiologist at the University of Quebec in Montreal.

Her team found that the workers' exposure to manganese, an essential dietary element that at high doses causes a debilitating disease similar to Parkinson's, appeared to be linked to lower scores on tests of cognition and motor skills such as finger tapping. Even more intriguing was what appeared to be a subtler sign of manganese toxicity. Some middle-aged men in a control group drawn from the populace around Beauharnois had also scored more poorly than expected in some of the same neurological tests.

The study was only suggestive: Mergler's group had limited data on airborne manganese around Beauharnois, leaving open the possibility that other factors were harming the men. But it raised the alarming prospect that even small amounts of inhaled manganese might erode neurological health. The results held up in a 1996 follow-up study funded by the U.S. Environmental Protection Agency (EPA), also led by Mergler, of 270 men and women around Beauharnois: Although the plant by then had been closed for 5 years, men over 50 who lived downwind and had higher manganese blood levels performed worse on motor and memory tests than controls. Disturbingly, the air was well below the threshold—110 nanograms of manganese per cubic meter ($ng/m^3$)—that the Canadian government deems safe.

If the shuttered plant had been the only potential manganese headache in Canada,

Mergler's findings may have faded into obscurity. But in 1990, the government completed phasing out leaded gasoline, paving the way for widespread use of a manganese-based compound, MMT, in gasoline. The additive increases octane levels, which boosts engine performance and enables fuel to be burned more evenly. Health officials in Canada, which has allowed MMT in gas since



**Breathing easy.** Canadian health officials have concluded that the gasoline additive MMT releases too little manganese into the air in Toronto and other cities to worry about.

1976, reaffirmed 9 years ago that in their view, MMT is safe. But the U.S. EPA is not so sure and is asking MMT's manufacturer, Ethyl of Richmond, Virginia, for more data.

The stakes are high, as MMT and other petroleum additives racked up $648 million in net sales last year for Ethyl. The company notes that MMT, now sold in 25 countries, has been and continues to be extensively tested. "We believe it's a very safe product," says Donald Lynam, an Ethyl vice president and senior scientist. But opponents claim that manganese could prove as dangerous as the antiknock additive it supplanted: lead, which was phased out after a decades-long debate over the extent to which it impairs child development.

Manganese follows in lead's footsteps in at least one respect: The arguments over its health effects have occasionally turned ugly. MMT is "a very emotional topic within the scientific community," explains Dave Dorman, a toxicologist at the CIIT Centers for

Health Research in Research Triangle Park, North Carolina. Tempers flared at a neurotoxicology conference in 1997 in Little Rock, Arkansas, when the Ferroalloy Association, a meeting co-sponsor, handed out a newsletter each day that downplayed research suggesting that manganese may be neurotoxic at low doses, says neurologist Jay Gorell of the Henry Ford Health System in Detroit. "I had never been to anything like that," he says.

Temperatures are likely to rise again as EPA and Health Canada complete their latest evaluations of the risk of manganese and MMT in light of fresh studies. Toxicologists have found, for instance, that in rats inhaled manganese can head straight to the brain through the olfactory nerve. On the other hand, measurements in Canada suggest that the MMT levels to which people are generally exposed are too low to cause harm.

Lingering bitterness over lead may make it hard for manganese to get a fair hearing. "A lot of us are very, very suspicious" of claims that MMT is safe, says neurotoxicologist Bernard Weiss of the University of Rochester in New York, who concedes that regulators may well see it differently.

### Friend and foe

As a nutrient, manganese is an essential component of several enzymes; a deficiency can lead to heart and bone problems and in children, stunted growth. The liver removes extra dietary manganese from the circulation, so ingested manganese is not a major concern, says EPA risk assessor J. Michael Davis. However, when manganese is inhaled, blood ferries it from the lungs to the brain, where it can readily cross the blood-brain barrier.

It's been known since 1837 that workers in manganese mines can develop manganism, a dreaded illness marked by Parkinson's-like tremors, violent outbursts, and hallucinations. Victims have lesions in the globus pallidus and striatum of the basal ganglia, a part of the brain involved in fine muscle control. But it takes large amounts of manganese to trigger the disease: airborne concentrations as high as 100 or more milligrams per cubic meter. And recently, concerns have grown that welders exposed to manganese in fumes could be at risk for Parkinson's-like disease (see sidebar).

By comparison, manganese exposure from MMT is low: Canada, for example, allows no more than 18 milligrams of manganese from MMT per liter of gasoline, and only a fraction of this amount is thought to reach the air as manganese particles. MMT,

CREDITS: ROBERT ESTALL/CORBIS

or methyl cyclopentadienyl manganese tricarbonyl, was developed by Ethyl in the 1950s as a substitute for tetraethyl lead. MMT isn't the only option: In the United States, the main additive is MTBE, or methyl tertiary butyl ether. But the ease with which this potential human carcinogen can infiltrate groundwater at levels that can be smelled and tasted has alarmed the public. Ethyl markets MMT as an alternative to MTBE. The main selling points, it says, are that MMT is cheaper and reduces tailpipe emissions of nitrogen oxides, which include precursors to smog.

Ethyl won its first approval for MMT in 1976 from Canada, which subsequently conducted a series of safety reviews. Health Canada's latest assessment, in 1994, assumed a safe threshold of 110 ng/m$^3$ for inhaled manganese, extrapolated from worker studies with added safety factors for children and susceptible adults. The agency's review of air quality data from several cities noted that manganese levels were below the threshold and thus too low to worry about.

Although the debate wasn't over—some Canadian legislators still decried MMT's potential health effects and tried to ban it—the additive's future in commerce seemed reasonably ensured, as more countries approved its use. One, Australia, concluded in a draft report last February that MMT does not pose a human health hazard.



CREDITS: (TOP TO BOTTOM) PHOTODISK; R. LUCCHINI AND R. GASPAROTTI/UNIV. OF BRESCIA, ITALY

**High-dose damage.** In this brain scan of a manganism victim, manganese deposits light up the globus pallidus (white areas in center).

A fight was brewing in the United States, however, where EPA had set a lower threshold for inhaled manganese of 50 ng/m$^3$. The agency's concerns began to rise after it reevaluated results from an exposure study in 1990 in Riverside, California, where MMT was permitted in leaded gas used by older vehicles. Extrapolating the data, EPA estimated that if MMT were used in all gas, 5% to 10% of the



population could be exposed to airborne manganese at levels exceeding 100 ng/m$^3$. In July 1994, the agency concluded that there was too much uncertainty to say whether MMT is safe and denied Ethyl's request to introduce the compound into unleaded gasoline.

That was not what Ethyl wanted to hear. The company sued EPA, arguing that the agency did not have the authority to bar MMT for health reasons under the Clean

## State Court to Rule on Manganese Fume Claims

As scientists spar over the health effects of low levels of manganese (see main text), the steel industry is bracing for a courtroom battle over exposure to the metal at higher doses. A wave of claims arguing that manganese in welding fumes caused Parkinson's-like neurological damage will go to trial beginning next month in a Mississippi state court. The number of claims could rival those for asbestos-related lung disease: There are at least 500,000 welders in the United States, and judging by the rate observed in the general population, 1%—5000—would be expected to develop Parkinson's disease after age 60. If manganese exposure leads to earlier or more cases, "it could be huge," says neurologist Brad Racette of Washington University in St. Louis. He and others caution, however, that the welders' case is not ironclad.



**Hidden hazards?** Court hearings are about to get under way on lawsuits claiming that manganese in welding fumes led to Parkinson's-like disease.

Welders fix joints together with molten flux from metal bars that sometimes contain manganese. Since the 1930s, doctors have noted neurological disease among welders. But it was several decades before evidence for a link grew stronger, when a 2001 report in Neurology suggested that welders are prone to early-onset Parkinson's. In that study, Racette's group examined 15 welders treated in their Parkinson's clinic. The patients, who had brain scans typical of Parkinson's, had developed the disease around age 45, on average—15 years earlier than controls.

This and other recent studies have inspired a wave of product liability complaints against welding bar manufacturers in states such as Mississippi and Louisiana, where the oil and shipbuilding industries employ thousands of welders. In the last 2 years a law firm in Lake Charles, Louisiana, Ranier, Gayle & Elliot, has filed thousands of claims in state courts against two dozen corporations, including Lincoln Electric and Westinghouse. The lawsuits charge that warning labels of the potential health risk, on welding bar boxes since 1967, were too vague and difficult to see, and the companies should have warned specifically of a risk of neurological damage from manganese. "They conspired together to hide the truth," contends Brett Powers, a lawyer with the firm. That's not how the companies see it. "The science just doesn't support" a link between welding and Parkinson's-like disease, says Pittsburgh attorney Ralph Davies, outside counsel for Lincoln Electric.

Experts say that in the absence of a large epidemiological study, convincing a jury of a link might be hard. Iron in welding rods competes with manganese for binding sites on proteins that transport it across the blood-brain barrier, so the iron could counteract any toxic effect, points out James Antonini of the National Institute for Occupational Safety and Health. And if welding fumes do lead to Parkinson's, the risk would depend on exposure. Exposure, says Racette, is "probably the biggest wild card."   –J.K.

Air Act. In 1995, a federal court agreed, but EPA had the authority to require Ethyl to pay for new safety studies even though it was free to sell MMT. In response to the court ruling, a parade of environmental health experts, from lead-effects pioneer Herb Needleman of the University of Pittsburgh to toxicologist Ellen Silbergeld, now at Johns Hopkins University, lined up behind EPA, citing Mergler's data on the control group. The battle peaked in March 1996 when Ethyl published full-page newspaper ads asserting that MMT is safe. EPA's response was to ratchet up the rhetoric: In a statement, Carol Browner, EPA's chief at the time, said that "the American public should not be used as a laboratory to test the safety of MMT," and called for more testing.

**SPECIAL SECTION**

### A mixed message

One argument for MMT's safety is manganese's very ubiquity: The air is suffused with low levels of the metal stirred up from soil. People ingest it daily; major sources include leafy vegetables and tea. According to Dorman, MMT doesn't add much to these other sources.

Critics counter that the manganese particles spewed from tailpipes are smaller than those from natural sources and therefore more likely to lodge deep in the lungs. And MMT-derived manganese, Davis says, includes highly soluble forms that more readily cross from lung alveoli into the bloodstream than other forms in crustal dust.

Another reason that EPA says it is cautious is the dearth of studies on the potential effects of low-level, long-term manganese exposure. EPA neurotoxicologist Kenneth Hudnell, a coauthor on Mergler's community study, says the agency is considering a proposal for a similar study in a U.S. city. He notes that a recent study by occupational health researcher Roberto Lucchini of the University of Brescia in Italy appears to support Mergler's findings. The as-yet-unpublished research has detected an elevated rate of Parkinson's disturbances in people living near a ferroalloy plant.

Recent work in lab animals has only clouded the picture. Dorman's group at CIIT, with funding from Ethyl, has exposed rats to aerosols of manganese sulfate, the most soluble form from combusting MMT. In their latest study, manganese didn't accumulate in most brain regions at exposures as high as 0.01 milligram per cubic meter, more than 1000 times higher than the levels in Toronto and Montreal air. "There is no change," Dorman says. "That's encouraging."

But manganese does accumulate in one brain area—the olfactory bulb—and that gives some researchers pause. Hans Tjalve and Jorgen Henriksson at the Swedish University of Agricultural Sciences in Uppsala have reported that after inhaled manganese enters a rat's brain via the olfactory bulb, it is transported through the brain to the striatum. Other studies have not repro-

duced the extent of these results, but have found that inhaled manganese penetrates the entire olfactory system, says toxicologist Michael Aschner of Wake Forest University School of Medicine in Winston-Salem, North Carolina.

Researchers dispute what these findings portend for people. Lynam notes that because rat nasal passages are proportionally much larger than people's and the animals breathe only through their noses, they should absorb 40 times more manganese by that route than people do. To get at this question, Ethyl is funding a study by Dorman's group of how inhaled manganese is taken up in primate brains.

Uncertainty also remains over estimates of how much manganese might be inhaled



**Low-dose disagreement.** Although airborne manganese detected in Toronto fell below Canada's safety threshold, some scientists argue that the metal's "incremental risk" could still be unacceptably high.

where MMT gas is sold. In the mid-1990s, Ethyl paid the Research Triangle Institute (RTI) to use personal monitors to record individual manganese exposure in 542 people in Toronto. As Health Canada had concluded earlier, the exposures fell well below the threshold. (Lynam thinks EPA's analysis of the Riverside data, which estimated higher levels, made "questionable assumptions and extrapolations.")

Even though the $3 million Toronto study was "well conducted," says Davis, EPA still has questions. For instance, the agency wants to be sure that the results would apply to cities with weather and traffic patterns that are different from Toronto's.

One fundamental concern of some experts is that while the regulations on airborne manganese may protect healthy people, certain vulnerable groups could still be at risk. They worry, for example, that manganese may hasten the onset of Parkinson's in people susceptible to the disease. Providing some support for this idea is a 2000 study in *Neurotoxicology and Teratology* by toxicologist Don Smith of the University of California, Santa Cruz. He found that rats treated with a chemical that induces a pre-Parkinson's condition developed more severe neurological symptoms, such as loss of motor control, from moderate manganese

exposures than did rats without the pre-Parkinson's condition. Other labs are exploring how young and aged animals respond.

One vulnerable group may be people who don't get enough iron in their diet. Aschner, for example, has found that iron-deficient rats are much more likely to accumulate manganese in the brain than are normal rats. The reason, he says, is that manganese and iron ions rely on the same proteins to cross the blood-brain barrier. That's important, because MMT is now being added to gas in some developing nations where many people are malnourished. "I would be concerned with any manganese exposure with any population that's iron deficient," says Aschner. Lynam doesn't dispute these findings, but he points out that the EPA and Health Canada safe thresholds are designed to protect such sensitive populations. MMT's contribution to air manganese levels is far below those levels, he says. "It's very, very small and is lost in the background."

### Uncertainty reigns

Health Canada is now reviewing the recent findings to keep up to speed on the science—not because it feels its earlier conclusion is wrong, says agency risk assessor Barry Jessiman. By contrast, EPA's review of the Ethyl data to be submitted by the end of 2004 will determine whether the company must conduct more toxicology tests. For now, partly because of health concerns, gas refiners in the United States are buying very little MMT.

Some experts believe that the only way to ascertain manganese's low-level effects on people is to see what happens years after primates inhale the metal, Weiss notes. Ethyl hasn't ruled out such an expensive long-term study, Lynam says, but feels that "if there is future testing, it should take into consideration the results of the ongoing research."

Whatever the outcome, opposition to MMT is likely to remain entrenched. Critics acknowledge that their concerns are as much philosophical as scientific: It's better to err on the side of caution, MMT opponents say, and to delay the introduction of a substance into the environment until it has been proven safe. "We still have too much uncertainty," contends toxicologist Joseph Zayed of the University of Montreal.

Weiss compares the debate over manganese to the years of sparring over lead. For both metals, he says, the issue boils down to "incremental risk." Mergler agrees, asserting that MMT's health effects will be detected not at the individual level, but at "the societal level." That's an incremental risk that she and others are loath to accept.

**–JOCELYN KAISER**

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT CENTAL DISTRICT OF CALIFORNIA AT
WESTERN DIVISION OF LOS ANGELES
UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE
-------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. WOODLAND MEMORIAL HOSPITAL ET AL;
IN RE ANN ZHAI V. AMERICAN HONDA MOTOR COMPANY ET AL;
IN RE ANN ZHAI V. BRIDGESTONE/FIRESTONE AMERICAS INC. ET AL
-------------------------------------------------------------------------------------------------
IN RE ANN ZHAI V. NEWMARKET COMPANY (KNOWN AS ETHYL & AFTON)


SIRS/MADAM:

        I have suffered a few near death conditions (as results of new engine refitting)
even after the oxygen treatment.   Before and after the three verified complaints were
filed with respective courts, despite my conditions, I exhausted efforts searched legal
counsels at both person injury bar and patent bar cross country and I was informed that
no one has done any case similar in gasoline fuel additives.   If WestLaw databases as
guide, no legal precedent in gasoline fuel additives.   Out of desperation and helpless
reading from medical information, comfort care is the only remedy.   Unable to work and
without health insurance, comfort care is too remote to relate.

        The past eight months visiting US EPA and USPTO public information yield this
paper.  I seek to consolidate the three cases to one jurisdiction for one jury verdict at
Eastern District of California where and when a semi-truck driver by hitting the stopped
vehicle helped me gradually uncovered the liability of fuel additive company (Ethyl and
Afton now NewMarket) no one has able to uncover.

        Few Article III judges qualify as "Persons skilled in the same art" in the patent
portfolios Ethyl (Afton) company have procured.  At this critical time when politicians are
swayed by left or right, Article III judges' job is to maintain the independence of judicial
branch and honor the rule of law in public interest.

        Ethyl v. EPA have failed us - all of us - it should not have been.

        I have used every single ounce of strength to make this paper finish up by July
4th and I did it on July 8th.  Each District Court receives a priority mail envelop with
copy of initial complaints, and with the paper I finished up on July 8th.  I ask court
assistance for competent counsels registered at Federal Bar.

                                                        Respectfully;


                                                        Ann Zhai
                                                        201-787-8788 (mobile)

In re Ethyl Corporation's Liability to this legal matter Zhai v. American Honda et. al..

## I. Ethyl Used Fraud and Inequitable Conduct To Secure US/4,082,517 and Disclosed and Claimed Thermal Decompositions of Gasoline Fuel Additives Directly Caused My Permanent Injuries

1.      Ethyl corporation (hereinafter "Ethyl") patent applicaiton entitled "Fuel Composition for Reducing Exhaust Gas Catalyst Plugging" was filed 12/15/1975 and issued 4/4/1978 as US/4,082,517 (hereinafter the "517" patent).

2.      United States Patent Rule 37 C.F.R. § 1.56 (hereinafter "Rule 56") was enacted 1/28/1977.  For the benefit of all readers, Rule 56 reads as followings:

§ 1.56 Duty to disclose information material to patentability.

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)–(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

(1) Prior art cited in search reports of a foreign patent office in a counterpart application, and (2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability.  A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are: (1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

Credits
[42 FR 5593, Jan. 28, 1977 as amended at 47 FR 21751, May 19, 1982; 48 FR 2710, Jan. 20, 1983; 49 FR 554, Jan. 4, 1984; 50 FR 5171, Feb. 6, 1985; 53 FR 47808, Nov. 28, 1988; 57 FR 2034, Jan. 17, 1992; 65 FR 54666, Sept. 8, 2000; 77 FR 48818, Aug. 14, 2012]

3.    Rule 56 shall apply 517 patent before its issuance 4/4/1978.   Instead,

Ethyl failed to comply with Rule 56 with "relevant and material" pubic information as

prior art pursuant to 35 U.S.C. §§102 & 103 for the following reasonings:

(1).    Public information in 1947 and 1950 both entitled "The Thermal Decomposition of Organic Nitrate" published in well known journal <u>NATURE</u>, in 1953 entitled "The Thermal Decomposition of Organic Nitrates III. The affect of Additives on the Thermal Decomposition of Ethyl Nitrate" and in 1955 entitled "The Thermal Decomposition of Ethyl Nitrate" which was deemed to be "relevant and material" in the subject matter of thermal decomposition of Organic Nitrates as propeller materials was known to persons skilled in the same art.  This fact alone rendered 517 patent obvious over prior art to persons skilled in the same art.

(2).  Public information in 1953 entitled "The Thermal Decomposition of Organic Nitrates III. The affect of Additives on the Thermal Decomposition of Ethyl Nitrate" and in 1955 entitled "The Thermal Decomposition of Ethyl Nitrate" which was deemed to be "relevant and material" in the subject matter of thermal decomposition of Organic Nitrates as propeller materials and gas production of said materials having less or negligible oxidization effect on metal catalysts was known to persons skilled in the same art.  This fact alone rendered 517 patent obvious over prior art to persons skilled in the same art.

(3).    Public information in 1954 entitled "Reactions of Free Haematins and Haemoproteins with Nitric Oxide and certain other Substances," in 1957 entitled "The Kinetics and Equilibria of The Reactions of Nitric Oxide with Sheep Haemoglobin,"  in 1964 entitled "Nitrite Metabolism by Muscle in Vitro," in 1964 entitled "Pig-heart Myoglobin and its Derivatives with Nitric Oxide," in 1964 entitled "The Facilitated Uptake of Nitric Oxide by Haemoglobin in Erythrocytes," in 1964 entitled "The Passive Uptake of Nitric Oxide by Haemoglobin in Erythrocytes," in 1967 entitled "Nitrite Metabolism by

3

Skeletal Muscle Mitochondria in Relation to Haem Pigments," and in 1967 entitled "The Chemistry of the in vivo Reaction Between Haemoglobin and Various Oxides of Nitrogen" which was deemed to be "relevant and material" in the subject matter of Nitric Oxide of Reactive Nitrogen Species as production of Organic Nitrate combustion gases capable of interaction with Hemoglobin of red blood cells and myoglobin of heart cells and skeletal muscles mitochondria was known prior art in relation to public interest, specifically the kinetics of "**fast**" interaction of Nitric Oxide to Haem proteins was determined as <u>1,500 times faster</u> than that of carbon monoxide.

(4).    These "relevant and material" prior art pursuant to Rule 56 was public interest in ultimate determination of 517 patentability by US Patent and Trademark Office and fuel additives certificate waiver at EPA pursuant to 42 U.S.C. §7545 (this statute was enacted in 1950 also amended in 1990).

(5).    Rule 56 imposes the duty of disclosure to inventors, assignees, and legal representatives of inventors and assignees.   Rule 56 also supersedes attorney-client privilege in patent practice.

4.    Ethyl failed to disclose "relevant and material" prior art pursuant to Rule 56 and 35 U.S.C. §§102 & 103 before 517 patent issuance 4/4/1978.

5.    517 patent claim 1 says: "As a composition of matter, a gasoline for an internal combustion engine comprising:

(1) an antiknock amount of a cyclopentadienyl manganese tricarbonyl antiknock, and

(2) an amount effective to reduce the plugging of an exhaust gas catalyst of a compound having the general formula: {N-(COOR)3}

4

wherein R is independently selected from hydrogen and hydrocarbyl radicals.  But, the wherein N- which is the donor of Nitric Oxide of Reactive Nitrogen Species was entirely absent and avoided from claims 1 to 25.

6.      The failure of disclosure had irreversible legal and public policy ramifications from 4/4/1978 to present as 517 patent incorporated as reference (see search results in US Patent collection databases for: AN/ethyl AND ACLM/"methylcyclopentadienyl manganese tricarbonyl" produce 23 patents) and for: AN/afton AND ACLM/"methylcyclopentadienyl manganese tricarbonyl" produce 15 patents).

7.      The failure of disclosure had irreversible consequences to living human beings when 517 patent was secured by fraud and inequitable conduct in violation of 35 U.S.C. §§102 & 103 and Patent Rule 37 C.F.R. § 1.56 and subsequently used it to secure gasoline fuel additives waiver 7/11/1995 as replacement of leaded gasolines and used it to resume market monopoly.

## II. Ethyl Used Fraud and Inequitable Conduct to Secure Fuel Additives Waiver after US/4,082,517 and Disclosed and Claimed Thermal Decompositions of Gasoline Fuel Additives Directly Caused My Permanent Injuries

8.      After 517 patent was obtained 4/4/1978, Ethyl sought fuel additives certificate waiver (hereinafter the "waiver") pursuant to 42 U.S.C. §7545.  They waited about five months and strategically split apart the disclosed and claimed composition in 517 patent in order to escape regulatory and public scrutiny.  517 patent disclosed that the gasoline may also contain antiknock quantities of other agents such as "cyclopentadienyl nickel nitrosyl," "N-methyl aniline," and the like (see segment 4 second paragraph of 517 patent).

9.      Indeed, 517 patent specifically disclosed and claimed fuel additives such as Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrate propellant materials having Manganese-[N-(COOR)3] in gasolines.

10.      Indeed, {N-(COOR)3} was disclosed and claimed composition in 517 patent without specification of NO-donor in all claims.

11.      Indeed, Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrate propellant materials produces Nitric Oxide of Reactive Nitrogen Species and Manganese served as transition metal.

12.      Indeed, the odor of [-COOR] in gasolines opens the Olfactory receptors in Olfactory neurons through Olfactory bulb in living human beings brains to deliver automotive fuel toxins which including but not limited to: Nitric Oxide, Manganese, and Hydrocarbons.

13.      For patented pharmaceutical composition and/or active ingredient subjects to FDA regulations prior to marketing approval, the practice of splitting apart of disclosed and claimed composition and/or active ingredient in an invention is departure from patent law principle and such conduct deems to be fraud and inequitable conducts for market manipulation.   The regulatory functionality of EPA is no different in this principle than FDA when the subject matter of disclosed and claimed composition is under patent protection for market monopoly.

14.      For patented gasoline fuel products which also emulate pharmacological and/or bio-pharmaceutical targets in living human beings, it is the duty of inventors and

assignees, and legal representatives of inventors and assignees to report the duo-functionality pursuant to Rule 56 to US Patent and Trademark Office and regulatory body prior to marketing approval.

15.    Ethyl not only knowingly failed such duty but also intentionally and consistently split apart of disclosed and claimed fuel additives composition in replacement of leaded gasolines and **ONLY** left MMT quantity per gallon as "**Subject Matter**" when applied for the waiver.  For laypersons who are not persons skilled in the same art, it means nothing.    But, for persons skilled in the same art, fraud and inequitable conduct were committed when purpose of splitting apart of disclosed and claimed composition in a patent is to escape regulatory and public scrutiny.

16.    Ethyl sought the waiver on such dates of 9/12/1978, 11/20/1981, 11/1/1990, 1/8/1992, and 7/13/1994.

17.    EPA denied them (see Waiver Requests Under Section 211(f) of the Clean Air Act Revised August 29, 2013, the EPA document (EPA-420-B-13-041 August 2013)).

18.    EPA final rejection on 7/13/1994 put pressure on market monopoly when Ethyl leaded gasolines should have phased out in 1995 per legislation of Clean Air Act of 1990 by giving five year grace period.

19.    517 patent was Ethyl first patent by using Manganese to replace lead which has disclosed and claimed Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrate propellant materials having Manganese-[N-(COOR)3] in gasolines.

20.    517 patent would expire on 4/4/1995.  EPA final rejection was 7/13/1994. The final rejection would have left Ethyl in limbo: the leaded gasolines phased out

without a valid new replacement.  Without the waiver and with expiration of 517 patent, the dominance of market monopoly by using 517 patent as replacement of leaded gasoline was impossible.

21.    Why Ethyl sued EPA at last minute of 517 patent expiration after failure to disclose "relevant and material" prior art and assumed the risks of having 517 patent vacated by Federal Circuit of US Court of Appeals and intentionally and consistently split apart disclosed and claimed composition in 517 patent at waiver application is an issue of facts for a unbiased jury.

22.    On parallel track, reduction of medical science from 1960s to 1990s was happening at decoding signal transduction systems of human neurotransmitters and hormones and immune-factors.  In 1993 alone, much fruition was associated with Nitric Oxide of Reactive Nitrogen Species as second messenger of signal transduction systems for neurotransmitters and hormones and immune-factors encompassing multiple organs and tissues and cells.  Among many peer-reviewed publications, one of which entitled "Second Messenger Role for Nitric Oxide Widens to Nervous and Immune Systems" was published in <u>Trends in Pharmacological Sciences including Toxicological Sciences</u> in 1989, and one of the two authors was Patrick Vallance who became Chief Scientific Adviser to the UK Government in 03/2018.  By the end of 1993, Nitric Oxide was dubbed as "**<u>Ubiquitous Messenger</u>**."    These findings were confirmation of 1979-1980 work published by Yael Bromberg et. al. entitled "Cyclic GMP Metabolism in Macrophages I. Regulation of Cyclic GMP Levels by Calcium and Stimulation of Cyclic GMP Synthesis by NO-Generating Agents" Section of Immunology, Department of Human Microbiology, Sackler School of Medicine, Tel Aviv University, Tel

Aviv, Israel in 1980 and "Electron Spin Resonance Study of the Role of NO*Catalase in the Activation of Guanylate Cyclase by NaN3 and NH2OH Modulation of Enzyme Responses by Heme Proteins and Their Nitrosyl Derivatives" published by Patricia A. Craven et. al., Department of Medicine, VA Hospital and University of Pittsburgh and Department of Chemistry University of Pittsburgh in 1979.

23.     Another French publication in 1993 entitled "NO, thiols and disulfides" by Pierre Girard and Pierre Potier Institut de Chimie des Substances Nutwelles, UPR 2301, CNRS, 91198 Gijlsur- Yvette Cedes France has illustrated molecular relationships among Nitric Oxide, heme or no heme Iron, S-Nitrosation and O-nitrosation reactions. In paragraph 4 of this publication, authors stated "NO is presented as a very peculiar ligand for heme and non-heme iron proteins especially with regard to its unusual binding affinity to various iron(H) porphyrins.  Another point is that NO binds iron better without proximal base, scenario involving <u>imidazole **release**</u> and participation for the mechanism of guanylate cyclase activation by NO" and the authors cited Ignarro. L.J. (1989) Semin. Hematol. 26, 63376.

24.     If Nitric Oxide was dubbed as "<u>**Ubiquitous messenger**</u>" for signal transduction systems of neurotransmitters and hormones and immune-factors in 1993, the medical, pharmacological, and toxicological functionality of Nitric Oxide from endogenous (human cells produced it on demand via signal transduction) and exogenous (supplier by combustion of gasoline engine fuel additives in 517 patent) must be sorted it out and carefully studied and validated when exogenous Nitric Oxide targeted on and interfered with the same "<u>**Ubiquitous messenger**</u>" signal transduction

systems for neurotransmitters and hormones and immune-factors for living human beings.

25.     If Nitric Oxide was dubbed as "**Ubiquitous messenger**" for signal transduction systems of neurotransmitters and hormones and immune-factors in 1993, the chemical conversion of Nitric Oxide to other forms of emission gases must be carefully studied and validated when exogenous Nitric Oxide targeted on and interfered with the same "**Ubiquitous messenger**" signal transduction systems for neurotransmitters and hormones and immune-factors for living human beings.

26.     "Relevant and Material" prior art in the subject matter of 517 patent imposed legal duty to Ethyl corporation pursuant to 35 U.S.C. §§102 & 103, Rule 56, 42 U.S.C. §7545, and product liability duty in public interest when Ethyl attempted to secure the waiver without regulatory review the validity and suitability of 517 patent and thereafter the 38 patents incorporated 517 patent as reference.

27.     Nevertheless, Ethyl sued EPA in 1994 to force a waiver.  The duties imposed on Ethyl should have brought Ethyl corporation and Federal Government to the drawing board to redefine the exact **Scope** of regulation in the subject matter of 517 patent - should it be a joint commission of EPA/FDA or EPA/Department of Health and Human Services or FDA commission in light of mounting medical scientific evidences, particularly in 1993 in recognition of Nitric Oxide of Reactive Nitrogen Species as **Ubiquitous messenger**.

28.     Nevertheless, Ethyl secured the waiver on 7/11/1995 after obtaining Ethyl v. EPA, (51 F.3d 1053, DC circuit, 4/14/1995), 10 days after expiration of 517 patent. Neither Ethyl nor Department of Justice brought the issue of "relevant and material"

facts in the subject matter of 517 patent into DC circuit legal proceeding in the public interest pursuant to the rule of law.

29.     Nevertheless, the issue of "relevant and material" facts in the subject matter of 517 patent was never passed onto Federal Circuit of US Court of Appeals in addition to D.C. Circuit since the former has subject matter jurisdiction over fraud and inequitable conducts on patent rights and market manipulation.

30.     Why Ethyl and Department of Justice omitted the issue of "relevant and material" facts in the subject matter of 517 patent at Federal Circuit of US Court of Appeals and DC Circuit in 1995 is an issue of facts for a unbiased jury.

31.     Why Ethyl and Department of Justice omitted medical scientific evidences as fruition of work from 1940s to 1995 in the subject matter of 517 patent into legal proceeding is an issue of facts for a unbiased jury.

32.     In 1970, "Dopamine and Diseases" was published by Barbeau A. Can Med Assoc J. 1970 Oct 17;103(8):824-32.

33.     In 1970, "Dopamine and Blood Pressure" was published by Barbeau A, Brossard Y, Kuchel O, Cuche JL, Boucher R, Genest J. Trans Am Neurol Assoc. 1970;95:69-72.

34.     In 1970, "Biochemistry and Treatment of Parkinson's Disease" was published by Barbeau A. Laval Med. 1970 Sep;41(7):902-5.

35.     In 1971, Nobel Prize in Physiology or Medicine was awarded to Earl W. Sutherland, Jr. for his discoveries concerning the mechanisms of the action of hormones, see Nobel Prize press release 10/1971.

36.     In 1972, "Role of Dopamine in the Nervous System" was published by Barbeau A. Monogr Hum Genet. 1972;6:114-36.

37.     In 1975, "Dopamine and Huntington's Chorea" was published by Barbeau A, Ando K. Lancet. 1975 Apr 26;1(7913):987.

38.     In 1976, "Parkinson's Disease Etiological Considerations" was published by Barbeau A. Res Publ Assoc Res Nerv Ment Dis. 1976;55:281-92.

39.     In 1976, "Progress in Understanding and Treating Parkinson's Disease" was published by Barbeau A. Can J Neurol Sci. 1976 May;3(2):81-4.

40.     In 1977, "Oxidation of Spermidine and Spermine in Rat Liver: Purification and Properties of Polyamine Oxidase" was published by Hölttä E. Biochemistry. 1977 Jan 11;16(1):91-100.

41.     In 1978, "The Role of Macrophage Activation in Chronic Inflammation" was published by Allison AC, Ferluga J, Prydz H, Schorlemmer HU. Agents Actions. 1978 Jan;8(1-2):27-35.

42.     In 1979, "Diamine Oxidase and Polyamine Oxidase Activities in Normal and Transformed Cells" was published by Quash G, Keolouangkhot T, Gazzolo L, Ripoll H, Saez S. Biochem J. 1979 Jan 1;177(1):275-82.

43.     In 1979, "Polyamines in Eukaryotes: Intracellular and Serum Homeostatic Mechanisms" was published by Quash G, Roch AM. Ann Biol Clin (Paris). 1979;37(6):317-25.

44.     In 1979, "Electron Spin Resonance Study of the Role of NO*Catalase in the Activation of Guanylate Cyclase by NaN3 and NH2OH Modulation of Enzyme Responses by Heme Proteins and Their Nitrosyl Derivatives" was published by Patricia

A. Craven, Frederick R. DeRubertis, and David W. Pratt, The Department of Medicine, Veterans Administration Hospital and University of Pittsburgh, Pittsburgh, Pennsylvania, and Department of Chemistry, University of Pittsburgh.

45.    In 1980, "Cyclic GMP Metabolism in Macrophages I. Regulation of Cyclic GMP Levels by Calcium and Stimulation of Cyclic GMP Synthesis by NO-Generating Agents" was published by Yael Bromberg and Edgar Picky of Section of Immunology, Department of Human Microbiology, Sackler School of Medicine, Tel Aviv University, Tel Aviv, Israel.

46.    In 1985, "Odorant-sensitive Adenylate Cyclase May Mediate Olfactory Reception" was Published by Umberto Pace, Emanuel Hanski, Yoram Salomon & Doron Lancet of Department of Membrane Research and Department of Hormone Research, Weizmann Institute of Science, Rehovot Israel 76100.

47.    In 1986, "Cross-linking of Atrial Natriuretic Peptide to Binding Sites in Rat Olfactory Bulb Membranes" was published by Gary M. Wildey and Christopher C. Glembotski of Department of Pharmacology, School of Medicine, University of Pennsylvania, Philadelphia, Pennsylvania 19104.

48.    In 1987, "A Kinetic Study on Functional Impairment of Nitric Oxide-Exposed Rat Erythrocytes" was published by Nobuji Maeda, Kazuhiko Imaizumi, Kazunori Kon, and Takeshi Shiga of Department of Physiology, School of Medicine, Ehime University, Shigenobu, Onsen-gun, Ehime, Japan 791-02.

49.    In 1987, "Atrial Natriuretic Factor Stimulates Luteal Guanylate Cyclase" was published by L.T. Budnik, B. Brunswig and A.K. Mukhopadyay of Institute for Hormone and Fertility Research, Hamburg, F.R.G..

13

50.     In 1987, "Localization of Specific Binding Sites for Atrial Natriuretic Factor in the CNS of Rat, Guinea Pig, Cat and Human" was published by Christopher R. Mantyh, Lawrence Kruger, Nicholas C. Brecha and Patrick W. Mantyh at Center for Ulcer Research and Education, VA Medical Center Los Angeles, and Department of Anatomy and Brian Research Institute, UCLA School of Medicine.

51.     In 1987, "Regulation and Role of Guanylate Cyclase cyclic GMP in Vascular Relaxation" was Published by Murad F, Waldman S, Molina C, Bennett B, Leitman D. in Progress Clinical Biology Research.

52.     In 1987, "ATP-Mn2+ Stimulates the Generation of a Putative Mediator of Insulin Action" was published by scientists in Japan and University of Virginia.

53.     In 1988, "Nitric Oxide, a Cytotoxic Activated Effector of Macrophage" was published by VA Medical Center, Department of Medicine and Division of Infectious Diseases University of Utah.

54.     In 1988, "The Discovery of Nitric Oxide as Endogenous Nitrovasodilator" was published by The Wellcome Research Laboratories, Beckenham, Kent, UK.

55.     In 1988, "Mammalian Synthesis of Nitrite, Nitrate, Nitric Oxide, and N-Nitrosating Agents" was published in Chemical Research Toxicology.

56.     In 1988, "Macrophage Oxidation of L-Arginine to Nitrite and Nitrate: Nitric Oxide is an intermediate" was published in Biochemistry.

57.     In 1989, "Endothelium-derived Nitric Oxide: Pharmacology and Relationship to the Actions of Organic Nitrate Esters" was published in Pharmacology Research.

58.　In 1989, "Does the Olfactory System Mediate Water- and Mineral-Regulating Mechanisms? Evidence of Immuno-reactive Atrial Natriuretic Factor Within Olfactory Mucosa" was published by Laboratory of Biochemistry of Hypertension and J.A. de Seve Laboratory of Molecular Endocrinology, Clinical Research Institute of Montreal, Montreal, Quebec, Canada.

59.　In 1989, "Human Atrial Natriuretic Peptide Receptor Defines a New Paradigm for Second Messenger Signal Transduction" was published by Genentech, Inc. and Departments of Pharmacology and Molecular Physiology and Biophysics, and The Howard Hughes Medical Institute, Vanderbilt University School of Medicine, Nashville, TN.

60.　In 1989, the "Second Messenger Role for Nitric Oxide Widens to Nervous and Immune Systems" was published in Trends in Pharmacological Sciences including Toxicological Sciences by Joe Collier and Patrick Vallance, Department of Pharmacology and Clinical Pharmacology, St. George's Hospital Medical School, London, UK.

61.　In 1990, "Control of Coronary Vascular Tone by Nitric Oxide" was published from the University of Dusseldorf, Physiologisches Institut I, F.R.G.

62.　In 1990, "Guanylate Cyclase in Olfactory Cilia from Rat and Pig" was published by J. E. Schultz, Pharmazeutisches Institut, Morgenstelle 8, D-7400 Tubingen, F.R.G.

63.　In 1990, "Haem-Dependent Activation of Guanylate Cyclase and Cyclic GMP Formation by Endogenous Nitric Oxide: A Unique Transduction Mechanism for

Transcellular Signaling" was published by Department of Pharmacology, UCLA School of Medicine, Center for the Health Sciences, Los Angeles, California 90024-1735.

64.    In 1990, "Inhibition of Nitric Oxide Synthase Blocks N-methyl-D-aspartate-, Quisqualate-, Kainate-, Harmaline-, and Pentylenetetrazole-dependent Increases in Cerebellar cyclic GMP in vivo" was published in Journal of Neurochemistry.

65.    In 1990, "Loss of Dompanine Receptors in the Olfactory Bulb of Patients with Alzheimer's Disease" was published in Brain Research Department of Biological Psychiatry, University of Psychiatry Clinic, University of Groningen, Groningen, the Netherland.

66.    In 1990, "Manganese and alcium Efflux Kinetics in Brain Mitochondria Relevance to Manganese Toxicity was published by Claire E. Gavin, Karlene K. Gunter and Thomas E. Gunter, University of Rochester Medical Center, Rochester, NY 14642.

67.    In 1990, "NO (Nitric Oxide), a Hormonally Active Substance" was published in Medical Monastsschr Pharmacology in Germany.

68.    In 1990, "Olfactory Transduction: Cross-Talk between Second-Messenger Systems" was published by Robert R. H. Anholt and Ann M. Rivers, Department of Neurobiology, Duke University Medical Center, Durham, North Carolina 27710.

69.    In 1990, "Predominant Localization in Glial Cells of Free L-arginine. Immunocytochemical evidence" was published in Osaka Japan.

70.    In 1990, "Rapid Kinetics of Second Messenger Formation in Olfactory Transduction" was published by H. Breer, I. Boekhoff & E. Tareilus, University Stuttgart-Hohenheim, Institute of Zoophysiology, 7000 Stuttgart 70, F.R.G.

71.     In 1990, "Sensory Neurotoxicology: Use of the Olfactory System in the Assessment of Toxicity" was published by Lloyd Hastings from Department of Environmental Health, University of Cincinnati Medical School, Cincinnati, OH.

72.     In 1990, "The Guanylyl Cyclase Receptor Family" was published in New Biology.

73.     In 1990, "The Polyamines, Spermine and Spermidine, Negatively Modulate N-Methyl-D-Aspartate (NMDA) and Quisqualate Receptor Mediated Responses in vivo: Cerebellar Cyclic GMP Measurements" was published by Tadimeti S. Rao, Julie A Cler, Erwin J. Oei, Mark R. Emmett, Steve J. Mick, Smriti Iyengar and Paul L. Wood, CNS Diseases Research, G. D. Searle & Co. 700 Chesterfield Village Parkway, St. Louis, MO 63198, USA.

74.     In 1991, "Effect of Exogenous and Endogenous Nitric Oxide on Mitochondrial Respiration of Rat Heptocytes" was published by University of Pittsburgh and Cornell University.

75.     In 1991, "Evidence for the Presence of L-arginine in the Glial Components of the Peripheral Nervous System" was published in Japan.

76.     In 1991, "Evidence for Atrial Natriuretic Peptide (ANP) Synthesis and the Presence of ANP-Transducing Receptors in the Rat Olfactory Bulb" was published by Laboratory of the Biochemistry of Hypertension, Laboratory of Molecular Pathophysiology, Laboratory of Molecular Genetics, J.A. de Seve Laboratory of Molecular Neuroendocrinology, Clinical Research Institute of Montreal, Quebec.

77.     In 1991, "Olfactory Primary Neurons as a Route of Entry for Toxic Agents

into the Central Nervous System" was published by Hastings L, Evans JE. Neurotoxicology. 1991 Winter;12(4):707-14.

78.    In 1991, "Olfactory Bulb Dopamine Receptors May Be Located on Terminals of the Olfactory Nerve" was published by University of Cincinnati College of Medicine, Cincinnati, OH.

79.    In 1992, "NO., CO and 'OH Endogenous soluble guanylyl cyclase-activating factors" was published Harald H.H.W. Schmidt at Northwestern University Medical School Department of Pharmacology in Chicago, IL.

80.    In 1992, "Molecular Messengers of Olfaction" was published by Gabriel V. Ronnett and Solomon H. Snyder, The Johns Hopkins University School of Medicine Department of Neuroscience Pharmacology and Molecular Sciences and Psychiatry.

81.    In 1993 alone, Nitric Oxide was credited as "**Ubiquitous messenger**" for neurotransmitters and hormones and immune factors in human physiological systems signal transduction and regulation encompassing multiple organs, tissues, and cells.

82.    In 1994, Nobel Prize in Physiology or Medicine was awarded jointly to Alfred G. Gilman and Martin Rodbell for their discovery of G- proteins and the role of these proteins in signal transduction in cells, see Nobel Prize press release 10/1994.

83.    In 1998, Nobel Prize in Physiology or Medicine was awarded the medical scientists who have jointly discovered function of Nitric Oxide to Robert F. Furchgott, Louis J. Ignarro and Ferid Murad for their discoveries concerning nitric oxide as a signaling molecule in the cardiovascular system, see Nobel Prize press release 10/1998.

84.     In 2000, "A Vertebrate Globin Expressed in the Brain" was published by Thorsten Burmester, Bettina Weich, Sigrid Reinhardt & Thomas Hankeln Institutes of Zoology, Molecular Genetics, Biosafety Research and Consulting, and Physiological Chemistry, Johannes Gutenberg University Mainz, D-55099 Mainz, Germany.

85.     In 2002, "Hemin Induces Neuroglobin Expression in Neural Cells" was published by Yonghua Zhu, Yunjuan Sun, Kunlin Jin, and David A. Greenberg Blood. 2002;100:2494-2498).

86.     In 2003, "Neuroprotection and the Role of Neuroglobin" was published by Daniel J Garry, Pradeep P A Mammen Departments of Internal Medicine (DJG, PPAM) and Molecular Biology (DJG), University of Texas Southwestern Medical Center, Dallas, TX 75390.

87.     In 2003, "Oxidative Damage in the Olfactory System in Alzheimer's Disease" was published by George Perry, Rudy J. Castellani, Mark A. Smith, Peggy L. R. Harris, Zvezdana Kubat, Kasra Ghanbari, Paul K. Jones, Giovanni Cordone, Massimo Tabaton, Benjamin Wolozin, Hossein Ghanbari Acta Neuropathol (2003) 106 : 552–556.

88.     The above "relevant and material" prior art illustrates the extent of public interest but does not cover subject matter in depth without formal discovery.

89.     With the waiver in hand 7/11/1995, Ethyl resumed market monopoly to replace leaded gasolines and set off entrapment and endangerment for public health and forever altered pharmaceutical industry (i.e., has anyone heard of blue bill for erectile dysfunction?  And new discovery of blue bill also worked on heart disease and high blood pressure?   This is just one obvious example Nitric Oxide of Reactive

Nitrogen Species targeted on and interfered with cGMP Cyclase family).  In this case, all of Emergency near death conditions California ER physicians (including Regional Poison Control) could not explain without any proper diagnosis and treatment can be explained with proof of medical scientific evidences in the subject matter of 517 patent and extension of 517 patent by the persons skilled in the same art.

90.   With the waiver in hand since 7/11/1995, Ethyl expanded market monopoly by filing PCT application.  The subject matter of 517 patent has expanded to jet fuels and diesel fuels from gasolines.

91.   Nitric Oxide is a mediator regulating central and peripheral body temperature of living human beings published by E. Simon in Amino Acid in 1998 and by Rüdiger Gerstberger in 1999.  Whether Nitric Oxide causing spikes of environmental temperature is a distinct and separate subject matter for others to explore.

92.   It has always been the public belief that the rule of law cannot be selectively enforced in genuine Democracy regardless of political connection and financial resources.  A patent application filed in 10/30/1990 (Issued as US/5,869,266) entitled "Human Olfactory Neuron Cultures to Diagnose Alzheimer's Disease" assigned to the United States of America as represented by the Department of Health and Human Services, Washington, D.C. demonstrated National Public Health Policy Priority in determination of relationship of Alzheimer's disease and Olfactory Neurons in 1990. The subject matter of 517 patent disclosed and claimed Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrate propellant materials having Manganese-[N-(COOR)3] in gasolines has used the "odor of -COOR" to open the Olfactory Receptors in Olfactory

Neurons through Olfactory Bulb to deliver compositions which including but not limited to Nitric Oxide of Reactive Nitrogen Species and Manganese which have been **targeted and interfered** with every single electron respiratory chain of mitochondria; **targeted and interfered** with the second messenger systems of cAMP and cGMP cyclase families; **targeted and interfered** with any enzymes which are depending upon the precise amount of Manganese to sustain living human beings physical activities.

93.     Ethyl used fraud and inequitable conduct to secure the waiver by splitting apart of disclosed and claimed fuel additives composition of Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrite propellant materials having Manganese-[N-(COOR)3] in gasolines in replacement of leaded gasolines but **ONLY** left MMT quantity per gallon as "**Subject Matter**" when applied for the waiver.  The fraud and inequitable conduct in obtaining 517 patent 4/4/1978 and fuel additives waiver 7/11/1995 were knowing and deliberate in light of mounting scientific evidences from 1940s to 1995.

### III. Ethyl Used Fraud and Inequitable Conduct Secured US/5,113,803 and Disclosed and Claimed Thermal Decompositions of Gasoline Fuel Additives Directly Caused My Permanent Injuries

94.     Immediately after filing 517 patent application 12/15/1975, a publication entitled "Biological Effects of Auto Emissions. I. Exhaust from Engine with and without Catalytic Converter" was published in Journal of Toxicological Environmental Health, 1976 May;1(5): 705-12.   This publication used animal study to demonstrate relevancy and materiality of Catalytic Converter on Carbon Monoxide.

95.     517 patent produces substantial amount of Nitric Oxide than Carbon Monoxide, a known art to persons skilled in the same art in the 1950s-1960s.

96.    4/1/1991, Ethyl filed another patent application entitled "Reduction of NOx Emissions from Gasoline Engines."    It was issue 5/19/1992 as US/5,113,803 (hereinafter "803" patent).

97.    Ethyl, as persons skilled in the same art, knew Nitric Oxide of Reactive Nitrogen Species was not Nitrogen Dioxide or Nitrous Oxide.

98.    803 patent acknowledged substantial Nitric Oxide as internal combustion engine production gas and labeled it as "Engine Out" and "Exhaust Out" NOx gases. 803 patent was in startle contrast with 517 patent by which all 25 claims were knowingly and deliberately avoided the NO donor of {N-(COOR)3} and reduction of NO-donors.

99.    Between 12/15/1975 to 5/19/1992, Ethyl, as persons skilled in the same art, knew Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrate propellant materials having Manganese-[N-(COOR)3] in gasolines in replacement of leaded gasolines would produce substantial amount of Nitric Oxide of Reactive Nitrogen Species and Manganese served as transition metal.

100.    Prior art demonstrated interaction of Nitric Oxide with Hemoglobin of red blood cells and Myoglobin of heart cells and Skeletal Muscle Mitochondria in 1960s.

101.    Prior art demonstrated kinetics of Nitric Oxide with Hemoglobin was at least 1,500 times faster than that of carbon monoxide in 1957.

102.    Without disclosing prior art to US Patent and Trademark Office pursuant to Rule 56 and 35 U.S.C. §§102 & 103 in 517 patent, 803 patent by incorporation of 517 patent as reference demonstrated Ethyl's intent to reduce the Nitric Oxide from engine out and exhaust out by lumping Nitric Oxide of Reactive Nitrogen Species to NOx

22

without scientific proof and technological validation and without an enabling three-way catalytic converter monitoring Nitric Oxide, Carbon Monoxide, and Hydrocarbon when 803 patent was issued 5/19/1992.

103.   In fact, the first embodiment of "Three Way Catalytic Converter" with Nitric Oxide "Engine Out" gas monitoring utility was patented and issued to Daimler-Benz AG as US/5,457,958 in 1995 (see #23 in search results in US Patent databases for: ACLM/"three way catalytic converter" AND ACLM/nitrogen: produce 31 patents).

104.   In fact, the first embodiment of "Three Way Catalytic Converter" with Carbon Monoxide and Nitric Oxide and Hydrocarbon monitoring utility was patented and issued to Hitachi America Ltd. as US/5,457,958 in 1995 (see #4 in search results in US Patent databases for: ACLM/"three way catalytic converter" AND ACLM/"nitric oxide": produce 4 patents).

105.   In absence of any enablement of "Three Way Catalytic Converter" monitoring nitric oxide, carbon monoxide, and hydrocarbon in the market place pursuant to 35 U.S.C. §§102, 103 & 112, 803 patent entitled "Reduction of NOx Emissions from Gasoline Engines" was issue 5/19/1992.

106.   803 patent incorporated 517 patent as reference in segment of "13" bottom line of same page.

107.   803 patent demonstrated Ethyl corporate knowledge and intent of reduction of Nitric Oxide "engine out" and "exhaust out" when disclosed and claimed Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent was in composition with thermal decomposition of Organic Nitrate propellant materials having Manganese-[N-(COOR)3] in gasolines to replace leaded gasolines.  Manganese served

as transition metal and antiknock quantities of other agents such as "cyclopentadienyl nickel nitrosyl," "N-methyl aniline," and the like were also enclosed (see segment 4 second paragraph of 517 patent).

108.    In absence of any patented embodiment of "Three Way Catalytic Converter" monitoring nitric oxide, carbon monoxide, and hydrocarbon in the market place, what has made 803 patent plausible and conceivable pursuant to 35 U.S.C. §§102 & 103 & 112 as to how Ethyl disclosed and claimed by using more MMT to reduce NOx emissions in gasoline engines is an issue of facts for a unbiased jury.

109.    US EPA never regulates consumer mobile source Nitric Oxide of Reactive Nitrogen Species according to EPA website public information.

110.    In fact, Nitric Oxide sensor monitoring mobile source emission was patented in 1993-1995 but never made it to market place after Ethyl secured the waiver 7/11/1995.  See US/5,418.366, US/5,426,934, US/5,457,958, and US/5,545,897.

111.    In ambient air, Oxygen counts about 21% and Nitrogen counts about 78%. 803 patent relied upon a 1979 publication entitled "Catalysis of NO Decomposition by Mn3O4" and the (discussion) of said publication speaks volume in regard to application of Mn3O4 in real automotive combustion and emission conditions.

112.    In ambient air, Nitric Oxide of Reactive Nitrogen Species does not need chemical or biological carrier to entering the living human beings via cutaneous exposure (see The Epidermis and Cyclic AMP published in 1974; Cyclic GMP System in Epidermis: I. Effect of Ischemia and Cyclic GMP System in Epidermis: II. Histamine Stimulates Cyclic GMP Formation were published in 1979; Adenyl Cyclase in Human Hair Follicles 1970) and inhalation exposure (see "Primary Structure and Functional

24

Expression of a Cyclic Nucleotide-activated Channel from Olfactory Neurons) was published by Ravinder S. Dhallan, King-Wai Yau, Karen A. Schrader & Randall R. Reed Department of Biomedical Engineering, Department of Neuroscience, Department of Molecular Biology and Genetics, The Howard Hughes Medical Institute, Johns Hopkins University of Medicine, Baltimore, MD 21205 in 1990.

113.    Nitric Oxide is water soluble.  The half life of Nitric Oxide remains stable in water for about 20 some minutes.   Only the heme protein(s) make Nitric Oxide disappear faster in **a few seconds** of time (see "Half-life of nitric oxide in aqueous solutions with and without haemoglobin" was published in Physiology Measurement in 1996 and stated "Hb may be used as a tool to quantitate NO release in some biological assays).   See also "Protein thiol modification and apoptotic cell death as cGMP-independent nitric oxide (NO) signaling pathways" was published in Reviews of Physiology, Biochemistry, and Pharmacology in 1996.   ***None of "Relevant and Material" prior art was utilized as clinical indices, as the undersigned near death conditions were turned away by California ER physicians and Regional Poison Control when blood workup and MRI films were screaming NO and Manganese Poisonings after Bridgestone/Firestone repossessed the "refitted engine by Honda."

114.    Lumping Nitric Oxide of Reactive Nitrogen Species to NOx without scientific proof and technological validation under real automobile gas combustion and emission condition in ambient air is improper in light of proof of medical, patho-physiological, and pharmacological effects targeting on and interfering with living human beings.   The irreversible damage of Cytochrome c Oxidase of haem proteins and Neuroglobin with overflowing Manganese ions in Mitochondria warrants legal and

factual assessment of banning the subject matter of 517 patent and extension of 517 patents.

115.   803 patent was applied and issued in 1991-1992 when EPA denied the waiver twice in 11/1/1990 and 1/8/1992. In order to avoid government and public scrutiny in light of mounting scientific evidences, Ethyl split apart of MMT in composition with thermal decomposition of Organic Nitrate having Manganese-[N-(COOR)3] in gasolines and **Only** left MMT quantification per gallon alone as "**Subject Matter**" for the waiver.  Ethyl knowingly and purposely misled the regulatory and public scrutiny in 517 and 803 patents in violation of 35 U.S.C. §§102 & 103 & 112 and Patent Rule 37 C.F.R. § 1.56 and 42 U.S.C. §7545.

116.   After Ethyl secured the waiver 7/11/1995, market monopoly was resumed through PCT applications in absence of regulatory and public scrutiny which was protected by the rule of law of Patent, Environment, Antitrust, and Product Liability.

117.   803 patent argued without independent scientific proof and technological validation that the more MMT, the better reduction of NOx emissions in gasoline engines.   Manganese is essential metal to sustain living human beings physical activities.  Vast majority of enzymes in human living cells require a precise amount of Manganese ion to sustain physical activities.   Manganese supplement is required for prescription and overdoses of Manganese have been reported (see "Massive intravenous manganese overdose due to compounding error: minimal role for hemodialysis" published in Clinical Toxicology, Vol 54, No.6, Pg 523-525, 2016, by ER of NYU School of Medicine).   Manganese **Bi-phasic** effects on human enzymes have

never been held by any clinical trials.  The competition of Manganese ions with Calcium and Magnesium ions in living human cells raises another issue of "relevant and material" facts that the more MMT, the better reduction of NOx in gasoline engines.

### IV. Ethyl Employed Fraud and Inequitable Conduct Secured US/5,679,116 and Disclosed and Claimed Thermal Decompositions of Gasoline Fuel Additives Directly Caused My Permanent Injuries

118.    Once Ethyl secured the waiver by splitting up the disclosed and claimed composition by fast tracking the MMT as replacement of leaded gasolines since 7/11/1995, a patent application entitled "Compositions for Control of Induction System Deposits" was filed and issued as US/5,679,116 (hereinafter the "116" patent).

119.    116 patent was filed 4/9/1996 and issued 10/21/1997.

120.    116 patent was Ethyl first intent to declare the NO-donors.

121.    Ethyl have knowingly and deliberately avoided declaration of NO donors from all of claims of {N-(COOR)3} in 517 and 803 patents before the waiver 7/11/1995.

122.    After the waiver, NO-donors in 116 patent were Polyamine and Amine to replace the {N-(COOR)3} (see search results in US Patent databases for: ACLM/ polyamine AND ACLM/ "methylcyclopentadienyl manganese tricarbonyl" produce 5 patents and ACLM/amine AND ACLM/"methylcyclopentadienyl manganese tricarbonyl" produce 7 patents).  The 12 patents were assigned to either Ethyl or Afton.

123.    Since Ethyl has already secured the waiver with respect to MMT (Manganese quantity per gallon) in 7/11/1995, any NO-donor substitution of {-[N-(COOR)3] } by Polyamine and Amine in composition with Methylcyclopentadienyl manganese tricarbonyl (MMT) as antiknock agent or detergent in gasolines have escaped regulatory and public scrutiny under the rule of law.

124.   In 1962, "The Pathogenesis of Parkinson's Disease: A New Hypothesis" was published by ANDRE BARBEAU, M.D., F.R.C.P.[C],* Montreal and in the conclusion of the paper author stated "It appears that the **cerebral amines** are somehow involved in the proper functioning of the "extra-pyramidal motor system.'"

125.   In 1970, "Dopamine and Diseases" was published by Andrji Barbeau, M.D., F.R.C.P.[CI, Montreal, Canada).

126.   In 1972, "Effect of a Magnesium-deficient Diet on the Striatal Content of Amines in the Dog" was published by Barbeau A, Rojo-Ortega JM, Brecht HM, Donaldson J, Minnich J, Genest J. (Note: Manganese ion competes with Magnesium ion and Calcium ion in some not all of physiological cellular activities, and for some enzymatic activities, the competition has bi-phasic effects).

127.   In 1972, "Cardiovascular Effects of Dopamine: Physiopathogenic Implications of the Regulation of Arterial Tension" was published by Cuche JL, Kuchel O, Barbeau, A, Boucher R. Genest J.

128.   In 1972, "Changes in Regional Concentrations of Cerebral Monoamines Induced by Angiotensin" was published by Minnich JL, Donaldson J, Barbeau A. Union Med Can. 1973 Apr;102(4):903-6 (Note: endogenous source Nitric Oxide and Angiotensin are interrelated).

129.   In 1975, "Uptake and Release of C14-Dopamine in Platelets of Normal Subjects and in Patients with Parkinson's Syndrome" was published by Campanella G, Yamada K, Butterworth R, Barbeau A. Riv Patol Nerv Ment. 1974 Oct;95(5):653-61.

130.   In 1975, "Uptake and Efflux of 14-C-Dopamine in Platelets: Evidence for a Generalized Defect in Parkinson's Disease" was published by Barbeau A, Campanella G, Butterworth RF, Yamada K. Neurology. 1975 Jan;25(1):1-9.

131.   In 1975, "A Reliable Method for Simultaneous Estimation of Dopamine, Noradrenaline and Serotonin in Discrete Area of Brain" was published by Butterworth RF, Landreville F, Guitard M, Barbeau A. Clin Biochem. 1975 Oct;8(5):298-302.

132.   In 1976, "Parkinson's Disease: Etiological Considerations" was published by Barbeau A. Res Publ Assoc Res Nerv Ment Dis. 1976;55:281-92.

133.   In 1977, "Role of Dopamine in Regulation of Arterial Pressure and Sodium Excretion, Physiopathological and Clinical Implications was published by Kuchel O, Buu NT, Faucheux B, Unger T, Barbeau A, Nowaczynski W, Genest J. Union Med Can. 1977 Apr;106(4):507-18.

134.   In 1984, "Manganese and Extrapyramidal Disorders (A Critical Review and Tribute to Dr. George C. Cotzias) was published by Barbeau A. Neurotoxicology. 1984 Spring;5(1):13-35. [Note: Both Dr. Barbeau (Canada) and Dr. Cotzias (USA) have deceased in 1985 and 1977 respectively].

135.   In 1984, "Neurotoxicology of Manganese. Clinical and Experimental Advances. Dedicated to Dr. George C. Cotzias June 16, 1918-1977 was published [No authors listed] Neurotoxicology. 1984 Spring;5(1):1-132.

136.   In 1985, "The Specific Vulnerability of the Substantia Nigra to MPTP is Related to the Presence of Transition Metals" was published by Poirier J, Donaldson J, Barbeau A. Biochem Biophys Res Commun. 1985 Apr 16;128(1):25-33.

137.    In 1986, "MPTP: A Neurotoxin Relevant to the Pathophysiology of Parkinson's Disease.  The 1985 George C. Cotzias Lecture was published by Snyder SH, D'Amato RJ. Neurology. 1986 Feb;36(2):250-8. Review.

138.    In 2013, a review article entitled "Pharmacological potential of biogenic amine–polyamine interactions beyond neurotransmission" was published by F Sánchez-Jiménez, M V Ruiz-Pérez, J L Urdiales and M A Medina, Departamento de Biología Molecular y Bioquímica, Facultad de Ciencias, Campus de Teatinos, Universidad de Málaga, Málaga, Spain, and Centro de Investigación en Red de Enfermedades Raras (CIBERER), Valencia, Spain.

139.    The "Relevant and Material" prior art in 1962-2013 illustrates the extent of public interest in Monoamine and Polyamine.  In PUBMED databases, search term of polyamine and amine as biogenic amines yields <u>hundreds of thousands</u> of scientific works dedicated to this subject matter.  But, once the waiver was obtained on MMT, Polyamines and Amines were in composition with MMT as antiknock agent or detergent in gasolines escaped regulatory and public scrutiny under the rule of law.

140.    In 1995, "Inhibition of Cytochrome c Oxidase in Turnover by Nitric Oxide: Mechanism and Implications for Control of Respiration" was published in Biochem J.

141.    In 1995, "Nitric Oxide Regulates Mitochondrial Respiration and Cell Function by Inhibiting Cytochrome Oxidate" was published in FBES Letters.

142.    In 1995, "Nitric Oxide Signaling in Ischemic Heart" was published in Cardiovascular Research.

143.    In 1996, "Nitric Oxide — A Retrograde Messenger for Carbon Monoxide Signaling in Ischemic Heart" was published in Molecular and Cellular Biochemistry.

144.   In 1996, "Nitric Oxide and Peroxynitrite Exert Distinct Effects on Mitochondrial Respiration Which Are Differentially Blocked by Glutathione or Glucose" was published in Biochem J.

145.   In 1997, "Nitric Oxide Mediated Mitochondrial Damage: A Potential Neuroprotective Role for Glutathione" was published in Free Radical Biology and Medicine.

146.   In 1997, "A method for Measuring Nitric Oxide Radical Scavenging Activity. Scavenging Properties of Sulfur-containing Compounds" was published in Pharmacy World & Science.

147.   116 patent was issued 10/21/1997 without compliance with 35 U.S.C. §§102 & 103 & 112 and Patent Rule 37 C.F.R. § 1.56 in public interest on patentability.

## V. Ethyl (Renamed as Afton) Employed Fraud and Inequitable Conduct to Secure US/7,553,343, US/8,715,373, US/8,734,540, and US/8,852,298 and Disclosed and Claimed Thermal Decompositions of Gasoline Fuel Additives Directly Caused My Permanent Injuries

148.   116 patent thereafter incorporated as reference to PCT application which was issued as US/7,553,343 to Afton Chemical Corporation (hereinafter "Afton").

149.   Legal issues by splitting apart the disclosed and claimed composition of Manganese-[N-(COOR)3] in gasolines remain with Afton and Ethyl and Newmarket.

150.   Afton procured US/7,553,343, US/8,715,373, US/8,734,540, and US/8,852,298 from benefits of 517 and 803 patents and from the benefit of waiver without regulatory and public scrutiny.

151.   Both US/8,715,373 and US/8,734,540 entitled "Fuel composition comprising a nitrogen-containing compound" incorporated 803 and 116 patents as references.  803 patent incorporated 517 patent as reference.  For laypersons who are

not persons skilled in the same art, it means nothing.   But, for persons skilled in the same art, fraud and inequitable conduct have been committed when purpose of splitting apart of disclosed and claimed composition in 517 and 803 patents was to escape regulatory and public scrutiny under the rule of law with affirmative intent to dominate market monopoly by replacement of leaded gasolines.

152.   US/7,553,343 (hereinafter "343" patent) entitled "Fuels Compositions for Direct Injection Gasoline Engines Containing Manganese Compounds" was filed in 12/12/2000 and issued 6/30/2009.   This was PCT patent application by designation of United States as one of the selected countries.

153.   343 patent directed to fuel injection gasoline engine (vs multi-port conventional engine).

154.   343 patent disclosed and claimed gasoline fuel compositions.

155.   In claims 13 and 26 of 343 patent, antiknock additives were incorporated in 343 patent.   Ethyl deliberately omitted the composition(s) of antiknock additives and deliberately omitted which patent was incorporated as reference to said antiknock additives.   Indeed, 517 patent is the most relevant patent on the list of antiknock additives assigned to Ethyl (see search results in US Patent databases for: AN/ethyl AND ACLM/antiknock: produce 18 patents and for: AN/afton AND ACLM/antiknock: produce 9 patents).   The legacy of Methylcyclopentadienyl manganese tricarbonyl (MMT) as anti knock agent in composition with thermal decomposition of Organic Nitrate propellant materials having Manganese-[N-(COOR)3] in gasolines which may also contain antiknock quantities of other agents such as "cyclopentadienyl nickel

nitrosyl," "N-methyl aniline," and the like (see segment 4 second paragraph of 517 patent) carried over into 343 patent.

156.    343 patent employed amines and polyamines and succinic derivatives by Mannich Reaction to produce Nitril- or Nitro- Manganese compositions as fuel detergent.   Mannich Reaction is a known art for Product-by-Process claims ("Product by Process claims see USPTO agency's determination which has affirmed by courts). What is important to the subject matter is the product(s) of said process having duo-functionality to living human beings. It is the duty of inventors, assignees, and legal representatives of inventors and assignees to disclose the duo-functionality pursuant to Rule 56, 35 U.S.C. §§102, 103 & 112, and 42 U.S.C. §7545.

157.    In 1970, Dopamine and Diseases was published by Andrji Barbeau, M.D., F.R.C.P.[CI, Montreal, Canada).

158.    Dopamine is polyamine.   The amine and polyamine basic knowledge for general public is linked here: https://en.wikipedia.org/wiki/Biogenic_amine

159.    N-aminosuccinmides could have become fungicide in Agriculture but was banned because of toxicity in kidney and neurological effects (see "Synthesis and anticonvulsant evaluation of N-aminosuccinimides" was published in Journal of Pharmacological Science in 1984).   "New antiepileptic drugs: molecular targets" was published in 2009 stated "In the past 20 years, a number of new antiepileptic drugs (AEDs) have been introduced and other molecules are in development, some of which are advantageous in terms of pharmacokinetics, tolerability and potential for drug interactions. These drugs are regarded as second generation compared to older agents such as barbiturates, phenytoin, carbamazepine, ethosuximide and valproic acid.

Although some of these second generation compounds may be advantageous in terms of kinetics, tolerability and potential for drug interactions, **all of them** still target <u>voltage-gated channels or GABA-mediated inhibition</u>, predominantly, without any real improvement in epilepsy therapy."

160. Nitric Oxide of Reactive Species targets voltage gated channels in all living human beings regardless of thermal decomposition of NO-donors are from Organic Nitrate ethyls or amines and polyamines and succinimide derivatives (see Ethyl's patent US/6,548,458, see also "Nitric Oxide Decreases [Ca2+] in Vascular Smooth Muscle by Inhibition of the Calcium Current" published in 1994 and "Modulation of Ion Channels in Rod Photoreceptors by Nitric Oxide" published in 1994, two examples before the grant of waiver 7/11/1995 and "Oxidative Stress and Mitochondrial-mediated Apoptosis in Dopaminergic Cells Exposed to Methylcyclopentadienyl Manganese Tricarbonyl" published in 2002 and "Peroxynitrite Donor Impairs Excitability of Hippocampal CA1 Neurons by Inhibiting Voltage-gated Potassium Currents" published in 2007 and "An NADPH-Oxidase/Polyamine Oxidase Feedback Loop Controls Oxidative Burst Under Salinity" was published in 2016 and "The Effect of Nitric Oxide on Mitochondrial Respiration" published in 2019 after the grant of waiver 7/11/1995.

161. In this matter, the undersigned personal near death conditions and subsequent near death episodes after "oxygen treatment" confirmed the "Relevant and Material" prior art in NO/ONOO species in living human cells: see the following "Relevant and Material" prior art demonstrating the irreversible damages to living human beings:

(1)     1994 publication entitled "Inhibition of Mitochondrial Electron Transport by Peroxynitrite;"

(2)     1996 publication entitled "Superoxide Production by Mitochondria in the Presence of Nitric Oxide Forms Peroxynitrite;"

(3)     1997 publication entitled "Nitric Oxide-mediated Mitochondrial Damage in the Brain: Mechanisms and Implications for Neurodegenerative Diseases;"

(4)     1998 publication entitled "Nitric Oxide and Its Congeners in Mitochondria: Implications for Apoptosis;"

(5)     1998 publication entitled "Interaction of Peroxynitrite with Mitochondrial Cytochrome Oxidase;"

(6)     1998 publication entitled "Mitochondrial Creatine Kinase Is a Prime Target of Peroxynitrite-induced Modification and Inactivation;"

(7)     1998 publication entitled "Peroxynitrite and Brain Mitochondria: Evidence for Increased Proton Leak;"

(8)     1998 publication entitled "Pretreatment of Astrocytes with Interferon-a//3 Prevents Neuronal Mitochondrial Respiratory Chain Damage;"

(9)     1999 publication entitled "The Assumption That Nitric Oxide Inhibits Mitochondrial ATP Synthesis Is Correct;"

(10)    2000 publication entitled "Astrocyte-Derived Nitric Oxide Causes Both Reversible and Irreversible Damage to the Neuronal Mitochondrial Respiratory Chain;"

(11)    2000 publication entitled "Regulation of Mitochondrial Respiration by Oxygen and Nitric Oxide."

162.   US/8,852,296 (hereinafter "296" patent) was filed in 6/29/2006 and issued 10/7/2014 to Afton.  803 and 116 patents were incorporated as references in 296 patent. 517 was incorporated as reference in 803 patent.

163.   In 1992, a Minireview entitled "<u>NO., CO and 'OH Endogenous soluble guanylyl cyclase-activating factors</u>" was published by Harald H.H.W. Schmidt at Northwestern University Medical School Department of Pharmacology in Chicago, IL. A french publication entitled "<u>NO, thiols, and disulfides</u>" was published in 1993.  To persons skilled in the same art such as Ethyl, the prior art would have rendered 296 patent obvious in violation of 35 U.S.C. §§102 & 103 and Patent Rule 37 C.F.R. § 1.56.

164.   298 patent further affirmed Ethyl corporate knowledge and intent for decades of splitting up the disclosed and claimed fuel additives in composition with Methylcyclopentadienyl manganese tricarbonyl (MMT) to escape the regulatory and public scrutiny under the rule of law.  Ethyl's patents and the waiver have excluded market competition by lawful participants since 4/4/1978 and 7/11/1995.

165.   American Honda and Bridgestone/Firestone took care of 2005 Honda mobile source in order to resolve Bridgestone/Firestone primary liability to cause engine explosion.  As unity of gasoline fuels and hardware providers which are under federal and state regulations, the personal injuries amplified a year long exposure with near death conditions.  Does any consumer give the consent to Honda and Bridgestone/ Firestone to engine refitting under the risk of losing one's life?  The rule of law and Public policy appear to amiss the epicenter of mountains of evidences as fruition of decades of work with monumental recognitions by Nobel Prize Committee in 1971, 1994, 1998, and 2012 with a patent system for legal monopoly of market.

166.   The argument that the fuel additives are preempted by 42 USC 7545 is incorrect.   The subject matter has never been settled in the correct subject matter jurisdiction.   No diligence amounts to counsels' representation nor to anyone has done anything similar.   Even to the persons skilled in the same art, the scope of knowledge and expertise is insurmountable.   To ensure the justice is served by a unbiased jury under the rule of law, the undersigned moves to have all associated legal matter with all interested parties consolidated at US District Court Eastern District of California where and when the semi-truck driver of Markstein Beverage Company lost control and swiped stopped vehicle at traffic light intersection and this whole legal matter gradually uncovered since 10/10/2017.   The costs of public health is too heavy to worry about the undersigned personal destiny.   Unlike politicians who are swayed by left or right, our judicial branch must honor the independence of the system to right the wrongs in public interest.   This paper is sent to US District Courts where three verified complaints have been filed.   The undersigned still seeks court assistance for competent legal counsels at Federal Bar.

DATED: 07/08/2019
ATLANTA, GA 30360

RESPECTFULLY SUBMITTED,

BY:   _____

ANN ZHAI
4325 Hickory Wood Lane
Doraville, GA 30360
201-787-8788 (Mobile)

<u>AFFIDAVIT OF SERVICES</u>

I, Ann Zhai, plaintiff, duly sworn, state, and affirm under the penalty of perjury of United States law:

Three verified complaints have been filed at US District Court at Middle District of Tennessee, Eastern District of California, and Central District of California at Western Division of Los Angeles.

This paper comes after exhaustion of all efforts with diligent search for counsels across country at Personal Injury and Patent Bar. No one has done any case similar in gasoline fuel additives and no legal precedent to cite. Overcoming several episodes of near death conditions after oxygen treatment, I am helpless but turn to US EPA and USPTO for answers. I have made every effort to write this. The unity of gasoline fuels and the hardware cannot be separated. To ensure one jury with one verdict under the rule of law, I seek to consolidate at one jurisdiction at Eastern District of California where and when Markstein Beverage semi-truck delivery driver lost control and swipe the stopped vehicle at Red light 10/10/2017 and the whole legal matter is gradually uncovered. Three priority envelops contain three sets of verified complaints and this paper with tracking receipt provided by USPS on or about 7/10/2019.

DATED: 07/08/2019
ATLANTA, GA 30360

RESPECTFULLY SUBMITTED,

BY: _____

ANN ZHAI
4325 Hickory Wood Lane
Doraville, GA 30360
201-787-8788 (Mobile)



PRESS FIRMLY TO SEAL

**USPS** UNITED STATES POSTAL SERVICE

**Retail**

**P** US POSTAGE PAID
**$7.35**

Origin: 30336
08/04/19
1204650066-41

PRIORITY MAIL 2-DAY

1 Lb 10.00 Oz
1006

EXPECTED DELIVERY DAY: 08/10/19

C056

SHIP TO:
350 W 1ST ST
LOS ANGELES CA 90012-4536

USPS TRACKING NUMBER

9505 5104 2953 9220 3882 71

UNIT...
POST...

**PRIORI...**
**MAIL**

• Date of delivery specif...
• USPS TRACKING™ inc...
  international destinations.
• Limited international insurance.
• Pick up available.
• Order supplies online.
• When used internationally, a customs
  declaration label may be required.

To schedule free
Package Pickup,
scan the QR code.

PRIORITY
★ MAIL ★

**USPS** UNITED STATES POSTAL SERVICE

VISIT US AT USPS.COM®

FROM:  Ann Zhou
4325 Hickory Wood Lane
Doraville, GA 30360

TO:  Clerk Office
United States District Court of
Central District of California LA
350 W. 1st Street
Los Angeles CA 90012



**PRIORITY** MAIL

FLAT RATE ENVELOPE
ONE RATE ★ ANY WEIGHT